UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRANDI PRICE and
CHRISTINE CHADWICK,
on behalf of themselves and all other
similarly situated,

*Plaintiffs,*

vs.                                                    No. 1:17-cv-614 (LGS)

L'ORÉAL USA, INC. and
MATRIX ESSENTIALS LLC,

*Defendants.*

**PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT
OF UNDISPUTED MATERIAL FACTS UNDER LOCAL CIV. R. 56.1**

## PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT
## OF UNDISPUTED MATERIAL FACTS

**A.     The Challenged Products**

1.      In February 2013, Defendants launched a product line called Matrix Biolage Advanced ("MBA"). (Ex. 1, Deposition of Melissa Morris Bacallao, dated Oct. 30, 2017 ("Morris Oct. 2017 Tr.") at 22:14–18).

**Plaintiffs' Response:** Undisputed.

2.      L'Oréal developed the MBA brand as a "flanker" brand to the already existing Biolage line of haircare products. (*Id.* at 19:7–22, 46:8–47:11.).

**Plaintiffs' Response:** Undisputed.

3.      The MBA brand was meant to appeal to the consumer who liked the Biolage brand but felt she had more advanced hair needs. (*Id.* at 46:8–47:11.)

**Plaintiffs' Response:** Undisputed.

4.      The Matrix Biolage Advanced Keratindose system of shampoo, conditioner, and Pro-Keratin Renewal Spray (the "Products") is one of four "sub-modules" within the MBA line. (*Id.* at 19:23–20:9, 22:14–23:3.) The three other sub-modules – Fiberstrong, Repairinside, and Fulldensity – are similarly comprised of a shampoo, conditioner, and leave-in treatment. (Ex. 2, MTX_KTDS00000019.)

**Plaintiffs' Response:** Undisputed.

5.      Each of the MBA products indicates on its label the hair condition the sub-module is designed to address.  (*Id.*)

**Plaintiffs' Response:** Disputed as to the meaning of the phrases "Each of the MBA products" and "designed to address." Defendants' representative, Mary Soliman, testified that the **Keratin**dose Products are "rinse-off products. When you wash them off, they're gone. When you

reapply them, they're back. So it's not reforming your hair." Pltfs' Ex. 1, Soliman Deposition Transcript ("Soliman Tr.") at 32:2-5. Ms. Soliman further testified that the **Keratin**dose Products provide only "surface effects and, you know, they're chemical bonds. But they're not permanent chemical bonds that are being formed. So you're able to create the appearance of and bring back the ability to de-tangle a little bit easier. You're able to bring shine where dullness was present when the cuticles were raised. So you're able to, I would say, replenish and restore. But, again, it's not the kind of chemistry that is a permanent processing because it's surface chemistry." *Id.* at 33:17-25; 34:2-5.

Further, although L'Oréal sold the **Keratin**dose Shampoo, Conditioner and Renewal Spray (collectively referred to as a "trinome") separately, ████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████ *Id.* at 21:15-23; 125: 20-25; 126:2-16; 127:1-25; 128:8-25; 129:1-21. In fact, Ms. Soliman admitted that the claim of "overprocessed hair" was meant for the products working in the trinome, and not independently as a shampoo, conditioner or spray:

> Q. So the claim of overprocessed hair that we've been discussing, that's meant for the products working in the trinome?
>
> A. Correct.
>
> Q. Not for each one independently?
>
> A. Correct.

*Id.* at 26:10-17.

In addition, Plaintiffs' expert Dr. Mark Van Dyke opined that none of the ingredients in the **Keratin**dose Products "have the capability to recapitulate the native structure of keratin proteins in the human hair fiber." Pltfs' Ex. 2, Dr. Van Dyke Report ("Van Dyke Rpt.") at 6.

Further disputed as irrelevant and improper, as issues regarding efficacy of the **Keratin**dose Products, or "what the products do," are not at issue in this case. ECF Nos. 115, 118, 121, 124 and 127.

6.      As indicated on the labels, the Keratindose Products are designed to meet the needs of "overprocessed hair." (*Id.*; Ex. 1, Morris Oct. 2017 Tr. at 42:2–13.).

**Plaintiffs' Response:** Disputed as to the meaning of the phrase "designed to meet the needs." Defendants' representative, Mary Soliman, testified that the **Keratin**dose Products are "rinse-off products. When you wash them off, they're gone. When you reapply them, they're back. So it's not reforming your hair." Ex. 1, Soliman Tr. at 32:2-5. Ms. Soliman further testified that the **Keratin**dose Products provide only "surface effects and, you know, they're chemical bonds. But they're not permanent chemical bonds that are being formed. So you're able to create the appearance of and bring back the ability to de-tangle a little bit easier. You're able to bring shine where dullness was present when the cuticles were raised. So you're able to, I would say, replenish and restore. But, again, it's not the kind of chemistry that is a permanent processing because it's surface chemistry." *Id.* at 33:17-25; 34:2-5.

Further, although L'Oréal sold the **Keratin**dose Shampoo, Conditioner and Renewal Spray (collectively referred to as a "trinome") separately, ███████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████ *Id.* at 21:15-23; 125: 20-25; 126:2-16; 127:1-25; 128:8-25; 129:1-21. In fact, Ms. Soliman admitted that the claim of "overprocessed hair" was meant for the products working in the trinome, and not independently as a shampoo, conditioner or spray.

> Q. So the claim of overprocessed hair that we've been discussing, that's meant for the products working in the trinome?

A. Correct.

Q. Not for each one independently?

A. Correct.

*Id.* at 26:10-17.

And, ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████    *Id.* 70:16-25; 71:1-7.

In addition, Plaintiffs' expert, Dr. Mark Van Dyke, opined that none of the ingredients in the **Keratin**dose Products "have the capability to recapitulate the native structure of keratin proteins in the human hair fiber." Ex. 2, Van Dyke Rpt. at 6.

Further disputed as irrelevant and improper, as issues regarding efficacy of the **Keratin**dose Products, or "what the products do," are not at issue in this case. ECF Nos. 115, 118, 121, 124 and 127.

7.       Keratin is a protein that is found in human hair. (Plaintiffs' Amended Class Action Complaint, ECF No. 42 ("FAC") ¶ 3; *see also* Pltfs' Ex. 3, Deposition of Melissa Morris Bacallao, dated Sept. 7, 2018 ("Morris Sept. 2018 Tr.") at 48:14–24; 50:3–9; Pltfs' Ex. 4, Deposition of Christine Chadwick, dated July 26, 2017 ("Chadwick Tr.") at 52:20–23, 55:12–18; Pltfs' Ex. 5, Deposition of Brandi Price, dated July 27, 2017 ("Price Tr.") at 43:2–10.).

**Plaintiffs' Response:** Undisputed that keratin is a protein found in human hair. Disputed to the extent this reference implies that keratin is found only in human hair, and not in some haircare products. L'Oréal's own expert Nikola Cline testified that she worked with a hair care product named "KeraTriplex" that "specifically included keratin" as an ingredient. Pltfs' Ex. 6, Cline Deposition Transcript ("Cline Tr."), at 184:1-10.

8.      Overprocessed hair can result from chemical treatments undertaken at salons, which open the natural bonds within hair in order to change its color, shape, texture of the hair. (Ex. 1, Morris Oct. 2017 Tr. at 49:22–25; 50:10–51:4; Ex. 6, Deposition of Mary Soliman, dated June 14, 2018 ("Soliman Tr.") at 21:5–7.)

**Plaintiffs' Response:** Disputed as irrelevant and improper, as issues regarding efficacy of the **Keratin**dose Products, or "what the products do," are not at issue in this case. ECF Nos. 115, 118, 121, 124 and 127.

9.      These salon treatments can negatively affect "the protein capital of the hair – Keratin – that accounts for 85% of the hair itself," leaving the hair with a need to be restored. (Ex. 7, MTX_KTDS00000468 at 479-480.).

**Plaintiffs' Response:** Disputed as irrelevant and improper, as issues regarding efficacy of the **Keratin**dose Products, or "what the products do," are not at issue in this case. ECF Nos. 115, 118, 121, 124 and 127. Disputed as to the meaning of "restored"; as Ms. Soliman testified, the **Keratin**dose Products are "rinse-off products. When you wash them off, they're gone. When you reapply them, they're back. So it's not reforming your hair." Pltfs' Ex. 1, Soliman Tr. at 32:2-5. Ms. Soliman further testified that the **Keratin**dose Products provide only "surface effects and, you know, they're chemical bonds. But they're not permanent chemical bonds that are being formed. So you're able to create the appearance of and bring back the ability to de-tangle a little bit easier. You're able to bring shine where dullness was present when the cuticles were raised. So you're able to, I would say, replenish and restore. But, again, it's not the kind of chemistry that is a permanent processing because it's surface chemistry." *Id.* at 33:17-25; 34:2-5.

10.     The Products were developed for women who have gone to a salon and had chemical treatments, including keratin (straightening) treatments. (Ex. 1, Morris Oct. 2017 Tr. at

49:21–51:4; Ex. 3, Morris Sept. 2018 Tr. at 41:24–42:20; *see also* Ex. 8, Declaration of Melissa Morris Bacallao, MTX_KTDS00000397, dated August 28, 2017 ("Morris Aug. 2017 Decl.")¶ 4.).

**Plaintiffs' Response:** Disputed as irrelevant and improper, as issues regarding efficacy of the **Keratin**dose Products, or "what the products do," are not at issue in this case. ECF Nos. 115, 118, 121, 124 and 127.

Also disputed as to the reason the "products were developed." Internal L'Oréal emails, produced in discovery by Defendants, show that L'Oréal developed the Products so that consumers would believe that they delivered "a daily dose of keratin." During the concept phase of the **Keratin**dose Products, Matrix Global Vice President and General Manager Leonardo Chavez emailed his colleagues on October 19, 2011, stating "I thought we were taking the concept more along the lines of giving your hair a daily dose of keratin to restore overstressed straightened hair." Pltfs' Ex. 7, MTX_KTDS00000510.

Further, L'Oréal's own salon development managers believed (or were misinformed) that there was keratin in the **Keratindose** Products. In February 2013, internal emails discussing "Questions on Keratindose," on behalf of a salesperson who was "on fire pre-selling" the Keratindose Products to stylists, one of L'Oréal's Salon Development Managers asked, "How much keratin is actually in there Keratindose products?," and "what type of keratin is it?," so that the salesperson could be "prepared with this information to answer an[y] salon questions as she sells" the Keratindose Products. Pltfs' Ex. 8, MTX_KTDS00002017-18. In other internal emails in February 2013, L'Oréal employees discussed "some questions folks from the State team need[ed] cleared up for their consultants," and those questions included: "What percentage of keratin is in Keratindose?," and "What kind of keratin is in Kertindose?" Pltfs' Ex. 9, MTX_KTDS00000747.

