UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X
                         :

BRANDI PRICE, et al.,           :

                       :

               Plaintiffs,  :        17 Civ. 614 (LGS)

                       :

        -against-        :      OPINION AND ORDER

                       :

L'ORÉAL USA, INC., et al.,     :

                       :

               Defendants. :

-----------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

      Plaintiffs Brandi Price and Christine Chadwick bring consumer class action claims against

Defendants L'Oréal USA, Inc. ("L'Oréal" ), and Matrix Essentials, LLC on behalf of two classes:

(1) a California Class, bringing claims of breach of express warranty (Count III); violation of

California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*, Unfair

Business Acts and Practices Prong (Count VI), Fraudulent Business Acts and Practices Prong

(Count VII) and Unlawful Prong (Count VIII); and violation of the California False Advertising

Law ("FAL"), Cal. Civ. Code §§ 17500, *et seq.,* (Count X); and (2) a New York Class, bringing

claims of violation of the Unfair and Deceptive Trade Practices Act, New York GBL §§ 349, *et*

*seq.* (Count IX); and breach of contract (Count II).

      Defendants now move for summary judgment as to all of Plaintiffs' remaining claims, and

move to exclude certain of Plaintiffs' experts' testimony.  Plaintiffs cross-move for partial

summary judgment as to the deceptiveness elements of the UCL, FAL and New York GBL

Section 349 claims, and as to liability for violation of the Unlawful Prong of the UCL.[1]

---

[1] Plaintiffs' cross-motion also asserts that they seek summary judgment on the "unfair" prong of
the UCL, but the memorandum of law does not address this prong and makes an argument
regarding only the "unlawful" prong.  Any motion as to the "unfair" prong is denied.

For the following reasons, Defendants' motion for summary judgment is granted in part; Defendants' motion to exclude the testimony of Bruce Silverman is granted in part; Defendants' motion to exclude certain testimony of Jean-Pierre Dubé is granted; and Plaintiffs' motion for summary judgment is denied.

## I.   BACKGROUND

### a.   Relevant Facts

Familiarity with the underlying facts is assumed.  *See Price v. L'Oréal USA, Inc.* ("*Price I*"), No. 17 Civ. 0614, 2017 WL 4480887, at *1 (S.D.N.Y. Oct. 5, 2017); *Price v. L'Oreal USA, Inc.* ("*Price II*"), No. 17 Civ. 614, 2018 WL 3869896, at *1 (S.D.N.Y. Aug. 15, 2018).  Unless otherwise stated, the following facts are undisputed and drawn from the parties' submissions and Rule 56.1 statements.

In February 2013, Defendants launched a haircare product line called Matrix Biolage Advanced ("MBA").  One of the four sub-modules of this product line is the Keratindose system of three products: the Pro-Keratin + Silk Shampoo, the Pro-Keratin + Silk Conditioner and the Pro-Keratin + Silk Renewal Spray (collectively, the "Products").  The word "Keratindose" appears on the front of the Products' labels, and the first seven letters of the word appear in bold font as follows: **Keratin**dose.

Keratin is a protein that is found in human hair and is also a treatment that customers administer to their hair.  The Products do not and have never contained keratin as an ingredient, and the ingredients lists on the back labels of the Products do not include keratin.  Plaintiffs are purchasers of the Products who assert that the terms "Keratindose" and "Pro-Keratin" (the "Challenged Terms") would lead reasonable consumers to believe that the Products contain keratin, and that they would not have purchased the Products, or would not have paid as much for the Products, had they known the Products did not contain keratin.

### b.  Procedural History

Plaintiffs commenced this action in January 2017, and amended the Complaint in May 2017.  In October 2017, Defendants' motion to dismiss was denied, except as to Count V for unjust enrichment to the extent asserted under New York or California law. *See Price I*, 2017 WL 4480887, at *7.  In August 2018, Plaintiffs' motion for class certification was granted in part and the following two classes were certified:

> A New York Class, defined as "[a]ll persons who reside in the state of New York and purchased Matrix Biolage Advanced Keratindose Pro-Keratin + Silk Shampoo, Pro-Keratin + Silk Conditioner, and/or Pro-Keratin + Silk Renewal Spray between January 26, 2013 and the present," certified as to Count IX (New York GBL § 349) and the Breach of Contract claim under Count II (not the alternative claim for Breach of Common Law Warranty).

> A California Class, defined as "[a]ll persons who reside in the state of California and purchased Matrix Biolage Advanced Keratindose Pro-Keratin + Silk Shampoo, Pro-Keratin + Silk Conditioner, and/or Pro-Keratin + Silk Renewal Spray between January 26, 2013 and the present," certified as to Counts III (Express Warranty), VI (California UCL, Unfair Business Acts and Practices Prong), VII (California UCL Fraudulent Business Acts and Practices Prong), VIII (California UCL, Unlawful Prong), and X (California FAL).

*See Price II*, 2018 WL 3869896, at *11-12.  The class period is defined as January 26, 2013, to November 4, 2018.  The parties' instant cross-motions for summary judgment and to exclude experts were filed in March 2020.

## I.    MOTION TO EXCLUDE PLAINTIFFS' EXPERT TESTIMONY

### a.  Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  The rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if [] (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702(a).  District Courts play a "'gatekeeping' function under Rule 702," and are "charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'"  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)); *accord In re Aluminum Warehousing Antitrust Litig.*, No. 13 MD 2481, 2020 WL 4218329, at *19 (S.D.N.Y. July 23, 2020).  The Second Circuit has outlined the following two-step inquiry:

> [1] [a] trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, *i.e.*, whether it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence[; and] [2] the district court must determine whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered [by considering] the indicia of reliability identified in Rule 702 . . . .

*Amorgianos*, 303 F.3d at 265 (alterations, quotation marks and citations omitted); *accord Chiaracane v. Port Auth. Trans-Hudson Corp.*, No. 18 Civ. 2995, 2020 WL 905628, at *5 (S.D.N.Y. Feb. 25, 2020).  "In short, the district court must 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Amorgianos*, 303 F.3d at 265-66 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).  Examination of an expert's analysis should be "rigorous," but "[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible." *Id.* at 267.  The party proffering the expert bears the burden of proof on the admissibility of his expert's testimony.  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016).[2]

---

[2] Plaintiffs assert that the certified UCL claims will be subject to a bench trial, and, therefore, the Court should use "an even more liberal interpretation of *Daubert*."  *See Cates v. Trustees of Columbia Univ. in City of New York*, No. 16 Civ. 06524, 2019 WL 8955333, at *6 (S.D.N.Y. Oct.