11.     Stylists and their customers recognize that keratin is a protein that is in hair and that is affiliated and associated with hair, as well as being a treatment that customers have administered to their hair. (Ex __ [*sic*], Morris Sept. 2018 Tr. at 48:14–24; ("Keratin is a protein that [is] in hair and that is affiliated and associated to hair[,] as well as being a treatment that [customers have administered] to their hair.")).

**Plaintiffs' Response:** Undisputed.

12.     The Products were positioned and marketed to be sold to consumers in-salon, often at the recommendation of a stylist who had performed a chemical treatment or had otherwise helped the customer assess her hair needs. (Ex. 1, Morris Oct. 2017 Tr. at 33:18–22; 38:20–39:10; 52:19–21; *see also* Ex. 4, Chadwick Tr. at 65:20–66:13; Ex. 5, Price Tr. at 54:13– 55:15.).

**Plaintiffs' Response:** Undisputed that L'Oréal marketed the products to be sold to consumers. Disputed as to the reference "often at the recommendation of a stylist who had performed a chemical treatment or had otherwise helped the customer assess her hair needs," as even Defendants' own experts admit that the product label is intended to *directly* influence the consumers' purchase decision. In his report, Defendants' marketing expert Professor Jan Patrick Kuehlwein stated: "It is well understood in the hair-care industry that manufacturers design the labels of hair care products to attract consumers' attention. In doing so, manufacturers take into account the amount of time a shopper may look at or interact with a product to ensure the label adequately conveys the quality and worth of the product. In other words, the specific design elements of the label are understood to be impacting a consumer's perception (and ultimately his/her purchase decision), if at all, in their totality, not in isolation." Pltfs' Ex. 10, Jan Patrick Kuehlwein Report ("Kuehlwein Rpt.") ¶ 24. Similarly, in his deposition, when asked about this statement Professor Keuhlwein testified as follows:

Q. So are you stating here that the goal of a hair care manufacturer like L'Oréal in designing a hair care product label is to impact the consumer's perception of the product?

***

THE WITNESS: Yeah, I'm saying that marketers try to attract the consumer with how they design their product, yes.

Q. With how they design the product label?

A Including the product label, yes.

Q Does that include the words on those labels?

A. Include the words, yes.

***

Q. So hair care manufacturers such as L'Oréal understand that labels and the words on those labels have an impact on consumers. That they matter to consumers?

THE WITNESS: They will understand that – they are seen by consumers, yes.

Q And will impact their perception of the product?

A That they will impact how they perceive the product, yeah, I think that's fair to say.

Q And hair care manufacturers like L'Oréal, their goal of impacting a consumer's perception of the product through label is to ultimately impact their purchase decision; right?

***

THE WITNESS: I think in most cases for manufacturers, the desire of the activity is to sell their product, yes.

Pltfs' Ex. 11, Kuehlwein Deposition Transcript ("Kuehlwein Tr."), at 115:14-15; 116:1-13; 116:21-25; 117:1-18.

**B.    The Products' Ingredients**

13.    All of the MBA products list their ingredients on their back panel in descending order of predominance by weight, as required by the Food and Drug Administration. (*See* 21 C.F.R.

701.3; Ex. 8, Morris Aug. 2017 Decl. ¶¶ 23–25.).

**Plaintiffs' Response:** Undisputed.

14.    The Products' labels do not expressly claim that keratin is an ingredient, and keratin does not appear on the ingredient list. (Ex. 8, Morris Aug. 2017 Decl. ¶¶ 23–25, Ex. 3, Morris Sept. 2018 Tr. at 48:14–24, 50:3–9; Ex. 6, Soliman Tr. at 17:19–25; FAC ¶ 27.)

**Plaintiffs' Response:** Undisputed that the ingredient list on the back label of the products does not include keratin. Disputed that the labels do not expressly claim that keratin is an ingredient. The **Keratin**dose Products' labels lead reasonable consumers to believe  that the products contain keratin, and Defendants were well aware that the labels were likely to lead consumers to believe the **Keratin**dose Products contain keratin – which is precisely what Defendants intended for them to do.

15.    Each of the MBA product labels contain call-outs to two ingredients. (Ex. 2, MTX_KTDS00000019.)

**Plaintiffs' Response:** Disputed as to the vague reference "calls-out two ingredients." The **Keratin**dose Product labels lead reasonable consumers to believe that the products contain the ingredient keratin.

16.    The labels on the Keratindose Products call out the ingredients Pro–Keratin and Silk. (Defendants' Answer to Plaintiffs' First Amended Complaint, ECF No. 86 ("Answer") ¶ 27.).

**Plaintiffs' Response**: Disputed that Pro-Keratin is an ingredient. As Ms. Soliman testified in her deposition, Pro-Keratin is "just a name attributed to [a] bundle of ingredient." Pltfs' Ex. 1, Soliman Tr. *at* 28:14-15. Further, L'Oréal's own records show that this bundle of ingredients was "proprietary," and that they would not even share the ingredients composing of this bundle with their own salespeople. When L'Oréal's sales team asked what information they could

communicate to salons about pro-keratin, Michael Sanchez, a key member of L'Oréal's marketing team, stated "[s]ince it's proprietary info about our formulas, we are somewhat hesitant to have this widely communicated." Pltfs' Ex. 12, MTX_KTDS00002017. That it was proprietary confirms that "Pro-Keratin" "is merely a proprietary name given for marketing purposes to a group of chemical ingredients," and that it is unlikely that consumers would understand that bit of labeling legerdemain; they would assume "Pro-Keratin" is keratin (especially when paired with "**Keratin**dose"). Pltfs' Ex. 13, Silverman June 11, 2019 Report ("Silverman June 2019 Rpt.") ¶ 59.

Further, when Defendant's so-called professional beauty product expert, Nikola Cline was asked at her deposition "so what is Pro-Keratin?", she responded, "That is a great question," and then she went on to state "[m]y impression of Pro-Keratin would likely be probably a combination or propriety blend of ingredients because *Pro-Keratin isn't a thing.*" Pltfs' Ex. 6, Cline Tr. at 9-16 (emphasis added).

17.     Silk, which is denoted on the label of the Products as silk powder, is a protein. (Ex. 6, Soliman Tr. at 105:15–22; *see also* Ex. 8, Morris Aug. 2017 Decl. ¶¶ 23–25.)

**Plaintiffs' Response:** Undisputed that the **Keratin**dose ingredient label indicates that the products contain silk powder, which Ms. Soliman testified is a protein. Pltfs' Ex. 1, Soliman Tr., at 105:105:15-25, 107:13-25; 108:1.

**C.     L'Oréal's Naming of the Products**

18.     The "Keratindose" name was designed to align with the concept of the Products, namely to appeal to consumers who had overprocessed hair due to keratin treatments, or similar chemical treatments. (Ex. 3, Morris Sept. 2018 Tr. at 41:24–42:20.)

**Plaintiffs' Response:** Disputed. During the concept phase of the **Keratin**dose Products,

Matrix Global Vice President and General Manager Leonardo Chavez emailed his colleagues on October 19, 2011, stating "I thought we were taking the concept more along the lines of giving your hair a daily dose of keratin to restore overstressed straightened hair." Pltfs' Ex. 7, MTX_KTDS00000510.

19.     L'Oréal named the Products to signal that they treat the distressed keratin bonds in overprocessed hair by providing a balance of protein and moisture. (*Id.* at 42:2–20 ("[T]he concept of the product was about the overprocessed hair and therefore, the need for moisture and protein balance"); *id.* at 48:14–24 ("[I]n our mind the word keratin wasn't an ingredient. Keratin is a protein that's in hair and that is affiliated and associated to hair as well as being a treatment that people get done to their hair.").

**Plaintiffs' Response:** Disputed. During the concept phase of the **Keratin**dose Products, Matrix Global Vice President and General Manager Leonardo Chavez emailed his colleagues on October 19, 2011, stating "I thought we were taking the concept more along the lines of giving your hair a daily dose of keratin to restore overstressed straightened hair." Pltfs' Ex. 7, MTX_KTDS00000510.

Further disputed as to the statement "treat the distressed keratin bonds in overprocessed hair." Defendants' representative, Mary Soliman, testified that the **Keratin**dose Products are "rinse-off products. When you wash them off, they're gone. When you reapply them, they're back. So it's not reforming your hair." Pltfs' Ex. 1, Soliman Tr. at 32:2-5. Ms. Soliman further testified that the **Keratin**dose Products provide only "surface effects and, you know, they're chemical bonds. But they're not permanent chemical bonds that are being formed. So you're able to create the appearance of and bring back the ability to de-tangle a little bit easier. You're able to bring shine where dullness was present when the cuticles were raised. So you're able to, I would say,

replenish and restore. But, again, it's not the kind of chemistry that is a permanent processing because it's surface chemistry." *Id.* at 33:17-25; 34:2-5.

Further, although L'Oréal sold the **Keratin**dose Shampoo, Conditioner and Renewal Spray (collectively referred to as a "trinome") separately, ███████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████ *Id.* at 21:15-23; 125: 20-25; 126:2-16; 127:1-25; 128:8-25; 129:1-21. In fact, Ms. Soliman admitted that the claim of "overprocessed hair" was meant for the products working in the trinome, and not independently as a shampoo, conditioner or spray.

> Q. So the claim of overprocessed hair that we've been discussing, that's meant for the products working in the trinome?
>
> A. Correct.
>
> Q. Not for each one independently?
>
> A. Correct.

*Id.* at 26:10-17.

In addition, Plaintiffs' expert, Dr. Mark Van Dyke, opined that none of the ingredients in the **Keratin**dose Products "have the capability to recapitulate the native structure of keratin proteins in the human hair fiber." Pltfs' Ex. 2, Van Dyke Rpt. at 6.

Further disputed as irrelevant and improper, as issues regarding efficacy of the **Keratin**dose Products, or "what the products do" are not at issue in this case. ECF Nos. 115, 118, 121, 124 and 127.

**D.    Named Plaintiffs' Testimony**

20.     Brandi Price is a licensed cosmetologist with a specialization in hair. (Ex. 5, Price Tr. at 12:9–11, 13:7–9.)

**Plaintiffs' Response:** Undisputed.

21.     In 2014, Ms. Price purchased the Keratindose Pro-Keratin Renewal Spray at a salon in New York based on the recommendation of her salon stylist. (*Id.* at 54:13–55:15, 68:18–69:4.)

**Plaintiffs' Response:** Disputed as to the implication that Ms. Price purchased the **Keratin**dose Products solely based on her stylist's recommendation. Ms. Price purchased the Product because she believed it contained keratin, and after she read the product label, and after her stylist told her it contained keratin.

Q. Were you immediately interested in purchasing the Keratindose spray after you heard a recommendation?

A. Yes.

Q. Did she tell you that it contained keratin?

A. Yes.

Q. Did she show you the product?

A. Yeah.

Q. Did you read the label?

A. The front, yeah.

Pltfs' Ex. 5, Price Tr. at 55:16-25; 56:2.