### b. Motion to Exclude Mr. Silverman's Testimony

Plaintiffs retained Mr. Bruce Silverman as a marketing, advertising and branding expert to rebut certain expert reports submitted on behalf of Defendants. Mr. Silverman opines, *inter alia*, that "a reasonable consumer would fully expect a family of hair care products named **Keratin**dose to include keratin, just as they would expect of any product that includes a well-known ingredient as part of its name." Defendants move to exclude the testimony of Mr. Silverman, arguing that his experience is inadequate because his "career has provided him with no experience in in-salon hair care products or the salon channel generally," and that his opinion regarding how a consumer would understand the Challenged Terms is mere *ipse dixit* and fails the admissibility requirements of *Daubert*. The motion is granted in part.

Mr. Silverman has an impressive fifty years of experience in advertising. Among other experiences, Mr. Silverman has reviewed thousands of proprietary quantitative studies providing insights into consumers' understanding and beliefs about various brands, products and advertising; personally interviewed more than five thousand consumers; and attended at least 3,500 focus group sessions, "many of which were devoted entirely to the subject of health and beauty aids." His opinion in this case is based on this experience, as well as "[a] simple Google search" for "keratin shampoos" and a search for the term "keratin shampoos" on Amazon.com. Mr. Silverman opines that, because "many women . . . are already aware of (or have ample opportunity to be aware of) the restorative properties of keratin," "consumers would see the Challenged Claims as branded ingredient(s) that differentiate the Challenged Products from

_____

25, 2019), *report and recommendation adopted,* No. 16 Civ. 6524, 2020 WL 1528124 (S.D.N.Y. Mar. 30, 2020) ("[E]xpert evidence should be quite freely admitted so that the judge may have the benefit of live testimony and cross-examination to determine how much weight, if any, to give to the expert's conclusions.") (citations and quotation marks omitted). But Plaintiffs bring claims in addition to the UCL claim to which these expert reports are relevant, so the Court declines to do so.

competitive products." He further opines that "a reasonable consumer would fully expect a family of hair care products named **Keratin**dose to include keratin, just as they would expect of any product that includes a well-known ingredient as part of its name."

Mr. Silverman's opinions that are premised on his own experience satisfy the factors set forth in Rule 702. "The test for reliability of expert testimony is flexible, especially in cases where the expert's knowledge is non-scientific and based on his experience." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 49 (S.D.N.Y. 2016); *see also* Advisory Committee Notes, 2000 Amendment, FED. R. EVID. 702 ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony"). "In cases where experts draw a conclusion from a set of observations based on extensive and specialized experience, the method is the application of experience to facts." *Scott*, 315 F.R.D. at 50 (citation and quotation marks omitted). The motion to exclude is denied as to Mr. Silverman's opinions that a reasonable consumer "would expect [] any product that includes a well-known ingredient as part of its name" to include that ingredient, and "consumers would see the Challenged Claims as branded ingredient(s) that differentiate the Challenged Products from competitive products," which opinions are based on his experience and his personal review of the Challenged Terms and product labels. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."); *Hobbs v. Brother Int'l Corp.*, No. 15 Civ. 1866, 2016 WL 7647674, at *4 (C.D. Cal. Aug. 31, 2016) (denying motion to exclude Silverman's report opining on the perception of a reasonable consumer based solely on his experience and personal review of the challenged statements because "the evidence that Silverman uses to form his opinion ultimately goes to the weight of the testimony, not admissibility.").

In contrast, Mr. Silverman's opinion that keratin is a well-known ingredient in hair products, and that "many women . . . are already aware of (or have ample opportunity to be aware of) the restorative properties of keratin" in hair products is not based on his experience, nor is it based on a reliable methodology.  Mr. Silverman does not claim to have any experience from which he can opine on consumer knowledge of keratin as an ingredient in hair products.  Rather, this opinion is based on certain Google searches (one of which consisted of a search for "keratin shampoos" and others which he did not identify), a search on Amazon.com for "keratin shampoos" and a review of emails and testimony from Defendants' employees and the United States Patent and Trademark Office's ("USPTO") ruling on Defendants' trademark application. With respect to the Google searches, Mr. Silverman stated in his deposition that he

> didn't list every article that I saw, I listed those that I cited, that I quote.  What impressed me was that there were an awful lot of articles about keratin and almost universally defining keratin as -- as the materials from which hair and nails are made and that keratin treatments are purportedly restorative.  So that's what was informing me about why a woman, why a consumer with damaged hair would be responsive to the word "keratin" . . . .

Without a record of the materials reviewed, Mr. Silverman's methodology cannot be tested, challenged or replicated.  *See LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 638 (S.D.N.Y. 2016), *aff'd*, 720 F. App'x 24 (2d Cir. 2017) (excluding expert testimony regarding secondary meaning where the expert testified that he had arrived at his conclusions by reviewing, *inter alia*, the content of the images and comments on social media platforms, but failed to record the search terms used or the sites viewed, or to preserve the materials on which he purportedly relied).  Of the five articles Mr. Silverman cites in the report, only one[3] is early enough in time to reflect the awareness of consumers during the class period; the other four are

---

[3] *See* "Keratin Hair Treatments: What to Expect," November 16, 2012, https://www.webmd.com/beauty/features/keratin-hair-straightening-treatments#2 (accessed July 21, 2020).

dated after the class period ended[4] or less than two months prior to the end of the class period.[5]

Similarly, since the Amazon.com search was conducted in 2019 after the class period,[6] the search

would not necessarily have revealed hair products that were available during the class period.

And the produced emails sent between Defendants' employees and the USPTO ruling do not

show the knowledge of consumers during the class period.