Q. Did you read the front label of the product –

A. Yes.

Q. – before purchasing?

A. Yes.

Q. How long did you spend reading the front label?

A. Ten seconds.

Q. Did you look at the back label?

A. No.

Q. Is there a reason you decided not to look at the back label?

A. No.

Q. What was your understanding about what was in the product based on your review of the front label?

A. Keratin was in it. That's pretty much it and that it was a leave-in.

Q. What about the front label made you believe it contained keratin?

A. The Keratindose.

Q. And what message does that convey to you?

A. That it's a dose of keratin to help with your hair.

*Id.* at 65:17-25; 66:2-17

Q. And the product packaging, you did see the product packaging before purchase?

A. I read the front of the bottle.

Q. You read the front of the bottle? And you purchased the product exclusively in reliance on the Keratindose label and the recommendation from Amanda?

A. Correct.

Q. Was the recommendation from Amanda more important than the label?

A. Not necessarily.

Q. Some combination of the two?

A. Yes.

*Id.* at 121:24-25; 122:2-12.

22.     On the date of her purchase, Ms. Price did not seek to purchase a product with keratin, and has not sought to purchase a product with keratin on any day since. She would have purchased anything that her salon stylist recommended to her regardless of whether it contained keratin. (*Id.* at 84:14–85:8.)

**Plaintiffs' Response:** Disputed as to the implication that Ms. Price purchased the **Keratin**dose Products solely based on her stylist's recommendation, and that she was not interested in purchasing a product with keratin. Ms. Price purchased the Product because she believed it contained keratin after she read the product label, and after her stylist told her it contained keratin:

> Q. Is it important to you that the product contains keratin?
>
> A. Yes.

Pltfs' Ex. 5, Price Tr. at 87:14-16.

> Q. Why is the presence of keratin in the product *important* to you?
>
> A. *Because it states that it contains keratin.*
>
> Q. Is it so – is it fair to say that it is important to you because you *believed it was true and you now believe it's not true*?
>
> A. *Correct.*
>
> Q. Do you believe L'Oréal lied to you?
>
> A. Yes.

*Id.* at 88:3-13 (emphasis added).

> Q. Were you immediately interested in purchasing the Keratindose spray after you heard a recommendation?
>
> A. Yes.
>
> Q. Did she tell you that it contained keratin?
>
> A. Yes.
>
> Q. Did she show you the product?
>
> A. Yeah.
>
> Q. Did you read the label?
>
> A. The front, yeah.

*Id.* at 55:16-25; 56:2.

Q. What was your understanding about what was in the product based on your review of the front label?

A. Keratin was in it. That's pretty much it and that it was a leave-in.

Q. What about the front label made you believe it contained keratin?

A. The Keratindose.

Q. And what message does that convey to you?

A. That it's a dose of keratin to help with your hair.

*Id.* at 65:17-25; 66:2-17

Q. And the product packaging, you did see the product packaging before purchase?

A. I read the front of the bottle.

Q. You read the front of the bottle? And you purchased the product exclusively in reliance on the Keratindose label and the recommendation from Amanda?

A. Correct.

Q. Was the recommendation from Amanda more important than the label?

A. Not necessarily.

Q. Some combination of the two?

A. Yes.

*Id.* at 121:24-25; 122:2-12.

23.     Christine Chadwick is a loyal Matrix consumer who always buys Biolage branded products. (Ex. 4, Chadwick Tr. at 79:16-23) ("I was just there to buy a Biolage product "Because I always buy Biolage.").)

**Plaintiffs' Response:** Undisputed that Ms. Chadwick testified that she had "previously used Biolage products, and that she was disappointed with her purchase of the **Keratin**dose Product because "a brand that I was loyal to deceived me" because the product "contains no keratin." Pltfs' Ex. 4, Chadwick Tr. at 68; 18-22, 171:8-17.

17

24.     Ms. Chadwick purchased a two–liter combination set of Keratindose shampoo and conditioner at a promotional price of $27.99 (expressed as a $12 discount) on two separate occasions, first in January 2016 and again in August 2016. (*Id.* at 60:17–61:7, 74:9–15, 77:10– 24, 129:23–130:5.).

**Plaintiffs' Response:** Undisputed.

25.     In her deposition, Ms. Chadwick first testified that she believed the Keratindose name meant the Products were nothing but keratin, and later testified that she believed the Products contained keratin that had been extracted from other people's hair. (*Id.* at 67:21–68:3, 86:6–7 ("[T]hey got keratin from other human hair and put it in a bottle.").

**Plaintiffs' Response:** Disputed. Ms. Chadwick testified that she believed the name "**Keratin**dose was the same thing as Keratin," not that she believed the Products were nothing but keratin.

Q. And what did you understand Keratindose to be?

A. An amino acid that's naturally occurring in our bodies, in our hair and nails.

Q. So did you understand that Keratindose is the same thing as keratin?

A. Yes.

Pltfs' Ex. 4, Chadwick Tr. at 67:23-25; 68:1-3.

Further disputed as to the implication that Ms. Chadwick was confused as to the meaning of the word keratin in the **Keratin**dose Product. Ms. Chadwick testified very clearly that she believed the **Keratin**dose Products contained keratin, and that the product would add keratin to her hair and strengthen it:

Q. So you thought it was shampoo and also keratin in a bottle?

A. Yes.

Q. And why is that appealing to you?

18

A. Because I wanted something with keratin.

Q. And why did you want something with keratin?

A. Because it was something good.

Q. What did you understand it to be – why do you say something good?

A. Something good for your hair, nails to help them grow and be strong.

\*\*\*

Q. Did you understand that it would affect the keratin in your hair?

A. Yes.

Q. In what way?

A. That it would add more to it.

*Id.* at 80:18-25; 81:1-15.

26.     Plaintiffs each have a different understanding of what "Pro–Keratin" means. (*Id.*

at 131:21–132:10; Ex. 5, Price Tr. at 106:4–107:9.)

**Plaintiffs' Response:** Disputed. Both Plaintiffs Chadwick and Price testified that they

believed Pro-Keratin is the same thing as keratin.

Q. If this line Keratindose isn't on the product, would anything else on the bottle
convey that it would make your hair strong?

A. The Pro-Keratin Renewal Spray as well states that there's keratin in it.

Q. Because of the word "keratin."

A. Correct.

Pltfs' Ex. 5, Price Tr. at 99: 9-15.

Q. What is your understanding of what Pro-Keratin is?

A. A higher dose, a lot of it is what I take that to believe.

\*\*\*

Q. So to clarify, you understood that Pro-Keratin means more keratin?

A. More higher power -- pro, there's a football player and there's a pro football player. So obviously when I see the word "pro," I see professional, more, higher, things like that. Q. Did you believe there was a higher dose of keratin or that it was a stronger keratin?

A. Or possibly both.

*Id.* at. 106:4-14

Q. Did you ever consider whether Pro-Keratin was like a proprietary ingredient?

A. No.

*Id.* at 107:10-12Q. Do you think Pro-Keratin is a type of keratin?

A. I believe it's the same thing as keratin.

Pltfs' Ex. 4, Chadwick Tr. at 132:7-10.

27.     Ms. Chadwick testified that she believed Pro–Keratin and keratin were the "same thing." (Ex. 4, Chadwick Tr. at 131:21–132:10.)

**Plaintiffs' Response:** Undisputed.

28.     Ms. Price testified that she believed Pro–Keratin might be "chemically" different from keratin or of a "higher power." (Ex. 5, Price Tr. at 106:4–107:9.)

**Plaintiffs' Response:** Disputed. When asked by defense counsel "do you believe [Pro-Keratin] is different chemically than keratin?," Plaintiff price testified that she did not know and simply stated "chemically, possibly." She then testified that she believed the word "Pro" before the word "keratin" in "Pro-Keratin" meant that the **Keratin**dose Products contained a "higher dose of keratin or that it was stronger keratin," or keratin that was "More higher power – pro, there's a football player and there's a pro football player. So obviously when I see the word "pro," I see professional, more, higher, things like that." Pltfs' Ex. 5, Price Tr. 106:6-23.

29.     Plaintiffs each have a different understanding of what a "keratin treatment" is. (*Id.* at 40:21–41:2; Ex. 4, Chadwick Tr. at 51:12–14.)

**Plaintiffs' Response:** Disputed as to the definition of the term "different." Neither Plaintiff Price, nor Plaintiff Chadwick has ever received a keratin treatment. Pltfs' Ex. 5, Price Tr., at 41:13-15; Pltfs' Ex. 4, Chadwick Tr. at 51:22-23. When asked whether she could explain what a keratin treatment is, Plaintiff Price testified "Not exactly," and that her understanding of a keratin treatment was that it's a "smoothing treatment." Pltfs' Ex. 4, Chadwick Tr., at 51:7-17. When asked what she thought a keratin treatment did for one's hair, Plaintiff Chadwick testified that it "strengthen[ed] hair." Pltfs' Ex. 5, Price Tr. at 41:13-22.

30.     Ms. Chadwick characterized a keratin treatment as a "smoothing treatment." (Ex. 4, Chadwick Tr. at 51:12–14.)

**Plaintiffs' Response:** Undisputed.

31.     Ms. Price testified that the objective of a keratin treatment is to "add more keratin to your hair that doesn't – if your hair is not producing enough, to help it handle the stress and not be so damaged." (Ex. 5 Price Tr. at 40:21–41:2.)

**Plaintiffs' Response:** Undisputed.

32.     Nikola Cline is a professional salon industry expert retained by Defendants' counsel in connection with this case. (Ex. 9, Deposition of Nikola Cline, dated June 20, 2019 ("Cline Tr.") at 6:21-7:12, 22:3-9.)

**Plaintiffs' Response:** Disputed as to the phrase "professional salon industry expert," as it is a broad and self-serving identification that may be the subject of a future *Daubert* challenge. During her deposition, Ms. Cline testified that numerous issues regarding the professional salon industry and professional salon products were beyond her expertise, including determining the "problem solution benefit" from looking at a product. Pltfs' Ex. 6, Cline Tr. at 144:3-25; determining whether the **Keratin**dose Products have keratin in them by looking at the product

label from an expert perspective, *id.* at 147:16-25; and "the types of things … a consumer would pay a premium for shampoo," *id.* at 176:17-23.

33.     Ms. Cline testified at her deposition that there are multiple conclusions one could draw from the Challenged Terms. (*Id.* at 147:23-148:2.)

**Plaintiffs' Response:** Disputed to the extent it implies that Ms. Cline did not opine on a specific meaning of the term **Keratin**dose.

Q. When you first viewed this product, did you believe it contained keratin?

\*\*\*

A. That's really beyond what I've been asked to input on.

Q. That's not what I asked. I asked when you first viewed this product, did you believe that there was keratin contained in it; it's a yes or a no?

\*\*\*

A. Well, I think, you know, from my perspective, that's, I think, one of the things that you could consider when looking at the product, but there is certainly a whole host of them.