"[W]hen an expert opinion is based on data, a methodology, or studies that are simply

inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of

that unreliable opinion testimony."  *Amorgianos*, 303 F.3d at 266; *see also AU New Haven, LLC

v. YKK Corp.*, No. 15 Civ. 3411, 2019 WL 1254763, at *24 (S.D.N.Y. Mar. 19, 2019), *objections

overruled*, No. 15 Civ. 3411, 2019 WL 2992016 (S.D.N.Y. July 8, 2019) (excluding in part an

expert opinion where the expert "goes over internal [defendant] documents and testifies that the

documents suggest that [defendant] agrees with his conclusion" because "[t]his testimony is

nothing more than a narrative of the case which a juror is equally capable of constructing").  To

the extent that Mr. Silverman opines on consumers' awareness of keratin as an ingredient in

haircare products and consumers' resulting perception of the Challenged Terms, those opinions

are excluded as unreliable.  This includes Mr. Silverman's opinion that "many shampoos actually

contain keratin and feature that word on their labels," and the subsequent conclusion that

"[c]learly, keratin is a desirable ingredient that many consumers would believe to be a valuable

---

[4] *See* "9 Best Keratin Shampoo Brands for 2019" (no web link provided); Phillips, Ashley,
"These Keratin Shampoos Are Like a Life Raft for Damaged Hair," April 10, 2019,
https://www.bestproducts.com/beauty/g2464/keratin-shampoos-for-damaged-hair (accessed July
21, 2020).

[5] *See* "What is Keratin?," September 16, 2018, https://www.healthline.com/health/keratin
(accessed July 21, 2020); Hall, Chloe, "14 Best Keratin Shampoos For Stronger, Shinier Hair,"
August 22, 2018, https://www.elle.com/beauty/hair/g14409298/best-keratin-shampoo/ (accessed
July 21, 2020).

[6] Mr. Silverman's report does not assert when the Amazon.com search was conducted, but since
he was retained in March 2019, the Court assumes the search was conducted after that date.

component in a shampoo, and if they see that word on a label, they would expect it to be in the product."

Plaintiffs' caselaw is not to the contrary, and supports the proposition that expert reports regarding consumer perception need not be based on scientific surveys, but that experts may testify based on their own experience. *See Lucky Brand Dungarees, Inc. v. Ally Apparel Res. LLC*, No. 05 Civ. 6757, 2009 WL 969930, at *2 (S.D.N.Y. Apr. 6, 2009) (in a trademark infringement case, denying a motion to exclude an expert opinion based on the expert's personal review of the merchandise and advertising, but granting the motion as to the expert's opinions that were based on an informal survey of his colleagues due to the "unclear [pu]rpose and insufficiently validated nature of [the expert's] study methodology"); *Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 580 (N.D. Cal. 2020) (denying a motion to exclude Mr. Silverman's testimony as to the meaning and materiality of certain challenged statements found on cereal packaging, and noting that "Silverman's in-depth experience in this field, including attending numerous focus groups centered on marketing cereal and developing marketing plans for cereal products, qualify him to opine on the matters addressed in his Report"); *Hadley v. Kellogg Sales Co.*, No. 16 Civ. 04955, 2019 WL 3804661, at *24 (N.D. Cal. Aug. 13, 2019) (denying a motion to strike Mr. Silverman's testimony where the defendant challenged the testimony for failing to conduct a consumer survey because the court found that a survey was not required, and that Mr. Silverman's opinions were based on his experience and his review of the defendant's own internal consumer research and other documents); *Hobbs*, 2016 WL 7647674, at *4-5 (denying a motion to exclude Mr. Silverman's opinion that "[a] reasonable consumer would interpret the terms *letter-size* or *legal-size* document glass . . . to mean the Subject Printers are fully capable of scanning the full content of letter or legal size documents" because "[t]hese statements are within Silverman's expertise as an advertising consultant.") (alterations omitted).

### c.   Motion to Exclude Dr. Dubé's Damages Model

Dr. Jean-Pierre Dubé was engaged as an expert by Plaintiffs "to measure the economic damages in this case on a class-wide basis."  Dr. Dubé performed a choice-based conjoint survey of 1,000 respondents designed to "determine[] survey respondents' preferences for shampoo product features, including the Challenged Claims" and to "determine whether the Challenged Claims had a statistically significant impact on survey respondents' preferences and demand for the Challenged Products."  He concludes, based on this survey, that the total economic damage to Class Members is 21% of the current price actually charged for the Products (the "willingness-to-pay" calculation), with a price premium[7] of 7% of the price charged.  Defendants do not seek to exclude this opinion in their current motion.

In a separate declaration proffered after the close of expert discovery, Dr. Dubé proposes the following formula to calculate aggregate economic damages:

**Aggregate Economic Damages** = (# bottles) x ($ price) x (% damages)

Dr. Dubé also proposes the following methodologies to identify the (# bottles) and ($ price) inputs in this formula: (1) with respect to the ($ price) input, as the actual retail price of the Products was not produced, Dr. Dubé uses the low end of the range of the manufacturer suggested retail prices ("MSRP"); (2) with respect to the (# bottles) input, because Defendants do not report bottle sales by state, Dr. Dubé uses the percentage of his conjoint survey respondents who reported that they had purchased a Matrix Biolage Advanced Keratindose

---

[7] Dr. Dubé defines price premium as the difference between the price of the Products with the Challenged Claims, and his calculation of the adjusted price of the Products without the Challenged Claims, necessary to compensate for the loss in demand when the Challenged Claims are removed from the label, all else remaining equal.

"shampoo/conditioning product,"[8] and who also reported that they were residents of California or New York, to apportion bottle sales to the two states; and (3) also with respect to the (# bottles) input, because Defendants provide data only for wholesale sales rather than final retail sales to consumers, and because in practice not all wholesale bottle sales will be resold to consumers, Dr. Dubé proposes using the wholesale bottle sale numbers with a shrinkage rate of 5% or, alternatively, using only those wholesale orders that have a corresponding re-sale order at a later date, based on the assumption that re-sale orders occur only when customers have sold their previous inventory.  Dr. Dubé provides several alternate calculations for total class-wide damages based on damages percentages of 21% or 7% of product price and variations on the above assumptions.

Defendants challenge the assumptions and resulting inputs used by Dr. Dubé in his aggregate damages formula as unreliable, and seek to exclude his opinions and testimony concerning those assumptions.  Defendants' motion to exclude is granted because certain of Dr. Dubé's assumptions regarding the quantity and price of the Products sold are unreliable.