Pltfs' Ex. 6, Cline Tr. at 146:14-25; 147:2-5.

Q. Did you think there might be keratin in the product based upon the label?

\*\*\*

A. It really is beyond my expertise to sort of input on that. I think, you know, when looking at this, I think it's a possibility…

*Id.* 147:16-23.

Q. Well, as you understand the product right now, the product is named Keratindose, correct?

A. Yes, it looks like it.

Q. And it does not contain keratin, correct?

A. Correct.

Q. With that set of facts, would you feel comfortable taking it to market?

\*\*\*

A. Well, I think – … I think that, you know, that is one possibility when you look at the product that it could contain keratin.

*Id.* at 149:18-25; 150:1-8.

34.     Neither of the Plaintiffs complained about the Products to Defendants or attempted to return the Products. (Ex. 5, Price Tr. at 80:4–12; 113:2–10; Ex. 4, Chadwick Tr. at 101:13–16.)

**Plaintiffs' Response:** Undisputed.

35.     Months after they ceased using the Products, each Plaintiff saw an advertisement on Facebook regarding a lawsuit involving the Products, which they clicked on, putting them in touch with counsel. (Ex. 5, Price Tr. at 88:14–89:25; Ex. 4, Chadwick Tr. at 105:14–106:25.).

**Plaintiffs' Response:** Disputed. Each Plaintiffs' cited testimony speaks for itself.

36.     Plaintiffs allege that they would not have purchased, or would not have paid as much for the Products, had they known the Products did not contain keratin. (FAC ¶¶ 4–5.)

**Plaintiffs' Response:** Undisputed.

37.     Aside from the testimony from Ms. Price and Ms. Chadwick, there is no other evidence in the record from consumers about consumers' understanding of "Keratindose" or "Pro-Keratin" (the "Challenged Terms").

**Plaintiffs' Response:** Disputed. There is substantial evidence in the record about consumers' understanding of the Challenged Terms, aside from the testimony of Ms. Price and Ms. Chadwick. Plaintiffs' expert Bruce Silverman opined that "a reasonable consumer would fully expect a family of hair care products named **Keratin**dose to include keratin as an ingredient, just as they would expect of any product that includes a well-known ingredient as part of its name." Pltfs' Ex. 13, Silverman June 2019 Rpt. ¶ 57. As Mr. Silverman notes, his opinions "are reflective of the practical knowledge and insights [he has] gained over the course of a 50-year career working

at the highest levels in the "real world" of marketing, branding and advertising," *id.* ¶ 9, including the creation of "[t]housands … of [ ] advertisements … published in consumer and business magazines, newspapers, billboards, and on websites [and] hundreds of national, regional and local television and radio commercials," *id.* ¶ 18.

Moreover, *Defendants' own* purported marketing expert, Dr. Eli Seggev, testified that he, "like everybody else," understands the use of the word "dose" in Keratindose to mean that consumers using a product will receive an amount of something or a "quantity taken in." Pltfs' Ex. 14, Seggev December 7, 2017 Deposition Transcript ("Seggev 2017 Tr.") at 128:3-25 (Q. Do you have any opinion as to what it means, what the word "dose" means? A. In this context, no. Q. If you are informed on a product that you're going to receive a dose of something, you don't have any understanding for what that would mean? … A. That's what I said. I said in this context. I know the meaning of the word "dose," of course, like everybody else. Q. Right. Well, what is your understanding of the word "dose?" A. Quantity taken in. Q. So the word "dose" would imply some amount, is that fair? … A. That's fair enough, yes.).

Further, *Defendants' own* purported consumer packaged goods expert, Jan Patrick Kuehlwein, testified that he would "expect" a product whose very name contained a particular ingredient *would actually contain* that ingredient. Pltfs' Ex. 11, Kuehlwein Tr. at 87:3-10 (Q. Would you have found it problematic while you were working at Fekkai if this product named Essential Shea did not actually have shea butter in it? A. Personally, this particular one since it calls out shea butter as an ingredient, I would expect that it has some form of shea butter in it.).

In addition, on or about February 15, 2012, the United States Patent and Trademark Office ("USPTO") denied Defendants' application for a trademark in the name "KERATINDOSE," finding that "[A]pplicant's mark includes the wording "KERATIN," which indicates that the goods

24

contain keratin. … [Because] the goods do not, in fact, contain keratin, the applied-for mark *will deceive* the public as to a material factor in its purchasing decision. ….” Pltfs' Ex. 15, USPTO file wrapper ("USPTO Decision") at 4 (emphasis added).

During the concept phase of the **Keratin**dose Products, Matrix Global Vice President and General Manager Leonardo Chavez emailed his colleagues on October 19, 2011, stating "I thought we were taking the concept more along the lines of giving your hair a daily dose of keratin to restore overstressed straightened hair." Pltfs' Ex. 7, MTX_KTDS00000510. In a February 3, 2013 email, Matrix Salon Development Manager Brittnee Marquez asked Matrix Business Development Manager, Kristen Hanson "[h]ow much keratin is actually in the Keratindose products?" Pltfs' Ex. 8, MTX_KTDS00002017-18. Similarly, on February 13, 2013, Matrix Director of Education Christopher Sarel emailed Biolage Director of Marketing Nataly Avila and L'Oréal Director of Marketing Julia Knoke, asking "'[w]hat percentage of keratin is in Keratindose?" and "[w]hat kind of keratin is in Keratindose?" so that he could provide this information at an upcoming sales meeting. Pltfs' Ex. 16, MTX_KTDS00002022.

Despite these indicia that the name was misleading and deceptive, Defendants chose to sell the **Keratin**dose Products as labeled because "the risk [was] worth taking." Pltfs' Ex. 17, MTX_KTDS00000450 (July 17, 2012 email from Leonardo Chavez to other L'Oréal employees, stating "I also keep hearing that your internal team is recommending against the name Keratindose. I need you to please assess the risk and hopefully agree with me that the risk is worth taking. To me the risk is manageable as we clearly say on the packaging that we have pro-keratin in the formula.").

Finally, the Challenged Terms themselves are evidence that a reasonable person would believe there is keratin in the Products.

**E.       Sales Data and Pricing**

38.    Like all Matrix products, the MBA line is authorized and intended for sale only in salons. (Ex. 1, Morris Oct. 2017 Tr. at 41:19–24; *see also* Ex. 8, Morris Aug. 2017 Decl. ¶ 7.)

**Plaintiffs' Response:** Disputed. The **Keratin**dose Products are sold at many non-salon retailers. L'Oréal sells the Products to wholesale distributors and to large nationwide retailers, such as JCPenney, Ulta, and Regis, that own their own salons. Pltfs' Ex. 18, Aug. 2017 Declaration of Melissa Morris Bacalao ("Morris Aug. 2017 Decl.") ¶ 7.

39.    Some Matrix products, including the Keratindose Products, end up sold in drugstores or via non–salon retailers. (Ex. 1, Morris Oct. 2017 Tr. at 41:19–24.) L'Oréal considers these "diverted products" or "gray" goods. (*Id.*)

**Plaintiffs' Response:** Undisputed.

40.    L'Oréal maintains sales records reflecting its nationwide sales to its wholesale customers. (Ex. 8, Morris Aug. 2017 Decl. ¶ 8.) Sell–in data represents the amount paid to L'Oréal by its customers when the Products are sold. (*Id.*) Sell-through data is received from only a handful of L'Oréal's customers and reflects in turn the amount of their own sales. (*Id.* ¶ 9) L'Oréal does not track where or to whom the downstream sales of its customers are made. (Ex. 1, Morris Oct. 2017 Tr. at 90:2; 108:11-14.)

**Plaintiffs' Response:** Undisputed that L'Oréal maintains sales records reflecting its nationwide sales to its wholesale customers, and that L'Oréal maintains sell-in and sell-through data as described, although disputed as to the undefined term "handful." Disputed that L'Oréal does not track where or to whom the downstream sales of its customers are made. In *Richardson, et al. v. L' Oréal USA, Inc.*, No. 13-CIV-508 (D.D.C. 2013), L'Oréal submitted the declaration of Christopher Lyden, who was the Senior Director of Brand Equity Protection for L' Oréal USA, at

the time (April 23, 2013). Mr. Lyden testified that "L'Oréal field sales representatives are required to participate in the Sample Buy Program as part of their regular job duties. Each sales representative is required to make regular, monthly sample buys from multiple non-salon retail locations in their area." Pltfs' Ex. 19, Declaration of Christopher Lyden ("Lyden Decl.") ¶ 9. Mr. Lyden further testified that "information about bottles purchased through the Sample Buy Program is maintained in a database that tracks the name and address of the non-salon retailer where the bottle was purchased, when the bottle was purchased, the price paid for the bottle, and whether any tracking codes were present on the bottle that would allow Brand Equity Protection to trace the diverted bottle back to the distributor and/or salon in order to identify potential diverters." *Id.* ¶ 10. Further, as part of L'Oréal's Brand Equity Protection program, the Sample Buy database contains information about the bottles of diverted L'Oréal Products that L'Oréal sales representatives purchased. *Id.* ¶ 11. And, L'Oréal's "Brand Equity Protection uses the Sample Buy database to analyze – among other things – the prices at which L'Oréal Products are sold by non-salon retailers and to compare such prices to L'Oréal's Manufacturer's Suggested Retail Price ('MSRP') for such products." *id.* ¶ 12.

41. L'Oréal generally does not have state specific sales data for the Products. (Ex. 8, Morris Aug. 2017 Decl. ¶ 13.) The sole exception is that L'Oréal does have state by state information about its sales to SalonCentric. (*Id.*)

**Plaintiffs' Response:** Undisputed.

42. SalonCentric is a beauty supply company that in turn sells to salons or stylists, but not to consumers. (Ex. 1, Morris Oct. 2017 Tr. at 39:11–23, 119:11–25.)

**Plaintiffs' Response:** Undisputed.

43. In order to make a purchase at SalonCentric, a cosmetology license is required. (*Id.*)

**Plaintiffs' Response:** Undisputed.

44.    L'Oréal does not determine how the Products are priced by salons, and does not have access to records of what salons charge for the Products. (*Id.* at 83:8–12; Ex. 8, Morris Aug. 2017 Decl. ¶ 14.)

**Plaintiffs' Response:** Disputed as to the phrase "does not determine how the products are priced by salons." L'Oréal's Matrix brand, which includes the **Keratin**dose Products, "creates a Manufacturer's Suggested Retail Price ("MSRP") list for the products manufactured and distributed by that brand. The MSRP lists contain a listing of every hair care product sold by each brand and the price at which L'Oréal recommends the product be sold to consumers. These lists are then distributed to salons, either by L'Oréal or by product distributors, and updated at least annually." Pltfs' Ex. 19, Lyden Decl. ¶ 13. L'Oréal calculates the MSRP of its Matrix products, which are sold at salons, using a markup formula common to the salon industry. *Id.*

45.    L'Oréal publishes catalogs which contain a "suggested retail price" for its products. (Ex. 1, Morris Oct. 2017 Tr. at 81:3–13; 83:13–17.) L'Oréal does not have knowledge as to or control over as to whether salons actually use those suggested prices. (*Id.* at 88:23–89:7; 90:14–19.)