With respect to the ($ price) input, Dr. Dubé relies on the declaration of Christopher Lyden, the Senior Director of Brand Equity Protection for L'Oréal (the "Lyden Declaration"), offered in a separate case in 2013, to support his use of the low end of the range of the manufacturer suggested retail prices (MSRP) as a substitute for actual product price in his formula.  The Lyden Declaration, however, does not support this assumption, as it states the following in relevant part:

> Salons are not obligated to follow the MSRP, and L'Oréal believes that there is variability in the prices that salons charge consumers for L'Oréal Products.  L'Oréal

---

[8] Of the survey respondents, seventy stated they had previously purchased the Shampoo.  An additional thirty-five Class Members were "over-sampled" to create a sample size of 105 Class Members to calculate damages.  Of those 105, eight respondents lived in New York at the time of survey participation, and ten lived in California.

does not have statistical information about the actual prices salons charge consumers for L'Oréal Products.  Because L'Oréal calculates the MSRP by using a markup formula common to the salon industry, however, it believes that the MSRP lists represent good proxies for the prices that salons charge consumers for L'Oréal Products, at least for purposes of comparing prices charged by salons to prices charged by non-salon retailers . . . .  [] By analyzing pricing data collected through the Sample Buy Program, Brand Equity Protection has discovered that on average, consumers who purchase L'Oréal Products from non-salon retailers pay more for those products than the MSRP.  Although this appears to be the case on average, the prices charged by non-salon retailers for L'Oréal Products are widely varied.  Non-salon retailers' prices are sometimes much higher than the MSRP and sometimes much lower.  Even a single mass market, non-salon retailer will sell the same product at different prices in different geographical regions.  Further, even within the same geographical area, different non-salon retailers charge vastly different prices for L'Oréal Products.  The pricing of L'Oréal Products by non-salon retailers does not seem to follow any discernable pattern and is unpredictable.

Dr. Dubé quotes the statement that L'Oréal "believes that the MSRP lists represent good proxies for the prices that salons charge consumers for L'Oréal Products," but fails to note that the assertion is qualified as applicable for "purposes of comparing prices charged by salons to prices charged by non-salon retailers," and, in fact, "consumers who purchase L'Oréal Products from non-salon retailers pay more for those products than the MSRP."  Since the Class members here are not restricted to those who purchased the Products from salons (versus non-salon retailers), the Lyden Declaration does not support the proposition that the MSRP is an accurate substitute for the actual prices paid by Class members.

While Plaintiffs also argue that certain statements made by Defendants' corporate representative, Lisa Morris, support Dr. Dubé's assumption regarding the ($ price) input, Ms. Morris also did not describe the MSRP as reflecting what consumers actually pay for the Products.  Rather, in her deposition, she described the MSRP as based on considerations of "where [L'Oréal] would position it in the market because that's basically what pricing is the indication of" and described the process of determining the MSRP as "look[ing] at the US pricing within the whole professional products market and . . . [including] the current [retail] pricing of the Matrix products as well as competitive products" and "think[ing] about [whether they] want

[the price] to be above or below certain products of our own and of competitors" "within that pricing ladder." She notes that "[t]he salon can charge anything they want to charge the consumer. We just give a recommendation," and explains that the MSRP determination for the Products was, in part, based on the fact that Defendants "want[ed] [the cost of the Products] to be higher than current core range of Biolage [products]" but "did not want to go above twenty dollars and so we made the recommendation nineteen to above two dollars above the current Biolage." Although Ms. Morris does say, "[i]t is very much just using market guidance" and "[p]ricing is more about what does the market currently pay for the overall brand," within the full context of her deposition, it is clear that the MSRP is determined based on how L'Oréal seeks to portray the product and competitor pricing, and not on any market research regarding what customers actually pay. Accordingly, the basis proposed by Dr. Dubé for his assumption that MSRP is an accurate proxy for price paid by class members is unreliable.

Dr. Dubé's unreliable methodology for calculating price is exacerbated by his questionable assumptions regarding the (# bottles) input. First, Dr. Dubé proposes using nationwide wholesale sales data to determine nationwide retail sales numbers. Because he acknowledges that, "[i]n practice, not all wholesale bottle sales will be resold to consumers due to shrinkage (the difference between the retailer's bottles acquired into inventory and the total bottles sold to consumers)," he proposes applying a shrinkage rate of 5%, which is "more than two to three times the average of reported shrinkage rates in the United States," and cites "The New Barometer 2014-2015: The Global Retail Theft Barometer," which reports a shrinkage rate in the United States of 1.27 percent during 2014-2015.[9] Dr. Dubé does not explain why

---

[9] *See* "The New Barometer 2014-2015: The Global Retail Theft Barometer," at 21, November 2015,
https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwid0cW
SjYTrAhUPknIEHeD0D6YQFjADegQIAxAB&url=http%3A%2F%2Fwww.fmc-

multiplying this shrinkage rate by two to three times is an accurate representation of the shrinkage rate of the Products, beyond emphasizing that he used the rate "[i]n order to be conservative." This is not sufficient explanation to show a "reliable foundation" for the assumption. *Amorgianos*, 303 F.3d at 265; *see also R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 275–76 (S.D.N.Y. 2010) (observing where an expert repeatedly described his opinion as "conservative" that "the fact that Smith's estimate of damages was erroneously low rather than erroneously high is not" relevant to the admissibility of testimony and "the admissibility of . . . testimony as to damages is not saved by . . . the fact that their estimate of damages may actually understate the true extent of damage suffered by plaintiff").  Alternatively, Dr. Dubé proposes removing all wholesale orders that do not have "a corresponding re-order at a later date," explaining that "we can reasonably conclude" with respect to those sales that "they sold their previous inventory." But the wholesale data in the record includes annual sales, not orders; this is significant because there is no evidence regarding the number of orders placed per year, which makes it impossible to apply accurately Dr. Dubé's proposed methodology.  Plaintiffs' argument that Defendants have not put forward evidence that the Products distributed into the consumer marketplace failed to sell at the retail level is unpersuasive where the burden is on Plaintiffs to show that Dr. Dubé's proposed methodology is reliable, *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 253, and Dr. Dubé stated in his report that "[i]n practice, not all wholesale bottle sales will be resold to consumers."