**Plaintiffs' Response:** Undisputed that L'Oréal publishes a catalog with the MSRP for its products. Disputed that L'Oréal has no knowledge as to whether salons actually use the MSRP. L'Oréal's Matrix brand, which includes the **Keratin**dose Products, "creates a Manufacturer's Suggested Retail Price ("MSRP") list for the products manufactured and distributed by that brand. The MSRP lists contain a listing of every hair care product sold by each brand and the price at which L'Oréal recommends the product be sold to consumers. These lists are then distributed to salons, either by L'Oréal or by product distributors, and updated at least annually." Pltfs' Ex. 19, Lyden Decl. ¶ 13.

L'Oréal calculates the MSRP of its Matrix products, which are sold at salons, using a markup formula common to the salon industry. *Id.*

Further, Lisa Morris, Defendants' corporate representative, testified that ███████████

████████████████████████████████████████████████████████████████████████

███████████████ Pltfs' Ex. 3, Morris Sept. 2018 Tr. at 156:5-13. She further testified that

████████████████████████████████████████████████████████████████████████

███████████████ *Id* at 159:18-24. Therefore, Defendants' own corporate representative testified that MSRP is a reliable figure for determining what consumers are paying for the **Keratin**dose Products.

46.    L'Oréal does not have information about how many of the Products are ultimately sold to consumers in any given state. (*Id.* at 89:13–90:23.)

**Plaintiffs' Response:** Undisputed.

47.    L'Oréal does not have information about the prices actually charged by salons for the Products.  (*Id.*)

**Plaintiffs' Response:** Disputed as to the implication that L'Oréal has no knowledge as to whether salons actually use the MSRP. L'Oréal's Matrix brand, which includes the **Keratin**dose Products, "creates a Manufacturer's Suggested Retail Price ("MSRP") list for the products manufactured and distributed by that brand. The MSRP lists contain a listing of every hair care product sold by each brand and the price at which L'Oréal recommends the product be sold to consumers. These lists are then distributed to salons, either by L'Oréal or by product distributors, and updated at least annually." Pltfs' Ex. 19, Lyden Decl. ¶ 13. L'Oréal calculates the MSRP of its Matrix products, which are sold at salons, using a markup formula common to the salon industry. *Id.*

Further, Lisa Morris, Defendants' corporate representative, testified that ███████████

████████████████████████████████████████████████████████████████████████

████████████████ Pltfs' Ex. 3, Morris Sept. 2018 Tr. at 156:5-13. She further testified that

████████████████████████████████████████████████████████████████

███████████████ *Id* at 159:18-24. Therefore, Defendants' own corporate representative testified

that MSRP is a reliable figure for determining what consumers are paying for the **Keratin**dose

Products.

48.    There is no record evidence showing how many sales of the Products were made

during the class period to consumers in New York or California.

**Plaintiffs' Response:** Disputed as to the term "record evidence." Dr. Dubé's November

19, 2019 report includes and relies upon record evidence to evaluate sales of the **Keratin**dose

Products in New York, and speaks for itself. Pltfs' Ex. 20, Dr. Dubé November 19, 2019 Report

("Dubé Nov. 2019 Rpt.").

**F.      Mr. Silverman Did Not Conduct Any Consumer Research**

50.    Bruce G. Silverman is a marketing expert retained by Plaintiffs' counsel in

connection with this case. (*See,* Ex. 10, Deposition of Bruce Silverman, dated August 19, 2019,

("Silverman Tr.") at 80:4-7; 306:5-14.)

**Plaintiffs' Response:** Undisputed.

51.    Mr. Silverman opines in this matter that a reasonable consumer would expect the

Products to include keratin. (*See, e.g.*, *id.* at 10:1–20.)

**Plaintiffs' Response:** Undisputed. Mr. Silverman opines that "a reasonable consumer

would fully expect a family of hair care products named **Keratin**dose to include keratin, just as

they would expect of any product that includes a well-known ingredient as part of its name." Pltfs'

Ex. 13, Silverman June 2019 Rpt. ¶ 57. Mr. Silverman's opinions "are reflective of the practical

knowledge and insights [he has] gained over the course of a 50-year career working at the highest

levels in the 'real world' of marketing, branding and advertising," *id.* ¶ 9, including the creation of "[t]housands … of [ ] advertisements … published in consumer and business magazines, newspapers, billboards, and on websites [and] hundreds of national, regional and local television and radio commercials," *id.* ¶ 18. *See also Hadley v. Kellogg Sales Co.,* No. 16-CV-04955-LHK, 2019 U.S. Dist. LEXIS 136791, at *73-74 (N.D. Cal. Aug. 13, 2019) (noting "…surveys and expert testimony regarding consumer expectations are not required" and denying motion to strike Mr. Silverman's expert opinions in that case, noting they "are based on his many years of marketing experience and his review of [defendant's] own internal consumer research and other documents"); *Hobbs v. Brother Int'l Corp.*, 2016 WL 7647674, at *4-5 (C.D. Cal. Aug. 31, 2016) (specifically rejecting defendant's argument that Mr. Silverman's testimony was inadmissible because he did not conduct a survey, finding his "declaration relevant to assess whether a significant portion of reasonable consumers would be misled" and holding that his "statements were within [his] expertise as an advertising consultant.").

52.     Mr. Silverman opines that consumer research is important to understanding how consumers view advertisements. (*See id.* at 242:22-243:11.)

**Plaintiffs' Response:** Disputed as a misleadingly incomplete statement of Mr. Silverman's testimony. When the cited passage is read as a whole, it is clear that Mr. Silverman opines that consumer research is *only one* means of understanding what advertisements such as the Challenged Terms communicate to consumers:

> Q. Your opinions about what the challenged terms communicate to consumers, are those based on science?
>
> [objection omitted]
>
> A. They are based on my experience as a marketing professional.
>
> Q. Is that science?

A. Well, there's a certain amount of science involved in marketing, there is, because you rely on – you rely on learning about consumers from secondary research sources like MRI, you learn about it from proprietary research sources, you learn about it by interviewing consumers, *you learn about it in many, many different ways*.

Certainly in those instances when studies are involved there's a certain amount of science. But I have always described my business, it is where commerce meets arts. The purpose of what I do is to sell products … you apply certain amounts of science to it and you apply a lot of experience to it.

Pltfs' Ex. 21, Silverman Deposition Transcript ("Silverman Tr."), at 242:22 – 243:20 (emphasis added).

53.     Mr. Silverman testified in at least one prior trial that expert opinions about consumer understanding without any basis in consumer research are unreliable. (Ex. 11, Trial Transcript in *VIP Products, LLC, v. Jack Daniel's Properties, Inc.*, 14-cv-257-SMM (D. Ariz.), ECF No. 238, dated October 5, 2017 ("*VIP Products* Tr.") at 33:4–21, 67:20–68:10, 70:7–25; *see also* Ex. 10, Silverman Tr. at 246:1-257:16.)

**Plaintiffs' Response:** Disputed as a mischaracterization of Mr. Silverman's testimony. The opinion at issue in that case was one offered by Dr. Simonson – that a dog toy made by a company called "Bad Spaniels" would tarnish the Jack Daniel's liquor brand by mimicking the Jack Daniel's bottle design with the legend "20% poo by volume,"[1] in a parody of alcohol-content labeling. *See* Pltfs' Ex. 21, Silverman Tr. at 248:1-17. Mr. Silverman testified that he considered Dr. Simonson's "disgust theory" to be "ridiculous, absolutely ridiculous," *id.*, at 253:17-18, in largest part because it "defied common sense," *id.* at 248:15. He also testified that Dr. Simonson's opinion was unreliable because "it was pretty evident" that Dr. Simonson himself "had never owned or walked a dog and possibly never changed a diaper," and "had no experience with pet

---

[1] "20% poo by volume" was Mr. Silverman's recollection at his deposition in the present case. The actual legend read "43% POO BY VOL." *See*, *e.g.*, 291 F.Supp.3d 891, 898 (D. Ariz. 2018).

products." *Id.* at 250:3-5, 252:3-4. Mr. Silverman found Dr. Simonson's opinion ridiculous because it had no empirical support *and* based on his experience as a marketer and a consumer, *and* as a matter of common sense, just as he opines that the notion that the challenged term **Keratin**dose does *not* convey that the products contain "a dose of keratin" also defies common sense. Finally, Mr. Silverman's statements as to Dr. Simonson's opinion are limited to that opinion in that particular case, and were not put forward in the generalized manner in which Defendants here frame them.

54.     Mr. Silverman did not conduct any consumer research about how consumers understand or interpret the Challenged Terms, and does not rely on any such research for his opinions in this case. (Ex. 10, Silverman Tr. at 122:23–123:14, 233:18–23.)

**Plaintiffs' Response:** Disputed as irrelevant and improper. Under the UCL, deceptiveness in advertising claims "may be established by testing [i.e., consumer research], scientific literature, or anecdotal evidence." *Consumer Advocates v. Echostar Satellite Corp.,* 113 Cal. App. 4th 1351, 1362; 8 Cal. Rptr. 3d 22 (Cal. Ct. App. 2003). Similarly, New York decisions explicitly acknowledge that the question of deceptiveness "'may be determined as a matter of law or fact (as individual cases require).'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co*., 875 F.3d 107, 124 (2d Cir. 2017) (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,* 85 N.Y.2d 20, 26, 647 N.E.2d 741, 623 N.Y.S.2d 529 (1995)). As the Second Circuit has held, under both the UCL and the GBL "[t]he primary evidence in a consumer-fraud case arising out of allegedly false advertising is, of course, *the advertising itself*." *Fink v. Time Warner Cable*, 714 F.3d 739, 742 (2d Cir. 2013) (emphasis added). Thus, Mr. Silverman is not required to base his opinions on consumer research, and the fact that he did not conduct such research is irrelevant.

Mr. Silverman's opinions in this case "are reflective of the practical knowledge and

insights [he has] gained over the course of a 50-year career working at the highest levels in the 'real world' of marketing, branding and advertising," Pltfs' Ex. 13, Silverman June 2019 Rpt. ¶ 9, including the creation of "[t]housands … of [ ] advertisements … published in consumer and business magazines, newspapers, billboards, and on websites [and] hundreds of national, regional and local television and radio commercials," *id.* ¶ 18. *See also Hadley*, 2019 U.S. Dist. LEXIS 136791, at *73-74 (noting "… surveys and expert testimony regarding consumer expectations are not required" and denying motion to strike Mr. Silverman's expert opinions in that case, noting they "are based on his many years of marketing experience and his review of [defendant's] own internal consumer research and other documents"); *Hobbs*, 2016 WL 7647674, at *4-5 (specifically rejecting defendant's argument that Mr. Silverman's testimony was inadmissible because he did not conduct a survey, finding his "declaration relevant to assess whether a significant portion of reasonable consumers would be misled" and holding that his "statements were within [his] expertise as an advertising consultant.").