Second, Dr. Dubé's conjoint survey was initially designed to measure consumer preferences and economic damages as a percentage of actual price charged, and for that purpose had a sample size of one thousand respondents.  To determine the percentage of the total sales that occurred in California and New York, Dr. Dubé attempts to retro-fit the 105 survey

---

warensicherung.ch%2Fwp%2Fwp-content%2Fuploads%2FGlobal-Retail-Theft-Barometer-2015-ENG.pdf&usg=AOvVaw0Qz6GliCUgTUmhuJd7CrZA (accessed August 5, 2020).

respondents who stated they had purchased one of the Products, eighteen of whom stated that they lived in either California or New York at the time of responding to the survey, to determine the quantity of Products purchased in California and New York during the class period.  To do this, he assumes that the percentage represented by those eighteen individuals out of the 105-person group -- eight in New York and ten in California -- equates to the percentage of total sales of Products that took place in California and New York.  But the survey respondents were not asked (1) where they purchased the product; (2) how many times they purchased the product over the course of the class period[10]; or (3) what product was purchased and whether, at the time(s) they purchased the product, they also purchased either of the other Products, or whether they had purchased any of the Products separately or repeatedly during the class period.  Despite this, Dr. Dubé assumes without explanation that the survey respondents who reported living in California and New York, and who stated that they had purchased one of the Products during the class period, purchased one each of the Products, one time, in the state in which they resided at the time they participated in the survey.  These assumptions lack support.  *See Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017) ("[T]he district court may consider the gap between the data and the conclusion drawn by the expert from that data, and exclude opinion evidence where the court 'conclude[s] that there is simply too great an analytical gap between the data and the opinion proffered.'") (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Dr. Dubé's methodology is made more unreliable by the small sample size used.  Plaintiffs argue that Dr. Dubé's sample size of 1,000 respondents is adequate, but do not explain

---

[10] Plaintiffs describe the argument that Dr. Dubé "did not account for the number of products each Class Member purchased as a red herring, as the quantity input is an *aggregate* figure based on the number of units sold in New York and California."  This argument is incorrect because determining the aggregate number of products sold in New York and California and resulting percentage of total national sales is the point of the calculation.

why the conjoint survey sample size is relevant to the aggregate damages calculation.  In fact, Dr.

Dubé's sample size for his aggregate damages calculation is only 105 (*i.e.*, the number of

purchasers of the shampoo), and "[t]he low number of respondents is one more factor that

diminishes the reliability and probative value of" his methodology.  See *Malletier v. Dooney &*

*Bourke, Inc.*, 525 F. Supp. 2d 558, 632-33 (S.D.N.Y. 2007) (excluding expert testimony).

Relatedly, Dr. Dubé also fails to provide the Court with a confidence interval for the aggregate

class-wide damages formula which, as Defendants observe, is significant since the addition or

subtraction of a single survey respondent living in California or New York stating they had

purchased the shampoo could account for hundreds of thousands of dollars in class damages, and

millions in statutory damages under the GBL.[11]  *See Daubert,* 509 U.S. at 594 ("[I]n the case of a

particular scientific technique, the court ordinarily should consider the known or potential rate of

error").

Plaintiffs argue that Dr. Dubé found his apportionment of nationwide sales to New York

and California to track closely to the census data as an indicator that the apportionments were

accurate, but neither Plaintiffs nor Dr. Dubé explain why consistency with the census data is an

indicator of accuracy and, "in any event, such after-the-fact analysis is not a proper way to

determine the accuracy of data that [Dr. Dubé] already had assumed to be accurate."  *Compania*

---

[11] Plaintiffs do not address Defendants' criticism regarding the confidence interval in their memorandum of law.  Plaintiffs' only reference to the issue is counsel's assertion in the response to Defendants' 56.1 statement that a confidence interval was not needed for Dr. Dubé's aggregate damages calculation because his analysis was based on "Bayes theory."  This comment has no further explanation, and Dr. Dubé does not address the confidence interval in his Declaration providing the aggregate class-wide damages formula.  Even if the comment were explained, a 56.1 statement is not the proper place for argument.  *See* Local Civil Rule 56.1 (providing that Rule 56.1 statements shall be "separate, short and concise statements" of "material facts"); *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 396 (S.D.N.Y. 2015), *aff'd*, 945 F.3d 83 (2d Cir. 2019) (declining to consider legal arguments and conclusions in Rule 56.1 Statement).

*Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 320 (S.D.N.Y. 2009) (rejecting corroboration of estimated sales volume through comparison to competitor's sale volume as justification for certain assumptions used in expert's calculation of defendant's sale volume).

Plaintiffs generally argue that these critiques are nothing more than "reasonable disagreements between experts" that should not impact the admissibility of Dr. Dubé's analysis, in other words that these alleged flaws go to the weight but not the admissibility of Dr. Dubé's testimony.  But, "there are only so many questions of weight that can be tolerated; as each flaw in a survey diminishes its reliability and probative value, and correspondingly increases the risk of jury confusion and prejudice, eventually the cumulative effect of the flaws mandates exclusion." *Malletier*, 525 F. Supp. 2d at 612.  Plaintiffs also cite *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1183 (9th Cir. 2017), *rev'd and remanded on other grounds,* 139 S. Ct. 710 (2019), for the proposition that "[c]lass wide damages calculations under the UCL, FAL, and CLRA are particularly forgiving.  California law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation."  While this is correct, it does not change the requirements for expert testimony under *Daubert*.

Plaintiffs cite distinguishable cases where courts did not find the expert's fundamental assumptions on which their opinions were based to be unreliable.  *See Moreno v. Deutsche Bank Americas Holding Corp.*, No. 15 Civ. 9936, 2018 WL 2727880, at *3 (S.D.N.Y. June 6, 2018) (declining to find plaintiff's expert's statistical analyses "fundamentally flawed to the point of being invalid as a matter of law" where defendant did not move to exclude the testimony, noting that "the cursory seven-paragraph rebuttal of [plaintiff's expert's work] in [defendant's expert's report] is not sufficiently persuasive to justify that rejection"); *Dial Corp. v. News Corp*, 165 F.