55.   Mr. Silverman has never seen any consumer data about women's awareness of the restorative nature of keratin. (*Id.* at 39:12–15.)

   **Plaintiffs' Response:** Disputed as irrelevant and improper, as issues regarding efficacy of the **Keratin**dose Products, or "what the products do" are not at issue in this case. ECF Nos. 115, 118, 121, 124 and 127. Moreover, the issue of whether women are aware of the purported restorative nature of keratin, or whether Mr. Silverman is aware of their purported awareness, is irrelevant to the reliability of his opinions in this case. Finally, the USPTO found substantial evidence that the hair care product industry on the whole touts the purported restorative nature of keratin in advertisements. Pltfs' Ex. 15, USPTO Decision.

56.   Mr. Silverman does not believe he ever saw sales data about the popularity of hair

care products containing keratin. (*Id.* at 50:11–15.)

**Plaintiffs' Response:** Undisputed. However, Mr. Silverman did opine that "Defendants clearly want consumers to see the word keratin, which they undoubtedly know to be highly desired by consumers." Pltfs' Ex. 13, Silverman June 2019 Rpt. ¶ 84.

57.     Mr. Silverman does not know if consumers understand that there are different kinds of keratin. (*Id.* at 41:17–22.)

**Plaintiffs' Response:** Disputed as assuming a fact not in evidence – to wit, that there *are* "different kinds of keratin."

58.     Mr. Silverman has never discussed keratin or keratin treatments with consumers or salon professionals. (*Id.* at 102:7–10.)

**Plaintiffs' Response:** Undisputed.

59.     Mr. Silverman has never conducted market research on keratin or keratin treatments. (*Id.* at 102:25–103:3.)

**Plaintiffs' Response:** Disputed as irrelevant and improper. Under the UCL, deceptiveness in advertising claims "may be established by testing [i.e., consumer research], scientific literature, or anecdotal evidence." *Echostar,* 113 Cal. App. 4th at 1362. Similarly, New York decisions explicitly acknowledge that the question of deceptiveness "'may be determined as a matter of law or fact (as individual cases require).'" *Nick's Garage*, 875 F.3d at 124. As the Second Circuit has held, under both the UCL and the GBL "[t]he primary evidence in a consumer-fraud case arising out of allegedly false advertising is, of course, *the advertising itself*." *Fink*, 714 F.3d at 742 (emphasis added). Thus, Mr. Silverman is not required to base his opinions on consumer research, and the fact that he did not conduct such research is irrelevant.

Mr. Silverman's opinions in this case "are reflective of the practical knowledge and

insights [he has] gained over the course of a 50-year career working at the highest levels in the 'real world' of marketing, branding and advertising," Pltfs' Ex. 13, Silverman June 2019 Rpt. ¶ 9, including the creation of "[t]housands … of [ ] advertisements … published in consumer and business magazines, newspapers, billboards, and on websites [and] hundreds of national, regional and local television and radio commercials," *id.* ¶ 18. *See also Hadley*, 2019 U.S. Dist. LEXIS 136791, at *73-74 (noting "…surveys and expert testimony regarding consumer expectations are not required" and denying motion to strike Mr. Silverman's expert opinions in that case, noting they "are based on his many years of marketing experience and his review of [defendant's] own internal consumer research and other documents"); *Hobbs*, 2016 WL 7647674, at *4-5 (specifically rejecting defendant's argument that Mr. Silverman's testimony was inadmissible because he did not conduct a survey, finding his "declaration relevant to assess whether a significant portion of reasonable consumers would be misled" and holding that his "statements were within [his] expertise as an advertising consultant.").

60.     Mr. Silverman has never read any market research conducted by someone else on keratin or keratin treatments. (*Id.* at 103:3–8.)

**Plaintiffs' Response:** Disputed as irrelevant and improper. Disputed as irrelevant and improper. Under the UCL, deceptiveness in advertising claims "may be established by testing [i.e., consumer research], scientific literature, or anecdotal evidence." *Echostar,* 113 Cal. App. 4th at 1362. Similarly, New York decisions explicitly acknowledge that the question of deceptiveness "'may be determined as a matter of law or fact (as individual cases require).'" *Nick's Garage*, 875 F.3d at 124. As the Second Circuit has held, under both the UCL and the GBL "[t]he primary evidence in a consumer-fraud case arising out of allegedly false advertising is, of course, *the advertising itself*." *Fink*, 714 F.3d at 742 (emphasis added). Thus, Mr. Silverman is not required

to base his opinions on consumer research, and the fact that he did not conduct such research is irrelevant.

Mr. Silverman's opinions in this case "are reflective of the practical knowledge and insights [he has] gained over the course of a 50-year career working at the highest levels in the 'real world' of marketing, branding and advertising," Pltfs' Ex. 13, Silverman June 2019 Rpt., ¶ 9, including the creation of "[t]housands … of [ ] advertisements … published in consumer and business magazines, newspapers, billboards, and on websites [and] hundreds of national, regional and local television and radio commercials," *id.* ¶ 18. *See also Hadley*, 2019 U.S. Dist. LEXIS 136791, at *73-74 (noting "…surveys and expert testimony regarding consumer expectations are not required" and denying motion to strike Mr. Silverman's expert opinions in that case, noting they "are based on his many years of marketing experience and his review of [defendant's] own internal consumer research and other documents"); *Hobbs*, 2016 WL 7647674, at *4-5 (specifically rejecting defendant's argument that Mr. Silverman's testimony was inadmissible because he did not conduct a survey, finding his "declaration relevant to assess whether a significant portion of reasonable consumers would be misled" and holding that his "statements were within [his] expertise as an advertising consultant.").

61.    Mr. Silverman believes that he can "eyeball" an advertisement or product labels and determine what a consumer would take away from it. (*Id.* at 111:24–112:8.)

**Plaintiffs' Response:** Undisputed. Mr. Silverman believes he can do so because of "the practical knowledge and insights [he has] gained over the course of a 50-year career working at the highest levels in the 'real world' of marketing, branding and advertising," Pltfs' Ex. 13, Silverman June 2019 Rpt. ¶ 9, including the creation of "[t]housands … of [ ] advertisements … published in consumer and business magazines, newspapers, billboards, and on websites [and]

hundreds of national, regional and local television and radio commercials," *id.* ¶ 18. *See also* Pltfs'
Ex. 22, Silverman Aug. 16, 2019 Report ("Silverman Aug. 2019 Rpt.") ¶¶ 12, 20, 27-38, 69, 78-
80, 83; *Hadley*, 2019 U.S. Dist. LEXIS 136791, at *73-74 (noting "…surveys and expert testimony
regarding consumer expectations are not required" and denying motion to strike Mr. Silverman's
expert opinions in that case, noting they "are based on his many years of marketing experience and
his review of [defendant's] own internal consumer research and other documents"); *Hobbs*, 2016
WL 7647674, at *4-5 (specifically rejecting defendant's argument that Mr. Silverman's testimony
was inadmissible because he did not conduct a survey, finding his "declaration relevant to assess
whether a significant portion of reasonable consumers would be misled" and holding that his
"statements were within [his] expertise as an advertising consultant.").

**G.      Dr. Dubé's Initial Damages Calculation**

62.      Dr. Jean-Pierre Dubé was retained by counsel for Plaintiffs to measure the
economic damages in this case. (Ex. 12, Expert Report of Professor of Jean-Pierre Dubé, dated
November 30, 2018 ("Dubé Nov. 2018 Report") ¶ 2.)

**Plaintiffs' Response:** Undisputed.

63.      Dr. Dubé designed and conducted a survey which he then used in a conjoint analysis
for the purposes of measuring the value to consumers of the Challenged Terms. (*Id.* ¶¶ 2, 33–34,
85–86.) Dr. Dubé states that the target population for the survey was individuals in the United
States "who have gone to a salon and had extensive chemical treatments and therefore have
overprocessed hair." (*Id.* ¶ 33.)

**Plaintiffs' Response:** Disputed as phrased. Dr. Dubé did design and conduct a Conjoint
Analysis with a random sample of 1,000 respondents to measure class wide economic damages
associated with the Challenged Claims. Pltfs' Ex. 23, Dr. Dubé November 2018 Report ("Dubé

Nov. 2018 Rpt.") ¶ 100. As to the target population, Dr. Dubé stated:

> Formally, the target population consists of the entire set of units for which the survey data are used to make statistical inferences from the sample, i.e., the population for which the sample results are meant to generalize. In this case, the Defendants' target population for their "in-salon brands" consists of individuals in the United States "who have gone to a salon and had extensive chemical treatments and therefore have overprocessed hair." By identifying the target population as U.S. consumers and potential consumers of in-salon shampoos for overprocessed hair and then sampling from this target population, the survey results can be used to determine preferences for these consumers based on the results from the survey sample.

*Id.* ¶ 33.

64.     The result of Dr. Dubé's analysis were two separate measurements – price premium and willingness-to-pay, each based on the sale of an individual unit of the Products and expressed as a percentage of the "current price actually charged." (*Id.* ¶¶ 6, 86.)

**Plaintiffs' Response:** Disputed as phrased; mischaracterizes the full language in the report cited. Dr. Dubé stated the following regarding the willingness to pay and price premium calculation:

> The total economic damage to Class Members is $4.18 per product purchase, or 21% of the current price actually charged for the Challenged Product. This economic damage includes both the price premium, computed to be $1.51 (or 7% of the current price actually charged for the Challenged Product) and the expected, incremental benefits to class members in dollars associated with Challenged Claims on the label of the Challenged Product. This approach is the proper way to measure the amount of monetary damage each class member incurred as a result of purchasing the Challenged Product with the Challenged claims, and is supported by well-established, peer-reviewed, published articles in leading scientific journals in economics and quantitative marketing. Dr. Dubé computed one measure of individual damages representing the "price premium" paid by each purchaser of the Products as a result of the presence on the Products' labels of the Challenged Terms. (*Id.* ¶ 97.) According to Dr. Dubé, the price premium is $1.51 per product purchase, or 7% of the "current price actually charged" for the product. (*Id.*)

Pltfs' Ex. 23, Dubé Nov. 2018 Rpt. ¶ 6.

> I measure the classwide economic damages associated with the Challenged Claims with a standard, microeconomic approach used extensively in the peer-reviewed academic literature. Following the research of Nobel Prize winning economist Sir

John Richard Hicks (Hicks 1939), I define classwide economic damages as the total dollar amount of compensation that would be required to restore Class Members' economic value but for the Challenged Claims on the Challenged Product's packaging. In applied work, this measure of compensation is often termed "willingness-to-pay" (hereafter, "WTP") since it would measure how much Class Members should be willing to pay to retain all the perceived economic benefits (from the supply and demand sides) in the factual scenario (i.e. with the Challenged Claims on the labels of the Challenged Product) relative to the but-for scenario (i.e. with the Challenged Claims removed from the labels of the Challenged Product).