Supp. 3d 25, 42 (S.D.N.Y. Jan. 15, 2016) ("Where, as here, [the expert's] methodologies are not clearly unsound or unreasonable, this Court declines to exclude his testimony on a *Daubert* motion."); *In re Vitamin C Antitrust Litig.*, No. 05 Civ. 0453, 2012 WL 6675117, at *8 (E.D.N.Y. Dec. 21, 2012) (denying motion to exclude expert testimony because "[t]his is not a case in which an expert is unable to articulate a rationale for his methodology; nor is it a case where the proffered rationale is patently flawed or unreasonable.  Dr. Wu has consistently provided explanations for his methodological decisions that appear reasonable and grounded in econometrics literature."); *Seeley v. Hamilton Beach/Proctor-Silex. Inc.*, 349 F. Supp. 2d 381, 386 (N.D.N.Y. 2004) (denying motion to exclude expert's testimony because "a thorough review of Wald's methods, reasoning, and conclusions shows that he has good grounds for his conclusions that will assist the trier of fact. . . . [The] opinions are supported by rational explanations which reasonable men might accept, and none of his methods strike the court as novel or extreme") (internal quotation marks and citation omitted).

Defendants' motion to exclude Dr. Dubé's testimony on his proposed calculation of the ($ price) and (# bottles) inputs to his aggregate class-wide damages formula is accordingly granted.

## II.    SUMMARY JUDGMENT

### a.  Standard

When parties cross-move for summary judgment, a court construes the motions separately, "in each case construing the evidence in the light most favorable to the non-moving party." *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018).  Summary judgment is appropriate where the record establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113

(2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "Rule 56(c)

mandates the entry of summary judgment, after adequate time for discovery and upon motion,

against a party who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  When the movant has properly supported its

motion with evidentiary materials, the opposing party must establish a genuine issue of fact by

"citing to particular parts of materials in the record."  FED. R. CIV. P. 56(c)(1)(A).  "[A] party may

not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion

for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation

marks omitted and alteration in original).

### b.  Defendants' Motion for Summary Judgment

#### i.  The Reasonable Consumer Standard

Defendants argue that Plaintiffs have failed to put forward sufficient evidence that the

Challenged Terms were deceptive to an objective "reasonable consumer," and on that basis seek

summary judgment.  Defendants' argument is unpersuasive.

Claims brought under the UCL and FAL "are governed by the 'reasonable consumer'

test."  *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016).  "[T]he reasonable consumer

standard requires a probability that a significant portion of the general consuming public or of

targeted consumers, acting reasonably in the circumstances, could be misled."  *Id.* (internal

quotation marks and citation omitted); *see also Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir.

1995) ("[T]o state a claim under the [UCL] . . . one need only show that 'members of the public

are likely to be deceived.'") (internal citation omitted).  Similarly, "[t]o make out a prima facie

case under [New York GBL] Section 349, a plaintiff must demonstrate that (1) the defendant's

deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3)

the plaintiff has been injured as a result." *Chufen Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 500 (2d Cir. 2020).  Under this standard, "'[d]eceptive acts' are acts that are 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'"  *Id.* (internal citation omitted); *see also Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) ("[T]he New York Court of Appeals has adopted an objective definition of 'misleading,' under which the alleged act must be likely to mislead a reasonable consumer acting reasonably under the circumstances." (internal quotation marks and citation omitted); *Axon v. Florida's Nat. Growers, Inc.*, No. 19-203-CV, 2020 WL 2787627, at *2 (2d Cir. May 29, 2020) (summary order) (applying *Ebner* reasonable consumer standard to claim brought under New York GBL § 349).

As discussed above, Mr. Silverman's expert opinion has been limited to the propositions that a reasonable consumer "would expect [] any product that includes a well-known ingredient as part of its name" to include that ingredient, and "consumers would see the Challenged Claims as branded ingredient(s) that differentiate the Challenged Products from competitive products."  In addition, Plaintiffs put forward anecdotal evidence showing that keratin was a known ingredient among consumers; the named Plaintiffs each testified that they believed, at the time of purchasing the Products, that the Products contained keratin based on the labeling.[12]  This evidence together is sufficient, when construed "in the light most favorable to the non-moving party," *Destito*, 879 F.3d at 30, to preclude summary judgment for Defendants.  *See Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1026 (9th Cir. 2008) (discussing the reasonable consumer standard under the UCL and observing that "[s]urveys and expert testimony regarding consumer assumptions and expectations may be offered but are not required; anecdotal evidence may suffice, although a few isolated examples of actual deception are insufficient."); *Hobbs*,

---

[12] Plaintiffs argue that emails between Defendants' employees and a USPTO ruling are further evidence of deception, but these do not show the perspective of a reasonable consumer.

2016 WL 7647674, at *8 (denying summary judgment on UCL and FAL claims where "[p]laintiff has presented the Court with evidence, based largely on the Silverman declaration, that [d]efendant's representations could mislead a substantial portion of reasonable consumers"); *cf. Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 565 (N.D. Cal. 2020) (rejecting at class certification the argument that plaintiffs' motion fails because they did not conduct consumer surveys to show what the challenged statements conveyed, finding testimony from plaintiffs' expert Bruce Silverman sufficient).

Defendants also argue that Mr. Silverman's testimony is insufficient to meet the reasonable consumer standard, but the cases they cite in support of this argument are inapposite and involve expert testimony that was deficient in some way. *See Rahman v. Mott's LLP*, No. 13 Civ. 3482 SI, 2014 WL 5282106, at *10 (N.D. Cal. Oct. 15, 2014) (finding an expert's testimony insufficient to raise a genuine issue of fact as to whether a reasonable consumer would be deceived where the expert stated that "the appropriate methodology for reaching valid and reliable answers to these questions is to conduct a survey"); *Kosta v. Del Monte Foods, Inc.*, 308 F.R.D. 217, 230 (N.D. Cal. 2015) (finding an expert declaration at issue insufficient to prove materiality where the declaration was not specific to the facts of the case and did not include a statement that the expert had reviewed the particular labels at issue); *Repro-Med Sys., Inc. v. EMED Techs. Corp.*, No. 13 Civ. 01957, 2019 WL 1427978, at *7 (E.D. Cal. Mar. 29, 2019) (finding, on a motion for preliminary injunction, an expert declaration insufficient evidence to demonstrate the moving party was likely to prevail on the merits of its claim for intentional misrepresentation, noting that the expert declaration "does not describe how [the opposing party's] alleged conduct misled customers").