*Id.* ¶ 86.

65.     Dr. Dubé computed one measure of individual damages representing the "price premium" paid by each purchaser of the Products as a result of the presence on the Products' labels of the Challenged Terms. (*Id.* ¶ 97.) According to Dr. Dubé, the price premium is $1.51 per product purchase, or 7% of the "current price actually charged" for the product. (*Id.*)

**Plaintiffs' Response:** Disputed as phrased; mischaracterizes the full language in the report cited. Dr. Dubé stated the following:

The factual and expected, but-for equilibrium prices are reported in Table 4. I find that the Challenged Product's expected price would fall to $19.49 in equilibrium. Therefore, taking into account the supply side of the market, I estimate a price premium associated with the Challenged Product of $1.51, or 7% of the actual price of the Challenged Product.

Pltfs' Ex. 23, Dubé Nov. 2018 Rpt. ¶ 97.

66.     Dr. Dubé also computed another measure of individual damages representing consumers' "willingness to pay" (or "WTP") for the Challenged Terms. According to Dr. Dubé the WTP damages are $4.18 per product purchase, or 21% of the "current price actually charged" for the product. (*Id.* ¶ 6.)

**Plaintiffs' Response:** Disputed as phrased; mischaracterizes the full language in the report cited. Dr. Dubé stated the following regarding the willingness to pay calculation:

The total economic damage to Class Members is $4.18 per product purchase, or 21% of the current price actually charged for the Challenged Product. This economic damage includes both the price premium, computed to be $1.51 (or 7%

of the current price actually charged for the Challenged Product) and the expected, incremental benefits to class members in dollars associated with Challenged Claims on the label of the Challenged Product. This approach is the proper way to measure the amount of monetary damage each class member incurred as a result of purchasing the Challenged Product with the Challenged claims, and is supported by well-established, peer-reviewed, published articles in leading scientific journals in economics and quantitative marketing.

Pltfs' Ex. 23, Dubé Nov. 2018 Rpt. ¶ 6.

67.     When calculating individual price premium and willingness-to-pay damages, Dr. Dubé based his calculation on what he concluded was the "current price actually charged" for a particular size of the shampoo Product. (*See id.* ¶¶ 6, 31, 72, 93, 97, 102, 103; Ex. 13, Conjoint Analysis Response Declaration of Professor Jean-Pierre Dubé, dated June 10, 2019 ("Dubé June 2019 Decl.") ¶¶ 4, 21; Ex. 14, Conjoint Analysis Sur-Rebuttal Declaration of Professor Jean-Pierre Dubé, dated Aug. 16, 2019 ("Dubé Aug. 2019 Decl.") ¶¶ 3, 52; *see also* Ex. 15, Deposition of Jean-Pierre Dubé, dated Sept. 5, 2019 ("Dubé Sept. 2019 Tr.") at 235:15– 236:4 (stating he would use $21 because it was the "going rate" for authorized sellers based on his own observations); *id.* at 237:11–13 (testifying that he would use $21 for the shampoo because "the data on authorized dealers … suggest[s] $21 is the right price."); 259:7–11 (denying that he would use MSRP as an input).)

**Plaintiffs' Response:** Disputed as phrased; mischaracterizes the full language in the report cited as well as Dr. Dubé's deposition testimony. Dr. Dubé stated the following regarding his damages calculation and the price levels in his conjoint analysis survey:

Finally, I used the set of prices actually charged for the tested brands to determine a set of tested price levels that is both realistic and sufficiently varied to learn respondents' price sensitivities. The available shampoo products varied according to the following prices

• $11

• $13

• $15

- $19

- $25

- $30

Pltfs' Ex. 23, Dubé Nov. 2018 Rpt. ¶ 31.

> Please see Exhibit 7 for images of receipts for the prices paid for each of the tested brands. The price levels for shampoo were determined by examining retail price data for in-salon shampoos at Ulta, Beauty Collection and Planet Salon (an Aveda salon) in Los Angeles on November 2, 2018. (See Exhibit 7) Moreover, the $21 price for a 13.5 oz bottle of Matrix Biolage Advanced shampoo with the Challenged Claims on the label is the same as the price reported in the Ugone Declaration for Ulta.com on September 6, 2017, more than a year earlier (see Figure 8 of Ugone Declaration). The list of tested price levels captures a range of prices that is both realistic and also sufficiently varied to learn about consumer price sensitivity.

*Id.* ¶ 31, nn. 13, 14.

Plaintiffs also dispute that Dr. Dubé provided testimony "denying that he would use MSRP as an input." In fact, he testified as follows:

> Q. Okay. Would you use the MSRP?

> A. I would use the same approach that I used for the – for the shampoos, which is to look and see which prices are charged at the shelf. The MSRP can be informative. On the case of shampoo, it turns out that most authorized dealers were using the $21 MSRP.

Pltfs' Ex. 24, Dr. Dubé September 2019 Deposition ("Dubé Sept. 2019 Tr.") at 259:7-14.

68.    Dr. Dubé's November 2018 report did not compute, and did not disclose a methodology for computing, aggregate classwide damages for either the New York or California classes under either his "price premium" or his "willingness to pay" measures of individual damages. (Ex. 15, Dubé Sept. 2019 Tr. at 301:19–23.)

**Plaintiffs' Response:** Disputed to the extent that in the November 2018 report Dr. Dubé did fully disclose his methodology and set forth his calculations for classwide economic damages. *See* Pltfs' Ex. 23, Dubé Nov. 2018 Rpt. The November 2018 report did not set forth the simple

math formula to aggregate the classwide damages that was discussed in subsequent reports and testimony.

69.     Dr. Dubé's November 2018 report did not contain a basis for calculating, or an opinion about, how many bottles of the Products were sold to consumers in New York and California. (*Id.* at at 35:3–5; *see id.* at 35:20–36:3.)

**Plaintiffs' Response:** Disputed as phrased; mischaracterizes Dr. Dubé's deposition testimony. He stated as follows:

> Q. But your damages report doesn't offer an opinion on the aggregate class-wide damages, correct?
>
> A. It does not offer an opinion on the total number of bottles sold, but the total class-wide damages would be 4.18 times the number of bottles sold. So that is an opinion about class-wide damages.
>
> Q. Where in your report do you talk about multiplying the $4.18 by a number of bottles sold?
>
> A. I may be mistaken, but I believe this was discussed in the class cert report.
>
> Q. Okay. And what data are you aware of that would allow you to do that multiplication that you just described?
>
> A. Off the top of my head, I don't recall, but there were spreadsheets that had total shipments from the – from the defendants. So, again, presumably, you would take those shipment data and multiply them by 4.18 to come up with the number of class-wide economic damages.

Pltfs' Ex. 24, Dubé Sept. 2019 Tr. at 35:20-25, 36:2-18.

70.     On September 5, 2019, the day before expert discovery ended in this matter, Dr. Dubé testified in his deposition that he did not know if L'Oréal's spreadsheets reflecting wholesale sales are broken down by state. (*Id.* at 299:5–9.)

**Plaintiffs' Response:** Disputed as phrased; mischaracterizes Dr. Dubé's deposition testimony. He stated as follows:

Q. Okay. Now, those spreadsheets that you recalled seeing prior to class certification, do you know if they're broken down state by state, in terms of the sales?

A. I don't recall.

Q. If they aren't broken down by state, how are you going to determine state – state-specific sales as part of your analysis?

A. There's a bunch of ways we could do this, I suppose. I could come up with some hypotheticals now. We could use the class – the – the people in the response – in our respondent panel, who said that they were a class member – or, sorry – that I'm calling class members, and look at the percentages of those who came from New York and California, and we could allocate the bottles that way.

The other thing to do would be – still seems a little surprising to me that the own products, but if they want to stand by that they don't know anything about sales and revenues by product, that's fine. That would be one way is just do an allocation. they don't know anything about sales and revenues by product, that's fine. That would be one way is just do an allocation.

Pltfs' Ex. 24, Dubé Sept. 2019 Tr. at 299:5-25, 300:1-6.

71.    At his September 5, 2019 deposition, Dr. Dubé testified he had not yet determined how he would get the "quantity" input into his aggregate damages calculation. (*Id.* at 301:16–302:11.)

**Plaintiffs' Response:** Disputed as phrased; mischaracterizes Dr. Dubé's deposition testimony. *See* Plaintiffs' Responses to Numbers 57 and 58 above, where Dr. Dubé sets forth the use of shipment data and state breakdown in his respondent panel to determine the "quantity" input.

72.    At his September 5, 2019 deposition, Dr. Dubé testified he did not know whether the number of units sold in California and New York was information available in the record in this case, either from L'Oréal or other sources. (*Id.* at 299:5–9.)

**Plaintiffs' Response:** Disputed as phrased; mischaracterizes Dr. Dubé's deposition testimony. *See* Plaintiffs' Responses to Numbers 57 and 58 above.

H.      **Dr. Dubé's Supplemental Aggregate Classwide Damages Calculation**

73.     Dr. Dubé's supplemental report, dated November 15, 2019, attempts to calculate the amount of aggregate classwide damages by estimating the number of Products sold to consumers in New York and California. (Ex. 16, Aggregate Classwide Economic Damages Declaration of Professor Jean-Pierre Dubé ("Dubé Nov. 2019 Decl.") ¶¶ 1, 5.).

**Plaintiffs' Response:** Disputed as to the phrase "attempts to calculate." Undisputed that in calculating aggregate classwide damages, Dr. Dubé apportioned Defendants' nationwide wholesale bottle sales of **Keratin**dose Products into units sold in New York and California.

74.     Dr. Dubé's post-deadline declaration on aggregate damages uses a "(#bottles) x ($ price) x (% damages)" formula. (*Id.* ¶ 4.)

**Plaintiffs' Response:** Undisputed as to the aggregate damages formula. Disputed that the declaration was submitted "post-deadline" as the Court extended the deadline for Dr. Dubé's report.

75.     To determine the "quantity" input, Dr. Dubé estimates the total number of bottles sold in New York and California based on the number of class members who took his survey. (*Id.* ¶¶ 5, 8.)

**Plaintiffs' Response:** Disputed as to the phrase "based on the number of class members who took his survey," which is vague. To determine the quantity input, Dr. Dubé offered multiple options for calculating damages or restitution using Defendants' wholesale sales data, including either (1) total numbers of bottles sold by Defendants into the consumer marketplace, or (2) only customer orders that have a corresponding re-order at a later date, "as an even more conservative measure." Using Defendants' own sales data, Dr. Dubé then apportioned the nationwide sales to New York and California using population data from his survey sample, which he compared to

census data. In order to be more conservative, Dr. Dubé reduced this number by a shrinkage rate of 5%, which is more than two to three times the average reported shrinkage rates in the United States. *See* Pltfs' Ex. 20, Dubé Nov. 2019 Rpt.