In essence, Defendants are arguing that, because that the Challenged Terms are not false on their face, Plaintiffs must proffer extrinsic evidence to show consumers' understanding of the

terms in the form of consumer data or a survey.  *See, e.g., Hughes v. Ester C Co.*, 330 F. Supp. 3d

862, 872 (E.D.N.Y. 2018) ("To satisfy the reasonable consumer standard [under the FAL and

UCL], a plaintiff must adduce extrinsic evidence—ordinarily in the form of a survey—to show

how reasonable consumers interpret the challenged claims.").  But, even if this extrinsic evidence

*may* be adduced in the form of a survey, *see id.*, "California courts have expressly rejected the

view that a plaintiff *must* produce a consumer survey or similar extrinsic evidence to prevail on a

claim that the public is likely to be misled by a representation."  *Mullins v. Premier Nutrition*

*Corp.*, 178 F. Supp. 3d 867, 890 (N.D. Cal. 2016) (construing the UCL) (internal quotation marks

and citation omitted) (emphasis added); *see also Consumer Advocates v. Echostar Satellite Corp.*,

113 Cal. App. 4th 1351, 1362 (2003) (quoting *Nat'l Council Against Health Fraud, Inc. v. King*

*Bio Pharm., Inc.*, 107 Cal App. 4th 1336, 1348 (2003) ("The falsity . . . of advertising claims may

be established by testing, scientific literature, or anecdotal evidence.")).  And Defendants cite no

binding legal authority holding that an expert opinion is insufficient to show that a defendant's

deceptive acts are misleading under the GBL.  The Court accordingly declines to find that

Plaintiffs' evidence is insufficient as a matter of law because they do not proffer a consumer

survey.

Defendants' other cited cases are also distinguishable, because they involve plaintiffs who

failed to offer any extrinsic evidence, or offered only the testimony of the parties themselves.

*See, e.g., Hughes v. Ester C Co.*, 330 F. Supp. 3d 862, 872 (E.D.N.Y. 2018) (granting summary

judgment to defendants where, *inter alia*, "[p]laintiffs offer nothing more than their own

conclusory allegations and 'anecdotal' testimony to show what implied claims Ester-C

purportedly conveyed."); *Playtex Prod., LLC v. Munchkin, Inc.*, No. 14 Civ. 1308, 2016 WL

1276450, at *4 (S.D.N.Y. Mar. 29, 2016) ("[p]laintiffs' claim must be dismissed since Dr. Dhar's

survey is  inadmissible and [p]laintiffs have offered no other evidence of intentional deception or

consumer confusion."); *N. Am. Olive Oil Ass'n v. Kangadis Food Inc.*, 962 F. Supp. 2d 514, 519

(S.D.N.Y. 2013) (finding plaintiff did not show likelihood of success on the merits on its motion

for a preliminary injunction based in part on a GBL claim, where the challenged labeling was not

literally false and plaintiff presented "no extrinsic evidence" of "the perceptions of ordinary

consumers" with respect to the challenged product label); *Ries v. Arizona Beverages USA LLC*,

No. 10 Civ. 01139, 2013 WL 1287416, at *7 (N.D. Cal. Mar. 28, 2013) (finding ambiguous

deposition testimony of owner of brewing company regarding his decision-making process in

changing the labels of the challenged product to include the challenged language insufficient, on

its own, to preclude summary judgment because it did not demonstrate that a significant portion

of the consuming public could be confused by the challenged language); *Johns v. Bayer Corp.*,

No. 09 Civ. 1935, 2013 WL 1498965, at *48 (S.D. Cal. Apr. 10, 2013) (granting summary

judgment because "there is simply no evidence to put before the jury on the issue of deception").

### ii. Damages

Defendants move for summary judgment on all claims on the ground that Plaintiffs cannot

prove damages or, in the alternative, seek summary judgment on Plaintiffs' claim for aggregate

class-wide damages. Dr. Dubé's proposed methodologies for calculating the ($ price) and (#

bottles) variables are excluded as unreliable, but his formula for calculating aggregate class-wide

damages has not been excluded. This Opinion does not express any view as to the admissibility

of non-expert evidence that might be applied to this formula to prove aggregate class-wide

damages. *See Lambert*, 870 F.3d at 1183 ("[c]lass wide damages calculations under the UCL,

FAL, and CLRA are particularly forgiving. California law requires only that some reasonable

basis of computation of damages be used, and the damages may be computed even if the result

reached is an approximation.").[13]  Defendants' motion for summary judgment on Plaintiffs' claim for aggregate class-wide damages is accordingly denied.

In addition, the record contains evidence of damages in the form of a price premium and a percentage of the price actually charged, based on Dr. Dubé's opinion, and statutory damages are available under the GBL.  *See* GBL §§ 349(h), 350-e.  Consequently, Defendants' motion for summary judgment more generally for failure to present evidence of damages is also denied.

### iii.  Express Warranty Claim

Defendants argue that, because courts evaluate a claim for breach of express warranty under California law[14] "in tandem" with claims under the UCL and FAL, the Court should grant summary judgment as to the breach of express warranty claim based on the same argument Defendants made regarding the UCL and FAL claims, *i.e.*, that Plaintiffs have failed to produce evidence to show that Defendants' representations regarding the Products were false.  As Defendants' motion for summary judgment on the deception element of the UCL and FAL was denied, this argument is rejected.  *See Strumlauf v. Starbucks Corp.*, No. 16 Civ. 01306, 2018 WL 306715, at *9 (N.D. Cal. Jan. 5, 2018) (applying the same analysis to determine whether plaintiffs established a false statement or misrepresentation to plaintiffs' UCL, FAL and breach of express warranty claims).

---

[13] Defendants cite *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215(2d Cir. 2008) for the proposition that an "estimate" of aggregate class-wide damages offends the Rules Enabling Act and the Due Process Clause.  To the contrary, the Second Circuit recognized that "damages need not [usually] be demonstrated with precision," but rejected the proposed "fluid recovery" program.  *Id.* at 231-23.  Plaintiffs here are not seeking a fluid recovery program.  Defendants' other cases are equally inapposite.

[14] To prevail on a breach of express warranty claim under California law, plaintiffs must prove "(1) the seller's statements constitute an affirmation of fact or promise . . .; (2) the statement was part of the basis of the bargain; and (3) the warranty was breached."  *Weinstat v. Dentsply Int'l, Inc.*, 103 Cal. Rptr. 3d 614, 626 (Ct. App. 2010) (internal quotation marks omitted).

### iv.  Breach of Contract Claim

Defendants argue that Plaintiffs have failed to adduce any evidence of privity between the parties and, on that basis, the breach of contract claim[15] fails.  This argument is persuasive, and summary judgment is granted as to the contract claim.