76.     Dr. Dubé based his estimate of aggregate classwide damages on the fact that 10 of the 105 purchasers who participated in his survey lived in California and 8 lived in New York. (*Id.*).

**Plaintiffs' Response:** Disputed as to the implication that Dr. Dubé's survey was based on only 105 survey participants, or that his aggregate classwide damages calculation is based solely on 10 consumers from California and 8 from New York. Dr. Dubé's survey involved 1,000 respondents. Of the 1,000 respondents, 105 had previously purchased the Challenged Products, and Dr. Dubé found that their preferences were consistent with those of the other nearly 900 respondents, which "is sufficient to reach a valid conclusion about classwide preferences and economic damages." Pltfs' Ex. 23, Dubé Nov. 2018 Rpt. ¶ 40. Dr. Dubé's finding "*is analogous to the results in the Seggev Declaration,*"[2] which also failed to detect any significant differences in results measured at the nationwide level versus at the level of the states of New York and California." *Id.* ¶ 67 (emphasis added). Therefore, Dr. Dubé was able to validly and reliably opine that his findings from the 1,000 respondents were consistent with his findings from Class Members and the New York and California respondents, and Defendants.

77.     Dr. Dubé opines that the number of total bottles sold to consumers in New York and California can be reliably estimated by calculating the percentage of the 105 represented by the 10 California purchasers and the 8 New York purchasers (i.e. 9.5 and 7.6%, respectively). (*Id.*).

**Plaintiffs' Response:** Disputed as to the implication that Dr. Dubé's survey was based on

---

[2] Dr. Seggev conducted a survey that included 830 respondents from all 50 states, because he "was asked [by Defendants] to do a national study." Seggev Tr. at 131:19-132:1-5.

only 105 survey participants, or that his aggregate classwide damages calculation is based solely on 10 consumers from California and 8 from New York. Dr. Dubé's survey involved 1,000 respondents. Of the 1,000 respondents, 105 had previously purchased the Challenged Products, and Dr. Dubé found that their preferences were consistent with those of the other nearly 900 respondents, which "is sufficient to reach a valid conclusion about classwide preferences and economic damages." Pltfs' Ex. 23, Dubé Nov. 2018 Rpt. ¶ 40. Dr. Dubé's finding "*is analogous to the results in the Seggev Declaration*, which also failed to detect any significant differences in results measured at the nationwide level versus at the level of the states of New York and California." *Id*. ¶ 67 (emphasis added). Therefore, Dr. Dubé was able to validly and reliably opine that his findings from the 1,000 respondents were consistent with his findings from Class Members and the New York and California respondents, and Defendants.

78.     In estimating the number of bottles sold to class members in New York and California, Dr. Dubé relies on the nationwide sell-in wholesale data produced by L'Oréal reflecting sales to distributors and chain salons.  (*Id.*).

**Plaintiffs' Response:** Undisputed that in calculating aggregate classwide damages, Dr. Dubé relies, in part, on sell-in wholesale data produced by L'Oréal, which reflect sales to L'Oréal's customers. Pltfs' Ex. 20, Dubé Nov. 2019 Rpt.

79.     Dr. Dubé applies a "shrinkage rate" of 5% to the wholesale amount, which he claims accounts for things like "theft from stores[,] a variety of process errors, accounting lapses, pricing mistakes, and improper inventory management." (*Id.* ¶ 9 & n. 13.).

**Plaintiff's Response:** Undisputed that, in order to have a conservative lower bound, Dr. Dubé uses a shrinkage rate of 5%, which he defines, in part, as being "largely due to theft from stores; a variety of process errors, accounting lapses, pricing mistakes, and improper inventory

management [that] also contribute to such losses." Pltfs' Ex. 20, Dubé Nov. 2019 Rpt.

80.    Dr. Dubé does not offer an explanation of how he reached a "shrinkage rate of" 5%, other than to state that the number 5% is a "conservative lower bound."  (*Id.*)

**Plaintiffs' Response:** Disputed. Dr. Dubé cites *The New Barometer 2014-2015: The Global Retail Theft Barometer*, page 15, in reference to his opinion regarding shrinkage. Pltfs' Ex. 20, Dubé Nov. 2019 Rpt.

81.    Dr. Dubé estimates what he describes as a second, "even more conservative measure" of the number of bottles sold to class members in New York and California, which he claims computes total bottle sales only using "those customer orders that have a corresponding re-order at a later date." (*Id.* ¶¶ 10, 12.).

**Plaintiffs' Response:** Undisputed that "[a]s an even more conservative measure of retail bottle sales, [Dr. Dubé] alternately compute[d] total bottle sales using only those customer orders that have a corresponding re-order at a later date. As explained in the Dubé Deposition, all wholesale inventory is acquired for the purpose of resale to end consumers. Therefore, when L'Oréal's customers reorder inventory, we can reasonably conclude that they sold their previous inventory." Pltfs' Ex. 20, Dubé Nov. 2019 Rpt.

82.    Dr. Dubé offers that he could estimate classwide damages by relying on L'Oréal's sell-through data, but does not perform that estimate. (*Id.* at 3 n.14.).

**Plaintiffs' Response:** Disputed as to the definition of "classwide damages." Dr. Dubé's classwide damages finding is 21% (or 7%) of the purchase price of the **Keratin**dose Products.

83.    To determine the "price" input for his "price x quantity x % damages" formula, Dr. Dubé states that he relies on the Products' "MSRPs." (*Id.* ¶¶ 6–7.).

**Plaintiffs' Response:** Undisputed.

84.     Dr. Dubé's estimates of aggregate classwide damages do not account for any variation in pricing from salon to salon, or for discount (promotional) pricing.  (*Id.*).

**Plaintiffs' Response.** Disputed. Dr. Dubé's aggregate classwide damages calculation is based, in part, on L'Oréal's statement, under oath in federal court, that L'Oréal's MSRP for the **Keratin**dose Products is based on a "markup formula common to the salon industry," and that because of this markup formula, the "MSRP lists *represent good proxies* for the prices that salons charge consumers for L'Oréal Products." Pltfs' Ex. 19, Lyden Decl. ¶ 14. Also, in order to be conservative, Dr. Dubé used the low end of the rage of the MSRP, which is supported by L'Oréal's additional statement, under oath and in federal court, that Defendants' prior research has found that "… on average, consumers who purchase L'Oréal products from non-salon retailers pay more for those products than the MSRP." *Id.* at ¶15.

85.     The anecdotal pricing survey undertaken during Phase I discovery by Defendants' damages expert, Keith R. Ugone, Ph.D., shows variation in pricing below the MSRP. (Ex. 17, Expert Report of Keith R. Ugone, Ph.D., dated November 29, 2017 ("Ugone Nov. 2017 Report") ¶¶ 87-91.).

**Plaintiffs' Response:** Disputed as to the validity of the data referenced in paragraphs 87-91, as Dr. Ugone failed to attach any evidence of his findings, such as a receipt or webpage, and Plaintiffs have no way of verifying its authenticity (which will be the subject of a future motion in limine). Further disputed as to the implication that any "variation" that Dr. Ugone found is material as the data referenced in those paragraphs was based on Dr. Ugone's alleged findings on a single day, September 6, 2017, and includes mostly non-salon retailers. Further disputed by L'Oréal's own data, as described in its statements under oath and in federal court: in the declaration of Christopher Lyden, a representative of L'Oréal, L'Oréal testified to the existence of a database

that it maintains, which showed that "… on average, consumers who purchase L'Oréal products from non-salon retailers pay more for those products than the MSRP." Pltfs' Ex. 19, Lyden Decl. ¶ 15.

86.     Dr. Dubé does not present a confidence interval for his aggregate damages estimate.

**Plaintiffs' Response:** Undisputed. A confidence interval was not needed for Dr. Dubé's aggregate damages calculation, as Dr. Dubé's analysis was based on Bayes theory. Pltfs' Ex. 36; Dr. Dubé June 2019 Decl.

87.     In his June 10, 2019 report, Dr. Dubé asserts that studies should be subject to a 95% confidence interval to assess their reliability. (Ex. 16, Dubé June 2019 Decl. ¶174.)

**Plaintiffs' Response:** Disputed.  Dr. Dube has never opined that all "studies should be subject to a 95% confidence interval to access their reliability" as Defendants suggest.  Dr. Dube states the following about the amount of statistical noise in the open-ended question study that Dr. Simonson conducted: "Inspection of the 95% confidence interval reveals that, even with over 200 respondents in each cell, Dr. Simonson's data still have a lot of statistical noise. This finding is not very surprising given all the problems that experts and practitioners have noted regarding open-ended questions about willingness to pay.  Pltfs' Ex. 36; Dr. Dubé June 2019 Decl. ¶ 174.

Dated:  January 31, 2020

**GREG COLEMAN LAW PC**

*/s/ Rachel Soffin*
Rachel Soffin (*pro hac vice*)
Adam Edwards (*pro hac vice*)
Greg Coleman (*pro hac vice*)
800 S. Gay Street, Suite 1100
Knoxville, Tennessee 37929
Telephone: (865) 247-0080
rachel@gregcolemanlaw.com
adam@gregcolemanlaw.com
greg@gregcolemanlaw.com

**BROWN, LLC**
Jason T. Brown
Patrick S. Almonrode
111 Town Square Place, Suite 400
Jersey City, New Jersey 07310
Telephone: (877) 561-0000
jtb@jtblawgroup.com
patalmonrode@jtblawgroup.com

**MORGAN & MORGAN
COMPLEX LITIGATION GROUP**
Jonathan B. Cohen (*pro hac vice*)
201 N. Franklin St., 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505
jcohen@forthepeople.com

**BARBAT, MANSOUR & SUCIU PLLC**
Nick Suciu III (*pro hac vice*)
1644 Bracken Rd.
Bloomfield Hills, Michigan 48302
Telephone:  (313) 303-3472
nicksuciu@bmslawyers.com

**SOMMERS SCHWARTZ P.C.**
Jason Thompson (*pro hac vice*)
Rod Johnston (*pro hac vice*)
One Towne Square, 17th Floor
Southfield, Michigan 48076
Telephone:  (248) 355-0300
jthompson@sommerspc.com
rjohnston@sommerspc.com

*Attorneys for Plaintiffs and the Certified Classes*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on March 20, 2020, a true and correct copy of the foregoing was filed with the Court and served electronically through CM/ECF system to all counsel of record registered to receive a Notice of Electronic Filing for this case.

<u>*s/Rachel Soffin*</u>
Rachel Soffin
GREG COLEMAN LAW PC
800 S. Gay Street, Suite 1100
Knoxville, Tennessee 37929
Telephone: (865) 247-0080
rachel@gregcolemanlaw.com