Under New York law, "[l]iability for breach of contract does not lie absent proof of a contractual relationship or privity between the parties."  *Hamlet at Willow Creek Dev. Co., LLC v. Ne. Land Dev. Corp.*, 878 N.Y.S.2d 97, 111 (2d Dep't 2009); *accord Stapleton v. Barrett Crane Design & Eng'g*, 725 F. App'x 28, 30 (2d Cir. 2018) (summary order).  Plaintiffs cite *Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC*, for the proposition that, "[u]nder New York law, a third party may enforce a contract when recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."  692 F.3d 42, 52-53 (2d Cir. 2012) (internal quotation marks and citation omitted).  But Plaintiffs cite no cases applying this holding to facts analogous to this case.  And, "[u]nder New York law, no privity exists between a manufacturer and a downstream or indirect purchaser."  *Waldman v. New Chapter, Inc.*, 714 F. Supp. 2d 398, 401 (E.D.N.Y. 2010); *see also Jesmer v. Retail Magic, Inc.*, 863 N.Y.S.2d 737, 739 (2d Dep't 2008) (finding end user of a computer system may not maintain a cause of action against the system's manufacturer sounding in breach of contract, in the absence of privity, "where the end user did not purchase the system from the manufacturer, but from an authorized dealer").  Defendants' motion for summary judgment on this claim is granted.

---

[15] In New York, a claim for breach of contract requires proof of: "(1) a valid contract; (2) plaintiff's performance; (3) defendant's failure to perform; and (4) damages resulting from the breach."  *Macaluso v. U.S. Life. Ins. Co.,* 2004 WL 1497606, at *3 (S.D.N.Y. July 2, 2004) (citing *Furia v. Furia,* 116 A.D.2d 694, 695 (2d Dep't 1986)).

### c. Plaintiffs' Motion for Summary Judgment

#### i. Deceptiveness Element of UCL, FAL and New York GBL § 349 Claims

Plaintiffs argue that the Challenged Terms themselves are sufficient to grant summary judgment to Plaintiffs. This argument is incorrect because the meaning of the Challenged Terms is ambiguous. "Pro-Keratin" has no clear meaning, and consumers could understand "Keratindose" to mean that the product is designed to deliver "a daily dose of keratin" as Plaintiffs allege, or understand it to mean that the product is designed to treat hair that has undergone a keratin treatment as proposed by Defendants, or understand it to mean something else entirely. Because their meaning is ambiguous, the Challenged Terms are not misleading as a matter of law. Rather a finder of fact must determine if they are misleading based on extrinsic evidence. *See Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007) (holding, in the context of a Lanham Act claim, that "only an *unambiguous* message can be literally false" and, "where the advertisement does not unambiguously make a claim, the court's reaction is at best not determinative and at worst irrelevant"); *N. Am. Olive Oil Ass'n v. Kangadis Food Inc.*, 962 F. Supp. 2d 514, 520-21 (S.D.N.Y. 2013) (applying Lanham Act analysis to a claim brought under GBL section 349); *Hughes v. Ester C Co.*, 330 F. Supp. 3d 862, 872 (E.D.N.Y. 2018) ("To satisfy the reasonable consumer standard [under the UCL and FAL], a plaintiff must adduce extrinsic evidence . . . to show how reasonable consumers interpret the challenged claims.").

Plaintiffs argue that the only evidence in the record shows that a reasonable consumer would find the Challenged Terms deceptive and, on that basis, Plaintiffs are entitled to summary judgment as to the deceptiveness elements of the UCL, FAL and New York GBL § 349 claims. But Plaintiffs' evidence of a reasonable consumer's perception of the Challenged Terms is almost entirely dependent on Mr. Silverman's expert opinion, and Defendants have raised relevant

critiques of Mr. Silverman's testimony. As such, should a jury not accept his opinion, they "could return a verdict for the nonmoving party." *Nick's Garage, Inc.*, 875 F.3d at 113. This is sufficient to preclude granting summary judgment for Plaintiffs. *See id.*; *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) ("Assessments of credibility . . . are matters for the jury, not for the court on summary judgment."); *In re Scotts EZ Seed Litig.*, No. 12 Civ. 4727, 2017 WL 3396433, at *17 (S.D.N.Y. Aug. 8, 2017) (declining to grant summary judgment on GBL claims in part because defendants' critiques of plaintiffs' expert reports "ultimately must be weighed by the trier of fact"); *Hobbs*, 2016 WL 7647674, at *4 ("Silverman is competent to comment on a reasonable consumer's perceptions of the statements on [d]efendant's website and print materials . . . [T]he evidence that Silverman uses to form his opinion ultimately goes to the weight of the testimony, not admissibility.").

### ii. The "Unlawful" Prongs of the UCL

Plaintiffs argue that, because the Challenged Terms are misleading, the Challenged Terms violate the Food Drug & Cosmetic Act 21 U.S.C.S. §§ 301 et seq. ("FDCA"), California's parallel Sherman Food, Drug, and Cosmetic Law. *See* Cal. Health & Safety Code §§ 110300, 111730 ("Sherman Law"); New York State Law (NY Educ. L § 6815(2)(a)). As such, Plaintiffs argue that the Court should grant summary judgment as to the "unlawful" claim, which broadly prohibits any practices forbidden by other law. As the Court denied Plaintiffs' motion for summary judgment as to the deceptiveness element of the UCL, FAL and GBL claims, this argument is also rejected.

## III. CONCLUSION

For the reasons set forth above, Defendants' motion to exclude the testimony of Bruce Silverman is GRANTED IN PART -- his testimony on consumers' awareness of keratin as an ingredient in haircare products and consumers' resulting perception of the Challenged Terms is

excluded as unreliable; Defendants' motion to exclude testimony of Jean-Pierre Dubé is

GRANTED -- his testimony on the proposed calculation of the ($ price) and (# bottles) inputs to

his aggregate class-wide damages formula is excluded as unreliable; Defendants' motion for

summary judgment is GRANTED as to the New York breach of contract claim and otherwise

DENIED; and Plaintiffs' motion for summary judgment is DENIED.

     The Clerk of Court is respectfully directed to close the motion at Docket Nos. 254 and

265.

Dated: August 24, 2020
       New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**