Frederick B. Warder III
Joshua Kipnees
Maren J. Messing
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036-6710
Telephone: (212) 336-2000
Fax: (212) 336-2222
fbwarder@pbwt.com
jkipnees@pbwt.com
mmessing@pbwt.com
*Attorneys for Defendants L'Oréal USA, Inc.*
*and Matrix Essentials LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRANDI PRICE AND CHRISTINE CHADWICK, on behalf of themselves and all other similarly situated<br><br>*Plaintiffs,*<br><br>vs.<br><br>L'ORÉAL  USA, INC. AND MATRIX ESSENTIALS LLC<br><br>*Defendants.* | Civil Action No.:<br><br>1:17-cv-614 (LGS)<br><br><br>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DECERTIFY THE CLASSES AND TO EXCLUDE THE EXPERT TESTIMONY OF JEAN-PIERRE DUBÉ** |

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES AND REFERENCES ...................................................... iii

PRELIMINARY STATEMENT ........................................................................1

STATEMENT OF FACTS ..............................................................................2

I.      Dr. Dubé's Damages Analysis for the Challenged Shampoo Product................................2

        A.      The Conjoint Survey ......................................................................2

        B.      The Economic Analysis ...................................................................5

        C.      Dr. Dubé's Conclusions ..................................................................5

II.     The Conditioner and Renewal Spray Products ...........................................................6

III.    No Evidence Regarding Quantity of Retail Sales or Average Prices Paid by Class
        Members ..............................................................................................6

LEGAL STANDARDS ...................................................................................7

I.      Daubert ...............................................................................................7

II.     Decertification and Comcast ...........................................................................7

ARGUMENT ............................................................................................9

I.      DR. DUBÉ'S PROPOSED DAMAGES MEASURE FAILS COMCAST AND
        SHOULD BE EXCLUDED UNDER DAUBERT BECAUSE IT INCLUDES
        THE VALUE OF THE UNCHALLENGED LABEL TERM "+ SILK" ...........................9

II.     BECAUSE DR. DUBÉ FAILED TO CONDUCT ANY DAMAGES ANALYSIS
        FOR THE CONDITIONER AND RENEWAL SPRAY PRODUCTS, THE
        CLASSES SHOULD BE DECERTIFIED WITH RESPECT TO THOSE TWO
        PRODUCTS, AND HIS RELATED OPINIONS EXCLUDED .....................................11

III.    DR. DUBÉ'S PROPOSED DAMAGES MEASURE FAILS COMCAST
        BECAUSE IT IMPROPERLY ASSIGNS DAMAGES ATTRIBUTABLE TO
        ALL INTERPRETATIONS OF THE CHALLENGED TERMS ...................................13

IV.     PLAINTIFFS' CLAIM FOR WTP DAMAGES SHOULD BE DECERTIFIED
        AND DR. DUBÉ'S OPINIONS REGARDING WTP AS A MEASURE OF
        DAMAGES SHOULD BE EXCLUDED .......................................................15

        A.      The Claim for Willingness to Pay ("WTP") Damages Should Be
                Decertified Because WTP Damages Are Unavailable As A Matter Of Law ........15

        B.      Dr. Dubé's Opinions Regarding WTP Damages Should Be Excluded
                Under Daubert Because They Are Irrelevant and Unreliable ..............................17

V.      THE CLASSES SHOULD BE DECERTIFIED BECAUSE THERE IS NO
        EVIDENCE OF THE QUANTITY OR AVERAGE PRICE OF NEW YORK
        AND CALIFORNIA RETAIL SALES DURING THE CLASS PERIOD .......................19

**TABLE OF CONTENTS**
**(continued)**

Page

VI.   DR. DUBÉ'S OPINIONS SHOULD BE EXCLUDED UNDER DAUBERT BECAUSE BOTH HIS CONJOINT SURVEY AND SUBSEQUENT ECONOMIC ANALYSIS ARE UNRELIABLE ............................................................21

    A.   Dr. Dubé's Conjoint Survey Methodology is Fundamentally Flawed .................21

        1.   Dr. Dubé Failed To Research the Relevant Market to Identify the Key Product Attributes ................................................................21

        2.   Dr. Dubé Artificially Increased The Importance of the Challenged Terms By Excluding Key Product Attributes .............................................23

        3.   Dr. Dubé Violated Basic Tenets of Survey Design by Failing to Present the Products as they Appear in the Market ...................................26

    B.   Dr. Dubé's Economic Analysis is Fundamentally Flawed ....................................28

        1.   Dr. Dubé Wrongly Assumed That L'Oréal Would Sell the Products Without a Product Name.......................................................29

        2.   Dr. Dubé's Attempt to "Infer" L'Oréal's Marginal Costs is Demonstrably Unreliable .........................................................30

VII.  THE CLASSES MUST BE DECERTIFIED BECAUSE THEY INCLUDE A MATERIAL PERCENTAGE OF UNINJURED YET UNIDENTIFIABLE CLASS MEMBERS...........................................................32

CONCLUSION.................................................................................33

# TABLE OF AUTHORITIES AND REFERENCES

**Page(s)**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002)..................................................................7, 19, 30, 31

*Apple, Inc. v. Samsung Elecs. Co.*,
    2014 U.S. Dist. LEXIS 29721 (N.D. Cal. Mar. 6, 2014)...................................26, 27

*In re Asacol Antitrust Litig.*,
    907 F.3d 42 (1st Cir. 2018)...........................................................................33

*Ault v. J.M. Smucker Co.*,
    310 F.R.D. 59 (S.D.N.Y. 2015) ...................................................................16

*Belfiore v. P&G*,
    140 F. Supp. 3d 241 (E.D.N.Y. 2015) ..........................................................16

*Boucher v. Syracuse Univ.*,
    164 F.3d 113 (2d Cir. 1999).........................................................................7

*Brazil v. Dole Packaged Foods, LLC*,
    2014 U.S. Dist. LEXIS 157575 (N.D. Cal. Nov. 6, 2014).......................................8

*Brazil v. Dole Packaged Foods, LLC*,
    660 F. App'x 531 (9th Cir. 2016) ..............................................................8, 16

*Chart v. Town of Parma*,
    2014 U.S. Dist. LEXIS 140463 (W.D.N.Y. Sep. 30, 2014) ................................28

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013).......................................................................... *passim*

*ComponentOne, L.L.C. v. ComponentArt, Inc.*,
    2008 U.S. Dist. LEXIS 87066 (W.D. Pa. Oct. 27, 2008) ....................................28

*Coopers & Lybrand v. Livesay*,
    437 U.S. 463 (1978).....................................................................................7

*Cumberland Packing Corp. v. Monsanto Co.*,
    32 F. Supp. 2d 561 (E.D.N.Y. 1999) ...........................................................26

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993)........................................................................ *passim*

## TABLE OF AUTHORITIES AND REFERENCES
### (continued)

**Page(s)**

*Davidson v. Apple, Inc.*,
　　2019 U.S. Dist. LEXIS 103624 (N.D. Cal. June 20, 2019) ......................................8

*Davis v. Carroll*,
　　937 F. Supp. 2d 390 (S.D.N.Y. 2013).............................................................12, 29

*Denney v. Deutsche Bank AG*,
　　443 F.3d 253 (2d Cir. 2006)..........................................................................32

*Famular v. Whirlpool Corp.*,
　　2019 U.S. Dist. LEXIS 44907 (S.D.N.Y. Mar. 18, 2019) ..................................9

*In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*,
　　2017 U.S. Dist. LEXIS 48792 (N.D. Ill. Mar. 31, 2017)................................21, 25

*Hughes v. Ester C Co.*,
　　317 F.R.D. 33 (E.D.N.Y. 2016) .......................................................................14

*IceMOS Tech. Corp. v. Omron Corp.*,
　　2019 U.S. Dist. LEXIS 196610 (D. Ariz. Nov. 13, 2019)..................................17

*In re AMLA Litig.*,
　　328 F.R.D. 127 (S.D.N.Y. 2018) .....................................................................19

*In re AMLA Litig.*,
　　16-cv-6593, Dkt. No. 335 (S.D.N.Y. Jan. 22, 2019) ......................................20

*Jacob v. Duane Reade, Inc.*,
　　293 F.R.D. 578 (S.D.N.Y. 2013) ......................................................................8

*Lanovaz v. Twinings N. Am., Inc.*,
　　2014 U.S. Dist. LEXIS 57535 (N.D. Cal. Apr. 24, 2014) ..................................16

*Lilly v. Jamba Juice Co.*,
　　308 F.R.D. 231 (N.D. Cal. 2014)......................................................................20

*LinkCo, Inc. v. Fujitsu Ltd.*,
　　2002 U.S. Dist. LEXIS 12975 (S.D.N.Y. July 15, 2002) ..................................23

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
　　525 F. Supp. 2d 558 (S.D.N.Y. 2007)..............................................................17

*LVL XIII Brants, Inc. v. Louis Vuitton Malletier S.A.*,
　　209 F. Supp. 3d 612 (S.D.N.Y. Sep. 13, 2016).................................................22

## TABLE OF AUTHORITIES AND REFERENCES
### (continued)

**Page(s)**

*Macaluso v. Herman Miller, Inc.*,
    2005 U.S. Dist. LEXIS 3717 (S.D.N.Y. Mar. 9, 2005) .........................................................29

*MacDougall v. Am. Honda Motor Co.*,
    2020 U.S. Dist. LEXIS 166786 (C.D. Cal. Sept. 11, 2020)...............................................21, 25

*Major League Baseball Props, Inc. v. Salvino*,
    542 F.3d 290 (2d Cir. 2008)...............................................................................................7, 28

*Mazzei v. Money Store*,
    829 F.3d 260 (2d Cir. 2016)..................................................................................................7, 8

*McMorrow v. Mondelez Int'l, Inc.*,
    2020 U.S. Dist. LEXIS 41359 (S.D. Cal. Mar. 9, 2020) ........................................................10

*In re NJOY Consumer Class Action Litig.*,
    120 F. Sup. 3d 1050, 1119 (C.D. Cal. 2015) .........................................................................17

*Oleg Cassini, Inc. v. Electrolux Home Prod., Inc.*,
    2014 U.S. Dist. LEXIS 52085 (S.D.N.Y. Apr. 15, 2014).......................................................31

*Oracle America, Inc. v. Google Inc.*,
    2012 U.S. Dist. LEXIS 33619 (N.D. Cal. Mar. 13, 2012)......................................................26

*Playtex Prods. v. Procter & Gamble Co.*,
    2003 U.S. Dist. LEXIS 8913 (S.D.N.Y. May 28, 2003)....................................................7, 22

*Point Prods. A.G. v. Sony Music Entm't, Inc.*,
    2004 U.S. Dist. LEXIS 2676 (S.D.N.Y. 2004)......................................................................28

*R.F.M.A.S., Inc. v. Mimi So*,
    748 F. Supp. 2d 244 (S.D.N.Y. 2010)..............................................................................19, 31

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    934 F.3d 619 (D.C. Cir. 2019)...............................................................................................33

*Reed Constr. Data Inc., v. McGraw-Hill Cos.*,
    49 F. Supp. 3d 385 (S.D.N.Y. 2014).....................................................................................18

*Robinson v. Sanctuary Record Grps., Ltd.*,
    542 F. Supp. 2d 284 (S.D.N.Y. 2008)...................................................................................31

*Rodriguez v. It's Just Lunch Int'l*,
    2018 U.S. Dist. LEXIS 131870 (S.D.N.Y. Aug. 6, 2018)....................................................7, 9

**TABLE OF AUTHORITIES AND REFERENCES**
**(continued)**

**Page(s)**

*Schechner v. Whirlpool Corp.*,
   2019 U.S. Dist. LEXIS 171642 (E.D. Mich. Aug. 13, 2019) ..................................................12

*Sykes v. Mel S. Harris & Assocs. LLC*,
   780 F.3d 70 (2d Cir. 2015)....................................................................................................32

*THOIP v. Walt Disney Co.*,
   690 F. Supp. 2d 218 (S.D.N.Y. 2010).................................................................................26

*Townsend v. Monster Bev. Corp.*,
   303 F. Supp. 3d 1010, 1023 (C.D. Cal. 2018) ............................................................. *passim*

*Trazo v. Nestle*,
   113 F. Supp. 3d 1047, 1052 (N.D. Cal. 2015) ......................................................................17

*Tyson Foods, Inc. v. Bouaphakeo*,
   136 S. Ct. 1036 (2016).........................................................................................................32

*Visteon Global Techs., LLC v. Garmin Int'l, Inc.*,
   2016 U.S. Dist. LEXIS 142395 (E.D. Mich. Oct. 14, 2016) .................................................26

*Washington v. Kellwood Co.*,
   105 F. Supp. 3d 293, 318 (S.D.N.Y. 2015)..........................................................................19

*WE Media, Inc. v. Gen. Elec. Co.*,
   218 F. Supp. 2d 463 (S.D.N.Y. 2002)..................................................................................28

*Werdebaugh v. Blue Diamond Growers*,
   2014 U.S. Dist. LEXIS 173789 (N.D. Cal. Dec. 15, 2014)...................................................16

*Whalen v. CSX Transp., Inc.*,
   2016 U.S. Dist. LEXIS 135069 (S.D.N.Y. Sep. 29, 2016)....................................................23

*Wu v. Pearson Educ. Inc.*,
   2012 U.S. Dist. LEXIS 182300 (S.D.N.Y. Dec. 20, 2012) .....................................................8

*Zakaria v. Gerber Prods. Co.*,
   755 F. App'x 623 (9th Cir. 2018) ...............................................................................8, 16, 17

**Statutes**

N.Y. Gen. Bus. Law § 349................................................................................................16

## PRELIMINARY STATEMENT

To obtain class certification in this case, Plaintiffs relied on a proposed conjoint survey and economic analysis from their damages expert, Dr. Jean-Pierre Dubé.  Although the Court certified classes of New York and California purchasers in August 2018 based on Plaintiffs' representations about what Dr. Dubé's analysis could and would show, the Court also made clear that it could "decertify a previously certified class if it becomes apparent that the requirements of Rule 23 are, in fact, not met."  Dkt. No. 159 ("Cert. Order") at 4.  Now that Dr. Dubé has actually performed his analysis, the evidentiary record is complete.  Because Plaintiffs are relying exclusively on Dr. Dubé's analysis to prove their class-wide damages claims, Plaintiffs have failed to meet the requirements of Rule 23 in multiple respects.

First, the post-certification damages analysis conducted by Dr. Dubé is methodologically flawed and unreliable as a means to calculate class-wide damages in this case, and is therefore inadmissible under *Daubert*.  Without an admissible damages analysis, Plaintiffs cannot sustain their burden to maintain certification of a damages class under Rule 23(b)(3).

Second, even if Dr. Dubé's opinions were admissible, his assessment of damages violates *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), and thus requires decertification, because it does not align with Plaintiffs' sole theory of liability: that class members understood the Challenged Terms "Keratindose" and "Pro-Keratin" to mean the Challenged Products contained keratin, and that they paid a price premium as a result.  Under *Comcast*, if Plaintiffs' analysis measures damages other than those available under the theory of liability asserted, certification is inappropriate.  Although Plaintiffs' class-wide damages calculation violates this requirement in multiple respects, the most glaring disconnect is that Dr. Dubé's assessment of economic injury incorporates the value of the term "+ Silk," even though it is undisputed that the Products contain silk and even though Plaintiffs do not allege that "+Silk" is misleading.

1

Third, the record reveals other indisputable facts demonstrating that certification is no longer appropriate: Dr. Dubé did not calculate damages for two of the three Challenged Products; Plaintiffs have developed no evidence of New York or California retail sales and prices during the class period; and Dr. Dubé's own analysis shows that a material percentage of class members are uninjured, but cannot be identified and removed from the class absent individualized inquiry.

For each and all of these reasons, the Court should exclude Dr. Dubé's testimony and decertify the classes of New York and California purchasers.

## STATEMENT OF FACTS

### I.     Dr. Dubé's Damages Analysis for the Challenged Shampoo Product

Dr. Dubé's damages analysis had two primary components: (1) a **conjoint survey**, through which he attempted to collect data regarding consumers' subjective preferences for particular shampoo attributes, including the Challenged Terms; and (2) an **economic analysis**, through which he attempted to apply a series of algorithmic computer simulations to the results of the conjoint survey to determine the economic value of the Challenged Terms.  From this computer analysis, Dr. Dubé calculated two separate, alternative measures of damages: an objective "price premium" figure and a subjective "willingness to pay," or "WTP," figure. Declaration of Frederick B. Warder III ("Warder Decl.") Ex. 1, November 30, 2018 Expert Report of Dr. Jean-Pierre Dubé ("Dubé Rep.") ¶¶ 97, 99, 102-03; Warder Decl. Ex. 2, March 5, 2019 Rebuttal Expert Report of Dr. Keith Ugone ("Ugone Rep.") ¶¶ 22-23.

### A.     The Conjoint Survey

Dr. Dubé recruited 1,035 respondents to participate in his conjoint survey, which he conducted in November 2018.  Only 105 of those respondents had previously purchased one of the Challenged Products within the last four years; of those, only eight purchasers were from

New York, and only ten purchasers were from California.  Ugone Rep. ¶ 23, Table 1; *see also*

Dkt. No. 282, Order on Defendants' Motion for Summary Judgment ("SJ Order") at 14-15.

Each respondent who participated in the conjoint survey completed twelve "choice

tasks," in which she was asked to choose one of three hypothetical shampoo products.  Each

choice task presented each hypothetical product as a combination of features from four

categories of product attributes: "Product/Brand,"[1] "Text Printed on the Shampoo Bottle,"

"Product Size,"[2] and "Price."[3]  Dubé Rep. ¶¶ 19, 23; Ugone Rep. ¶ 23.  Despite underscoring the

necessity of selecting attributes that "would capture the spirit of a typical purchase experience of

shampoo for damaged or over-processed hair," *see* Dubé Rep. ¶ 27, Dr. Dubé limited the survey

to these four attributes, and excluded a number of other attributes of the Challenged Products.

He selected the four attributes without first conducting any reliable research or analysis to

determine whether these (or any other) attributes are important to women who purchase in-salon

shampoos for over-processed hair.  Dr. Dubé did not consult with anyone who had expertise in

the relevant market, and he did not interview or survey relevant consumers to educate himself

about which attributes are important in this market.  Warder Decl. Ex. 3, September 5, 2019

Deposition of Jean-Pierre Dubé ("Dubé Tr.") at 197:19-199:11; 14:8-14; 71:22-72:4; Warder

Decl. Ex. 5, March 5, 2019 Expert Report of Dr. Carol A. Scott ("Scott Rep.") ¶¶ 16-17.

Here is a screenshot of an example of a choice task as it appeared to respondents in Dr.

Dubé's survey.  (Warder Decl. Ex. 4, Dubé Deposition Ex. 4 at 44):

---

[1] The brand variations were presented as: Matrix Biolage Advanced, Redken Extreme Shampoo, Awapuhi Wild Ginger Moisturizing Lather Shampoo, Aquage SeaExtend Strengthening Shampoo, Aveda Damage Remedy Restructuring Shampoo, Pureology Strength Cure Shampoo, Joico K-PAK Shampoo, and TIGI Bed Head Urban Antidotes Level 3 Resurrection Shampoo.  Dubé Rep. ¶ 26.
[2] The size variations were presented as: 250 mL / 8.5 Fl Oz, 300 mL / 101.Fl Oz, and 400 mL / 13.5 Fl Oz.  Dubé Rep. ¶ 28.
[3] The price variations were presented as: $11, $13, $15, $19, $25, and $30.  Dubé Rep. ¶ 31.

**If these were your only options and you had to choose one, which shampoo would you choose?**
*Choose by clicking one of the buttons below. Click the "Next" at the bottom to continue.*

Assume that the shampoo products do not vary on any other features other than the features that are shown to vary.

*You may click on the blue attributes to review the definition of those attributes.*



|  | Option A | Option B | Option C |
|---|---|---|---|
| **Product/Brand** | Awapuhi Wild Ginger Moisturizing Lather Shampoo | Matrix Biolage Advanced | Aveda Damage Remedy Restructuring Shampoo |
| **Text Printed on the Shampoo Bottle** |  | • Keratindose Pro-Keratin + Silk<br>• RCT Protein Complex<br>• With Asta-Repair | • Keratindose Pro-Keratin + Silk<br>• With Asta-Repair |
| **Product Size** | 400 mL / 13.5 Fl Oz | 250 mL / 8.5 Fl Oz | 300 mL / 10.1 Fl Oz |
| **Price** | $25 | $30 | $35 |
|  | ○ | ◉ | ○ |

Would you actually purchase the shampoo that you chose above at the indicated price?

◉ Yes
○ No

The "Text Printed on the Shampoo Bottle" field presented either none, one, or several of three options: "Keratindose Pro-Keratin + Silk," "With Asta-Repair," and/or "RCT Protein Complex." Dubé Rep. ¶ 29. Thus, in attempting to determine how consumers value the Challenged Terms "Keratindose" and "Pro-Keratin," Dr. Dubé used the combined statement "Keratindose Pro-Keratin + Silk," *Id.* ¶ 29(a); Ex. 5.42, even though Plaintiffs do not allege that the term "+ Silk" is false or misleading, or dispute that silk is an ingredient in the Products. Dkt. No. 42, First Am. Compl. ("FAC") ¶¶ 4-6; Dkt. No. 261, Pl.'s Opposition to Rule 56.1 Statement ("Pl.'s 56.1 Opp.") ¶ 17. Dr. Dubé then used the survey results to calculate respondents'

4

preferences for each variation within each of these tested attributes, including the Challenged Terms (as Dr. Dubé defined and presented them).  Ugone Rep. ¶ 23; Dubé Rep., App'x B, Table 1.  In addition, Dr. Dubé measured respondents' preferences for the Challenged Terms without evaluating how respondents interpreted them—i.e., whether as a claim that the product contains keratin as an ingredient, or something else.  Dubé Rep. ¶ 85; Warder Decl. Ex. 6, June 10, 2019 Expert Reply Report of Dr. Jean-Pierre Dubé ("Dubé Reply Rep.") ¶ 205.

### B.    The Economic Analysis

Dr. Dubé then applied the results of his conjoint survey to an economic formula intended to "simulate" the target market (which he identified as in-salon shampoos for over-processed hair).  Dubé Rep. ¶¶ 3, 27, 33, 58; Dubé Tr. at 63:12-23.  In addition to the Challenged Shampoo Product, Dr. Dubé defined this market to include the seven other shampoo products featured in his conjoint survey.  This aspect of Dr. Dubé's analysis did not involve the participation of survey respondents or class members, and instead consisted of a series of algorithmic computer simulations.  Through these algorithms, Dr. Dubé attempted to compare two different scenarios—the "real world" and the "but for" world—to assess whether the demand for and price of the Shampoo Product would change upon removal of the Challenged Terms.  Dubé Rep. ¶¶ 68-74; Ugone Rep. ¶ 23.  In the first scenario, the Challenged Terms remained on the label, and each product in Dr. Dubé's hypothetical shampoo market was available at a "real-world" price assumed by Dr. Dubé ($21 for the Challenged Shampoo).  *Id.*  In the second, "but-for" scenario, the Challenged Terms were removed from the label of the Challenged Shampoo Product (but not replaced with any substitute text), and the prices of all eight shampoo products in Dr. Dubé's hypothetical market were allowed to adjust in response to that label change.  *Id.*

### C.    Dr. Dubé's Conclusions

Based on this analysis, Dr. Dubé opined that the price of the Challenged Shampoo

Product would decrease from $21 to $19.49 in the but-for scenario.  From this, he concluded that the Challenged Terms account for a $1.51 price premium (calculated as 7% of the assumed price of $21).  With respect to Dr. Dubé's alternative WTP measure of damages, Dr. Dubé separately opined that consumers' average subjective valuation of the Challenged Terms in the but-for scenario was $4.18 (calculated as 20% of $21).  Dubé Rep. ¶¶ 97, 99, 102-03.

## II.   The Conditioner and Renewal Spray Products

Dr. Dubé did not conduct any economic analysis for the Conditioner or Renewal Spray. He did not include those Products in his conjoint survey, nor undertake any separate evaluation of the markets for those Products.  Instead, he simply assumes that the price premium and WTP "percentages" he calculated for the Shampoo—i.e., a 7% price premium and a 20% WTP—can be applied to the Conditioner and Renewal Spray.  Dubé Tr. at 230:18-231:2; 239:8-20.

## III.  No Evidence Regarding Quantity of Retail Sales or Average Prices Paid by Class Members

In its summary judgment order, the Court excluded Dr. Dubé's aggregate damages calculations and opinions, in which he attempted to extrapolate state-specific quantities of retail sales from L'Oréal's nationwide wholesale sales data.  SJ Order at 18.  As this Court recognized, the quantity of Challenged Products sold in New York or California during the class period is an indispensable input to Plaintiffs' proposed formula for calculating aggregate damages.  *Id.* at 13-18.  Yet there is no evidence in the record from which to calculate those quantities.  Plaintiffs have admitted this: When opposing L'Oréal's motion for summary judgment, Plaintiffs conceded that, other than those now-excluded opinions from Dr. Dubé, there is no evidence in the record showing the quantity of New York or California retail sales.  Pl.'s 56.1 Opp. ¶¶ 41-42, 46, 48.

Nor is there any evidence in the record showing the average price that class members paid for the Challenged Products during the class period.  The evidence of MSRP in the record is

6

not "an accurate substitute for the actual prices paid by Class members." SJ Order at 12-13.

Plaintiffs have not identified any other evidence that could be used as the "price" input for their

aggregate damages formula. Pl.'s 56.1 Opp. ¶¶ 44-45, 47.

## LEGAL STANDARDS

### I.      Daubert

Under its "'gatekeeping' function under Rule 702," the district court is "charged with 'the

task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to

the task at hand.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002)

(quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)); *see also* SJ Order at

4. Expert testimony is unreliable, and therefore must be excluded, if it is based on unsupported

or speculative assumptions, or if the expert failed to conduct the necessary research or

investigation to support his assumptions. *Major League Baseball Props, Inc. v. Salvino*, 542

F.3d 290, 311 (2d Cir. 2008); *Playtex Prods. v. Procter & Gamble Co.*, 2003 U.S. Dist. LEXIS

8913, at *31 (S.D.N.Y. May 28, 2003).

### II.     Decertification and *Comcast*

Class certification is "inherently tentative." *Coopers & Lybrand v. Livesay*, 437 U.S.

463, 469 (1978). Once a class has been certified, "actual, not presumed, conformance with Rule

23[] remains . . . indispensable to the continued maintenance of a class action." *Rodriguez v. It's

Just Lunch Int'l*, 2018 U.S. Dist. LEXIS 131870, at *8 (S.D.N.Y. Aug. 6, 2018) (quoting *Gen.

Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)). District courts are "required to reassess

their class rulings as the case develops," *Boucher v. Syracuse Univ.*, 164 F.3d 113, 118 (2d Cir.

1999), and have "the affirmative duty of monitoring . . . class decisions in light of the evidentiary

development of the case." *Mazzei v. Money Store*, 829 F.3d 260, 266 (2d Cir. 2016) (internal

quotation marks and citation omitted). Consequently, a "district court may – and should –

decertify a class when the standards of Rule 23 have not been met." *Wu v. Pearson Educ. Inc.*, 2012 U.S. Dist. LEXIS 182300, at *12 (S.D.N.Y. Dec. 20, 2012) (citing *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 572 (2d Cir. 1982)). In opposing decertification, Plaintiffs "retain[] the burden to demonstrate that these requirements [are] satisfied." *Mazzei*, 829 F.3d at 270.

In *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), the Supreme Court held that to satisfy Rule 23(b)(3)'s predominance requirement, a "model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to [the plaintiff's] theory" of liability. *Id.* at 35. Simply put, "there cannot be a mismatch" between the alleged injury and damages model. *Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578, 587 (S.D.N.Y. 2013).

In certifying the classes in August 2018, this Court held that Plaintiffs' ***proposed*** damages model, as it was presented to the Court at that time, met the requirements of *Comcast*. However, "vast differences can exist between a hypothetical damages model and an actual damages model." *Davidson v. Apple, Inc.*, 2019 U.S. Dist. LEXIS 103624, at *49 (N.D. Cal. June 20, 2019). Courts have thus decertified class actions under *Comcast* where the damages model, once executed, failed to align with the plaintiff's theory of liability. *See Jacob*, 293 F.R.D. at 592 (decertifying class under *Comcast* where model's assumptions created "discrepancies" between the injury and remedy); *Zakaria v. Gerber Prods. Co.*, 755 F. App'x 623, 624-25 (9th Cir. 2018) (affirming decertification where damages model based on conjoint analysis "failed to provide an adequate basis to calculate" damages consistent with plaintiff's theory of liability); *Brazil v. Dole Packaged Foods, LLC*, 2014 U.S. Dist. LEXIS 157575, at *45 (N.D. Cal. Nov. 6, 2014), *aff'd* 660 F. App'x 531 (9th Cir. 2016) (decertifying class where damages model failed to isolate value of statements at issue).

<u>ARGUMENT</u>

I.   **DR. DUBÉ'S PROPOSED DAMAGES MEASURE FAILS *COMCAST* AND SHOULD BE EXCLUDED UNDER *DAUBERT* BECAUSE IT INCLUDES THE VALUE OF THE UNCHALLENGED LABEL TERM "+ SILK"**

Plaintiffs' sole theory of liability in this case is that the terms "Keratindose" and "Pro-Keratin" deceived consumers into believing that the Products contain keratin as an ingredient. FAC ¶¶ 4-6; *see also* SJ Order at 2; Cert. Order at 18.  Plaintiffs' theory of liability is not based in any way on the label term "+ Silk."  The FAC does not allege that the term "+ Silk" is false or misleading, and it is undisputed that the Products contain silk.

Despite this, Dr. Dubé designed his conjoint survey to measure the value to consumers of "Keratindose Pro-Keratin + Silk," a phrase that includes ***both*** the Challenged Terms ***and*** the unchallenged (and accurate) term "+ Silk."  Dubé Rep. ¶ 29(a), Ex. 5.42.  At deposition, Dr. Dubé did not, and could not, dispute this.  He testified that he has no way of knowing how much of his proposed damages figure is being driven by "+ Silk," as opposed to the terms Plaintiffs actually challenge.  *See* Dubé Tr. at 222:12-18 (agreeing that he "would not be able to . . . isolate the effect of 'Silk' separately from the [other] terms"); *id.* at 225:5 ("No, I cannot isolate 'Silk.'"); *id.* at 225:18-20 ("I did not reach a conclusion in my report about the effect of 'Silk.'").

This approach violates *Comcast* because it calculates damages "that are not the result of the wrong."  569 U.S. at 37.  Courts "routinely reject price premium methodologies under *Comcast* when [they] do not attempt to isolate the premium ***due only to the allegedly misleading marketing statement***."  *Rodriguez*, 2018 U.S. Dist. LEXIS 131870, at *16 (emphasis added) (citation omitted); *see also Famular v. Whirlpool Corp.*, 2019 U.S. Dist. LEXIS 44907, at *27 (S.D.N.Y. Mar. 18, 2019) (explaining that for a "price premium model adequately to match plaintiff's theory of liability," the expert "must show other features are <u>not included</u> in [the] calculation of the price premium") (emphasis in original).

*McMorrow v. Mondelez Int'l, Inc.*, 2020 U.S. Dist. LEXIS 41359 (S.D. Cal. Mar. 9, 2020) is directly on point.  In *McMorrow*, the plaintiff challenged the defendant's "nutritious" labeling statements, but the conjoint survey designed by the plaintiff's expert instead measured the value of statements that included "nutritious" along with other unchallenged terms, such as "nutritious sustained energy" and "nutritious steady energy all morning."  *Id.* at *17.  As the court explained, the model failed to isolate "whether the respondents would pay a price premium because the product is advertised as being 'nutritious,' or because it is advertised [as] providing 'steady energy,' or a combination of the two."  *Id.* at *24-25.  Applying *Comcast*, the court denied certification because the model was inconsistent with the plaintiffs' theory of liability, as it "cannot determine how consumers value only the word 'nutritious' on a label."  *Id.*  This is the exact error Dr. Dubé has made here: instead of filtering out the unchallenged term "+ Silk," Dr. Dubé inextricably incorporated its value into his proposed damages figure, making it impossible to know whether respondents would pay a premium for the Challenged Terms, the unchallenged term "+ Silk," or some combination of the two.  This error warrants decertification of the classes.

This mistake also requires exclusion of Dr. Dubé's opinions under *Daubert* because, as the *McMorrow* court explained, a damages figure that incorporates the value of an unchallenged term is simply irrelevant, and is therefore of no aid to the fact finder.  *Id.* at *2 n.2 (excluding expert's conjoint survey suffering from this flaw as "not relevant" because it "does not measure only the damages attributable to their liability theory"); *see also Townsend v. Monster Bev. Corp.*, 303 F. Supp. 3d 1010, 1023 (C.D. Cal. 2018) (excluding damages expert's conjoint survey as "irrelevant and unreliable" and "untethered to Plaintiffs' theory of liability" because it failed to use "the precise language of the statements at issue").

II.    **BECAUSE DR. DUBÉ FAILED TO CONDUCT ANY DAMAGES ANALYSIS FOR THE CONDITIONER AND RENEWAL SPRAY PRODUCTS, THE CLASSES SHOULD BE DECERTIFIED WITH RESPECT TO THOSE TWO PRODUCTS, AND HIS RELATED OPINIONS EXCLUDED**

Dr. Dubé *did not even attempt* to calculate damages for the Conditioner and Renewal Spray.  Instead, he offers only unsupported and conjectural damages opinions regarding these products, based on the survey and analysis he conducted *only for the Shampoo*.  These opinions should be excluded, and the Court should decertify the classes with respect to purchasers of the Conditioner and Renewal Spray.

Prior to class certification, Dr. Dubé was unequivocal about the need to conduct "a separate Conjoint Analysis for each of the three in-salon hair product categories: shampoo, conditioner and renewal spray."  Warder Decl. Ex. 7, November 4, 2017 Expert Report of Jean-Pierre Dubé ("Pre-Cert. Dubé Rep.") ¶ 20; *see also* Warder Decl. Ex. 8, November 21, 2017 Pre-Certification Deposition of Jean-Pierre Dubé at 99:20-21.  But when it came time to actually execute his model, Dr. Dubé instead conducted a single analysis based solely on the Shampoo.  Dr. Dubé now seeks *post hoc* to apply his conclusions regarding damages for the Shampoo to the two other Challenged Products.

But even Dr. Dubé admitted there is no tenable basis for assuming that purchasers of all three Products attach the same economic value to the Challenged Terms, or that they paid the same price premium regardless of which Product they purchased.  As Dr. Dubé testified during his deposition, damages across the three products are "***not equal***" because of key differences in the markets for each product category.  Dubé Tr. at 247:4-24 (emphasis added).  Moreover, Dr. Dubé repeatedly agreed that variations in the number and types of competitive products in the market for each of the three Challenged Products would fundamentally impact his analysis (which aimed to simulate the relevant market) and would therefore "change the output" of his

11

conclusions regarding economic damages. *Id.* at 257:10-16; 254:11-255:20; 229:5-10; 252:15-253:22.  Despite this, he never examined whether the markets for each of the three Products are comprised of the same or different competitors.  And the only record evidence on this point shows that the competitive landscape in fact varies across the three product categories.  For example, many of the competitor brands used in Dr. Dubé's hypothetical market do not offer a spray product.  Ugone Rep. ¶¶ 49-50.  This and Dr. Dubé's own testimony prove that his assumptions in trying to apply his Shampoo analysis to the Conditioner and Renewal Spray are not only unsupported, but wrong.  *See Davis v. Carroll*, 937 F. Supp. 2d 390, 420 (S.D.N.Y. 2013) (excluding expert opinion based on unsupported assumptions).

Moreover, despite admitting that the "prices are different" for each of the three Products, Dr. Dubé made no attempt to determine the real-world prices for the Conditioner and Renewal Spray.  Dubé Tr. at 238:13-18; 259:3-24.  This error is fatal, as analyses like his require "'real-world retail pricing . . . data' to calculate the price premium associated with allegedly false marketing."  *Schechner v. Whirlpool Corp.*, 2019 U.S. Dist. LEXIS 171642, at *18 (E.D. Mich. Aug. 13, 2019) (quoting *Singleton v. Fifth Generation, Inc.*, 2017 U.S. Dist. LEXIS 170415, at *64 (N.D.N.Y. Sept. 27, 2017)).  Therefore, even if Dr. Dubé had some basis for his assumption that the competitive marketplace for the Conditioner and Renewal Spray is the same as the Shampoo, the absence of a standard baseline price for those two Products makes it impossible to quantify the supposed price premium or WTP associated with those Products.

Dr. Dubé's failure to assess damages for the Conditioner and Renewal Spray, coupled with ***his own*** admissions regarding the effect of that failure, requires exclusion of his opinions regarding claimed damages associated with those two Products.  In addition, or in the alternative, the classes should be decertified with respect to purchasers of the Conditioner and Renewal

Spray because Plaintiffs have no evidence of class-wide damages specific to those products. *See Tropicana Orange Juice Mktg. & Sales Practices Litig.*, 2019 U.S. Dist. LEXIS 102566, at *38-40 (D.N.J. June 19, 2019) (denying certification for failure to conduct an analysis "specific" to each of the several products at issue).

## III.  DR. DUBÉ'S PROPOSED DAMAGES MEASURE FAILS *COMCAST* BECAUSE IT IMPROPERLY ASSIGNS DAMAGES ATTRIBUTABLE TO ALL INTERPRETATIONS OF THE CHALLENGED TERMS

As the Court has recognized, "the meaning of the Challenged Terms is ambiguous." SJ Order at 26. Yet Dr. Dubé failed to account for this ambiguity in his analysis, and instead measured respondents' valuation of the Challenged Terms regardless of what the respondents understood those terms to mean. Dubé Rep. ¶ 85; Dubé Reply Rep. ¶ 205. Dr. Dubé admitted this, testifying that his analysis does not account for how respondents or class members interpreted the Challenged Terms. Dubé Tr. at 39:2-5, 337:8-13; 338:12-339:3.

This approach violates *Comcast* because it improperly calculates damages regardless of the meaning of the Challenged Terms to respondents. "In order to tie a damages model for a misleading statement to a theory of liability," the "plaintiff must show that the price premium paid ***was for the attribute consumers believed the product contained***." *Townsend*, 303 F. Supp. 3d at 1051 (emphasis added). By his own admission, Dr. Dubé's proposed measure of damages incorporates the value assigned by class members to other, indisputably non-misleading interpretations of the Challenged Terms. Dubé Reply Rep. ¶ 207 (acknowledging the "inclusion" of respondents in his survey "who may have determined that the Challenged Products do not contain keratin"); Dubé Tr. at 337:8-13 (testifying that the possibility that "some class members understood that the product didn't contain any keratin" was irrelevant to his conclusions). Dr. Dubé therefore has not measured the value of the Challenged Terms as confined to the instances where they communicate a keratin ingredient claim. Rather, his

measurement also includes the value placed on other potential interpretations of the Challenged Terms, such as "that the product is designed to treat hair that has undergone a keratin treatment" or "something else entirely."  SJ Order at 26.

Numerous courts have rejected damages models as insufficient under *Comcast* for this exact reason.  In *Townsend*, the plaintiffs alleged that the statement "hydrates like a sports drink" was misleading because it indicated that the product contained electrolytes, when in fact it did not.  The court denied certification because the plaintiffs' conjoint analysis failed to limit the value of the disputed statement to plaintiff's proposed interpretation of that statement.  To satisfy *Comcast*, the plaintiffs "would have to show that consumers paid a price premium for a drink they believe contained electrolytes in order for it to align with their theory of liability for the Hydrates statement," but the damages model made "no such showing."  *Id.* 303 F. Supp. 3d at 1051.  Similarly, in *Hughes v. Ester C Co.*, 317 F.R.D. 33, 355 (E.D.N.Y. 2016), the court rejected the plaintiffs' model for isolating the price premium associated with a "better" claim because, in the context of the claim "Better Vitamin C," "'better' [was] not an objective term that carries a single definition or refers to a specific product feature."  *Id.* at 355.  As a result, the "only solution [was] to determine damages based on each class members' precise definition of 'better,' a result plainly prohibited by *Comcast*."  *Id*. (citing *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1024 (C.D. Cal. 2015) (rejecting damages model that failed "to segregate the percentage of the price premium specifically attributable" to plaintiffs' "specific theory of liability"—i.e., that "100% Natural" communicated the product was free of GMO ingredients)).

Likewise here, Dr. Dubé has conceded that his proposed damages figure incorporates all interpretations of the Challenged Terms, even if they are unquestionably accurate, or unrelated to Plaintiffs' theory of liability.  Dubé Reply Rep. ¶¶ 205, 207; Dubé Tr. at 337:8-13, 338:12-339:3.

Because his model does not measure only those damages arising from Plaintiffs' theory of

liability, the classes should be decertified under *Comcast*.

IV.    **PLAINTIFFS' CLAIM FOR WTP DAMAGES SHOULD BE DECERTIFIED AND DR. DUBÉ'S OPINIONS REGARDING WTP AS A MEASURE OF DAMAGES SHOULD BE EXCLUDED**

   A.    *The Claim for Willingness to Pay ("WTP") Damages Should Be Decertified Because WTP Damages Are Unavailable As A Matter Of Law*

Dr. Dubé purports to have calculated two distinct, separate measures of class members'

damages: (1) a price premium associated with the Challenged Terms, which Dr. Dubé asserts is

7% of the purchase price (or $1.51 of Dr. Dubé's assumed Shampoo price of $21); and (2)

consumers' average WTP for the value they subjectively associate with the Challenged Terms,

which Dr. Dubé asserts is 20% of the purchase price (or $4.18 of $21).  Dubé Rep. ¶¶ 97, 99,

102-03.  The price premium figure purports to measure the difference between the price

consumers paid for the product and the market value of what they received.  In other words, Dr.

Dubé claims the price premium reflects the reduction in price that would ***actually*** occur in a

functioning marketplace upon removal of the Challenged Terms from the Products' labels.  Pre-

Cert. Dubé Rep. ¶ 28; Dubé Tr. 295:20-296:3.  By contrast, the WTP figure purports to measure

the "***perceived*** economic benefits" that class members subjectively associate with the Challenged

Terms, regardless of their objective effect on the marketplace.  Dubé Rep. ¶ 86 (emphasis

added).  WTP thus measures economic value that is unconstrained by the real-world market

value of the Challenged Terms.  Ugone Rep. ¶¶ 32-33.

WTP damages are unavailable as a matter of law under the classes' causes of action,

which limit recovery to the difference between the price consumers actually paid and the true

market value of what they received, i.e., a price premium.  Under California's UCL and FAL,

restitution is measured by "the difference between the ***market price actually paid*** by consumers

and the ***true market price*** that reflects the impact of the unlawful, unfair, or fraudulent business practices." *Werdebaugh v. Blue Diamond Growers*, 2014 U.S. Dist. LEXIS 173789, at *27 (N.D. Cal. Dec. 15, 2014) (emphasis added); *see also Brazil*, 660 F. App'x at 534-35 (a "greater value than the price premium is not available" because damages are "correctly limited … to the difference between the prices customers paid and the value of [what] they bought—in other words, the 'price premium.'"); *Lanovaz v. Twinings N. Am., Inc.*, 2014 U.S. Dist. LEXIS 57535, at *23 (N.D. Cal. Apr. 24, 2014) ("[T]he price premium attributable to the [disputed] labels is the only legally permissible measure of damages").

The same is true of New York's GBL § 349, which only allows for the recovery of "actual damages," not a plaintiff's subjective valuation of her own injury.  N.Y. Gen. Bus. Law § 349(h); *see also Belfiore v. P&G*, 140 F. Supp. 3d 241, 247 (E.D.N.Y. 2015) (describing "actual damages" under Section 349 as "the price premium"); *Ault v. J.M. Smucker Co.*, 310 F.R.D. 59, 67 (S.D.N.Y. 2015) (rejecting damages model that measured the "price [consumers] would be willing to pay for the product" as "not 'consistent with [Plaintiff's] liability case' because it makes no attempt to calculate the amount that consumers ***actually overpaid***") (emphasis added) (quoting *Comcast*, 569 U.S. at 33).

Because the UCL, FAL, and GBL do not authorize damages based on consumers' subjective valuation of labeling statements, a model purporting to measure damages in this way cannot satisfy *Comcast*.  In *Zakaria*, the Ninth Circuit affirmed decertification of a consumer class where the damages model "showed only how much consumers ***subjectively valued***" the statement at issue based on a WTP model, "not what had occurred to the ***actual market price*** of [the product] with or without the label."  755 F. App'x at 624-25 (emphasis added).  As a result, "regardless [of] whether consumers were willing to pay a higher price for the labeled product,

the expert's opinion did not contain any evidence that such higher price was actually paid; hence, no evidence of restitution or actual damages was proffered." *Id.*; *see also*, *e.g.*, *In re NJOY Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1119 (C.D. Cal. 2015) (denying certification under *Comcast* for same reason).

These cases are dispositive of Plaintiffs' attempt to recover WTP damages here.  There is no evidence that consumers actually paid an additional $4.18 as a result of the Challenged Terms being included on the Shampoo.  Allowing for recovery of WTP damages would therefore overcompensate class members because they would receive damages over and above the increase in price that L'Oréal was allegedly able to charge as a result of using the Challenged Terms on the Products' label (i.e., the price premium).  *See Trazo v. Nestle*, 113 F. Supp. 3d 1047, 1052 (N.D. Cal. 2015) (in mislabeling cases, "[t]here is no reason to go beyond the price premium, and doing so would result in a windfall to plaintiff").  To the extent Plaintiffs seek recovery of WTP damages, as opposed to price premium damages, the classes should be decertified.

### B.   *Dr. Dubé's Opinions Regarding WTP Damages Should Be Excluded Under Daubert Because They Are Irrelevant and Unreliable*

Because WTP damages are unavailable as a matter of law, Dr. Dubé's testimony regarding such damages is irrelevant, will not aid the fact-finder, and therefore should be excluded.  *See Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 572 (S.D.N.Y. 2007) (excluding expert testimony concerning unrecoverable damages because such testimony did not fit the facts of the case); *IceMOS Tech. Corp. v. Omron Corp.*, 2019 U.S. Dist. LEXIS 196610, at *50 (D. Ariz. Nov. 13, 2019) (excluding expert testimony regarding category of damages as "irrelevant in light of the Court's decision that these damages are unavailable.").

But even if Dr. Dubé's opinions regarding WTP damages were somehow relevant, they should still be excluded because the methodology Dr. Dubé used to calculate WTP damages was

premised on an undisclosed, arbitrary, and inherently unreliable step in executing his model.  To calculate WTP damages from the results of his conjoint survey, Dr. Dubé used a statistical algorithm that generated unique marketplace simulations, known as "draws."  Dubé Tr. at 411:8-412:3; Ugone Rep. ¶ 23.  For each draw, Dr. Dubé calculated the average WTP value across all of the 105 purchasers who participated in the survey.  After calculating this average within each draw, Dr. Dubé then calculated the average across all of the draws.  This final "average of averages" represents Dr. Dubé's proposed WTP measure of damages.  Ugone Rep. ¶ 110.

However, before performing that final step, Dr. Dubé discarded the draws with the eight highest and eight lowest WTP values.  Dubé Tr. 412:4-10; Ugone Rep. ¶¶ 110-11.  In his report, Dr. Dubé did not disclose that he had discarded any draws, let alone explain why he discarded them.  And yet, Dr. Dubé's undisclosed exclusion of data from his analysis fundamentally impacted his calculations.  As Dr. Dubé himself explained, if he had not discarded the draws, his claimed WTP figure would have increased from $4.18 to $6.05, an increase of 44%.  Dubé Reply Rep. ¶ 241.  Dr. Dubé's conclusions are therefore highly sensitive to inclusion or exclusion of particular individual data points, which evinces a lack of robustness.  Ugone Rep. ¶ 114; *see Reed Constr. Data Inc., v. McGraw-Hill Cos*., 49 F. Supp. 3d 385, 407 (S.D.N.Y. 2014) ("[W]here, as here, very minor changes in arbitrarily selected model parameters can entirely alter the model's conclusions, that model is insufficiently robust to withstand the scrutiny of Rule 702" and must be excluded).

Dr. Dubé could offer no coherent explanation for his arbitrary exclusion of data, and ultimately had to admit during his deposition that it was an unintentional error he made when "playing around with [his] code."  Dubé Tr. at 414:3-17.  Dr. Dubé tried to defend this error by labeling it "conservative" because it results in a lower WTP number than if he had not discarded

any draws at all.  Dubé Reply Rep. ¶ 241.  But as this Court already held, calling an action

"conservative" does not make the resulting conclusion reliable.  SJ Order at 14; *see also*

*R.F.M.A.S., Inc. v. Mimi So*, 748 F. Supp. 2d 244, 276-77 (S.D.N.Y. 2010) (expert's claim that

his damages figure is "conservative" is "plainly inadequate to satisfy Daubert standards" because

the "fact that [an] estimate of damages was erroneously low rather than erroneously high" is

irrelevant to the admissibility of expert testimony).

　　　　To fulfill its gatekeeping function, the Court must ensure that an expert "employs in the

courtroom the same level of intellectual rigor that characterizes the practice of an expert in the

relevant field."  *Amorgianos*, 303 F.3d at 265-66.  Dr. Dubé's admission that his WTP

conclusions were altered by his mistaken omission of some data draws—and his indefensible

attempt to stand by those conclusions because the effect of their removal was "conservative"—

demonstrates a lack of rigor that warrants exclusion under *Daubert*.  *Id*; *see also Washington v.*

*Kellwood Co.*, 105 F. Supp. 3d 293, 318 (S.D.N.Y. 2015) (excluding damages opinion premised

on "wholly arbitrary decisions").

## V.　　THE CLASSES SHOULD BE DECERTIFIED BECAUSE THERE IS NO EVIDENCE OF THE QUANTITY OR AVERAGE PRICE OF NEW YORK AND CALIFORNIA RETAIL SALES DURING THE CLASS PERIOD

　　　　Plaintiffs have failed to adduce ***any evidence*** establishing the quantity or average prices

of New York and California retail sales during the class period.  Without any evidence of these

necessary inputs to their aggregate damages formula, Plaintiffs have not sustained their burden

under Rule 23 to show that damages can be calculated on a class-wide basis.  Irrespective of

whether Plaintiffs' aggregate damages equation of "(# bottles) x ($ price) x (% damages)" is

theoretically valid for this purpose, an equation with no data to input is insufficient.  *See In re*

*AMLA Litig.*, 328 F.R.D. 127, 136 (S.D.N.Y. 2018) (without "record evidence of total retail

purchases in New York . . . then plaintiffs have not come forward with evidence sufficient to

carry their burden of showing classwide damages."); *Lilly v. Jamba Juice Co.*, 308 F.R.D. 231, 239 (N.D. Cal. 2014) ("[I]t is Plaintiffs' burden" under Rule 23 "to produce evidence of the total damages to which the Class is entitled.").

Plaintiffs have already conceded that there is no evidence in the record of sales quantities or prices that can be used to calculate class-wide damages.  In their response to L'Oréal's Rule 56.1 Statement, Plaintiffs agreed that other than Dr. Dubé's now-excluded aggregate damages report, there is no other evidence showing quantities of New York or California retail sales during the class period.  Pl.'s 56.1 Opp. ¶¶ 41-42, 46, 48.  And apart from L'Oréal's MSRP, which this Court held is not "an accurate substitute for the actual prices paid by Class members," SJ Order at 12-13, Plaintiffs have not identified any evidence of the average price actually paid by class members for the Products during the class period, another necessary input into their class-wide damages formula.  Pl.'s 56.1 Opp. ¶¶ 44-45, 47.

*In re AMLA Litig.*, 16-cv-6593 (S.D.N.Y.) illustrates why Plaintiffs' failure to obtain inputs for their damages formula warrants decertification of the classes—or, at a minimum, decertification of their claim for aggregate damages.  In *AMLA*, just as here, the plaintiffs had the burden to prove state-specific retail sales, but the only evidence in the record was of nationwide wholesale sales.  Confronted with a last-minute supplemental expert report by which plaintiffs sought to introduce third-party retail sales data, the court excluded the expert testimony (as untimely and inadmissible) and then decertified the class ***due to the absence of any evidence of retail sales***.  *In re AMLA Litig.*, 16-cv-6593, Dkt. No. 335, Hr'g Tr. at 55-56 (Jan. 22, 2019).

Now that this Court has excluded Dr. Dubé's testimony regarding his calculation of aggregate class-wide damages, *see* SJ Order at 18, there is no evidence in the record that would permit a jury to award aggregate damages based on Plaintiffs' proposed formula.  Plaintiffs must

"satisfy through **evidentiary proof**" their burdens under Rule 23(b)(3).  *Comcast*, 569 U.S. at 33

(emphasis added).  Because Plaintiffs have not developed the evidentiary proof necessary to

prove class-wide damages, the classes should be decertified or, at a minimum, the classes' claims

for aggregate damages should be decertified.

## VI. DR. DUBÉ'S OPINIONS SHOULD BE EXCLUDED UNDER *DAUBERT* BECAUSE BOTH HIS CONJOINT SURVEY AND SUBSEQUENT ECONOMIC ANALYSIS ARE UNRELIABLE

### A. Dr. Dubé's Conjoint Survey Methodology is Fundamentally Flawed

#### 1. Dr. Dubé Failed To Research the Relevant Market to Identify the Key Product Attributes

Including an appropriate mix of product attributes known to be important to consumers of

the products at issue is essential to obtaining reliable results from a conjoint survey.  Dubé Rep. ¶

22; Scott Rep. ¶¶ 15-19.  Dr. Dubé himself confirmed that selecting the right attributes is

"central" to conjoint survey design, and said he would examine how and why attributes were

selected if he were evaluating someone else's conjoint survey.  Dubé Tr. at 72:14-24; 73:5-14.

Dr. Dubé has acknowledged that, for this case, his conjoint survey needed to include the "key

drivers of choice" for purchasers of in-salon shampoo for over-processed hair.  *Id*. at 72:10-13;

74:13-75:4.  Dr. Dubé further acknowledged that inclusion or exclusion of a key attribute could

"change the results of the survey."  *Id.*

To reliably identify the key drivers of choice for use in a conjoint survey, experts should

first conduct consumer research on which factors are most important to consumers' purchase

decisions for the product or service in question.  *See MacDougall v. Am. Honda Motor Co.,* 2020

U.S. Dist. LEXIS 166786, at *20-24 (C.D. Cal. Sept. 11, 2020) (survey excluded where expert

ran pre-test to assess relative importance of attributes but failed to properly incorporate findings

into survey); *In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig*., 2017

U.S. Dist. LEXIS 48792, at *92 (N.D. Ill. Mar. 31, 2017) (rejecting conjoint survey for failure to justify selected attributes and noting that "in other conjoint analyses cases, experts first ask[] respondents to prioritize… attributes" to determine which attributes should be included in the survey ); *see also* Scott Rep. ¶ 16.

Yet in this case, Dr. Dubé did not conduct any pre-test (or any other reliable market research) to determine what attributes are most relevant to purchasers of in-salon shampoos for over-processed hair.  Dubé Tr. at 197-19-199:11; 14:8-14.  Nor did he consult with anyone with experience or expertise in the hair care or professional salon industry before designing his survey.  *Id.* at 71:22-72:4.  As a result, Dr. Dubé's claim to have selected attributes that "capture the spirit of a typical purchase experience of shampoo for damaged or over-processed hair," Dubé Rep. ¶ 27, is based on nothing other than his own say-so.

Dr. Dubé himself had no relevant expertise on which to have based his selection of attributes to test in his survey.  Not only had Dr. Dubé never conducted a survey regarding hair care products prior to his conjoint survey for this case, he also had never served as a consultant regarding hair care products, and had never published any research focused on hair care products.  Dubé Tr. at 14:8-14; 9:10-10:3; 10:11-19.  Nor does Dr. Dubé's experience with consumer products generally give him an understanding as to relevant attributes in the market for in-salon hair care products for overprocessed hair.  *See LVL XIII Brants, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 647 (S.D.N.Y. Sep. 13, 2016) ("[A] vague claim of 'prior experience' cannot salvage an opinion . . . that is the product of guesswork.") (citation omitted).

Dr. Dubé's failure to use any reliable methodology whatsoever to identify the key product attributes appropriate for inclusion in his survey, combined with his own lack of expertise in the relevant market, is grounds for his exclusion under *Daubert*.  *See Playtex*, 2003

22

U.S. Dist. LEXIS 8913, at *31 (excluding expert who "had no expertise" in particular aspect of her testimony, but "failed to conduct independent research or consult any research from any source to support her supposition"); *LinkCo, Inc. v. Fujitsu Ltd.*, 2002 U.S. Dist. LEXIS 12975, at *10-11 (S.D.N.Y. July 15, 2002) (excluding expert's opinions that "address issues requiring specialized knowledge which may assist the jury, but are based on unsubstantiated references to [the expert's] experience, without benefit of citation to research, studies, or other generally accepted support for expert testimony"); *Whalen v. CSX Transp., Inc.*, 2016 U.S. Dist. LEXIS 135069, at *43 (S.D.N.Y. Sep. 29, 2016) (well-credentialed expert's opinion subject to disqualification if expert "fails to employ investigative techniques or cannot explain the … basis for his opinion").

       2.    <u>Dr. Dubé Artificially Increased The Importance of the Challenged Terms By Excluding Key Product Attributes</u>

Dr. Dubé's failure to reliably choose the key attributes for his conjoint survey resulted in the exclusion of a number of product attributes from respondents' consideration which Dr. Dubé admits may have been ***more important*** to consumers than the attributes he did include.

For example, Dr. Dubé did not include as an attribute in his survey the statement "Shampoo for Overprocessed Hair," which appears prominently on the front label of the Challenged Products. Dubé Tr. at 38:17-23; 112:9-16; 117:18-118:9. Dr. Dubé could not offer any coherent explanation for why he excluded this attribute. Indeed, he agreed that "Shampoo for Overprocessed Hair" is "an important detail for this product," and even admitted that this descriptor could be "***more important***" to consumers than the Challenged Terms. *Id.* at 114:18-115:9; 141:8-10. Yet he inexplicably maintained it was not necessary to assess whether this label statement was a "key driver of choice," notwithstanding his prior testimony that a well-designed conjoint survey should include key drivers of choice. *Id*. at 114:3-9; 74:13-75:4. Dr.

Dubé similarly failed to include the statement "No sulfates, parabens and harsh salts system" as a tested attribute, even though that statement also appeared on the front label, and product formula exclusion statements such as this are known to be drivers of choice in this market.  Dubé Tr. at 115:23-116:25; Warder Decl. Ex. 9, March 1, 2020 Expert Report of Nikola R. Cline ("Cline Rep.") ¶ 30.

Dr. Dubé also failed to include an attribute that ***one of the named Plaintiffs testified was a key driver of her purchase decision***: whether the product was recommended by a salon professional.  Dubé Tr. at 90:16-21; 91:7-18.  As Defendants' industry expert explained, a recommendation from a hair stylist is an important, if not the "most powerful," factor when making a purchase decision in this product category.  Cline Rep. ¶ 20.  Evincing this, Plaintiff Price testified that she purchased the product at issue based on the "recommendation of [her] stylist," that this recommendation was the "predominant reason why [she] purchased the product," and that she would have purchased any product her stylist recommended, regardless of whether it contained keratin.  Warder Decl. Ex. 10, July 27, 2017 Deposition of Brandi Price at 68:24-69:9; 84:14-85:8.  Yet Dr. Dubé paid no regard to this testimony, even though it was readily available to him prior to conducting his survey, and even though Plaintiffs have presented Price as "typical" of the class she represents.[4]  He simply ***did not consider*** whether to include professional recommendation as a tested attribute in his conjoint survey, though he admitted it was "possible" that salon recommendation is a key driver of choice, and that he ***could*** have included it as a tested attribute.  Dubé Tr. at 91:7-18; 100:22-101:15.

This omission of key attributes renders Dr. Dubé's survey unreliable because it causes respondents to artificially overvalue the Challenged Terms.  When a particular feature is

---

[4] Dr. Dubé also paid no regard to the same testimony from L'Oréal's corporate representative, who confirmed the importance of salon recommendations.  Warder Decl. Ex. 11, October 30, 2017 Deposition of Melissa Morris Bacallao at 38:20-39:9; 40:3-9; 44:5-24.

emphasized due to the omission of other important attributes, respondents' valuation of the tested attribute cannot reliably approximate how consumers would value that attribute in the real world, where they could consider and make tradeoffs among all key attributes.  Scott Rep. ¶ 16.  This results in a well-known survey defect often referred to as focalism bias, which "occurs when respondents pay more attention to a product attribute or feature in the choice exercises than they ordinarily would in the actual purchase process, thus increasing the apparent relative subjective value they assign to the attribute in the conjoint study."  *Townsend*, 303 F. Supp. 3d at 1049.

Numerous courts have excluded conjoint surveys under *Daubert*—or given them no weight for purposes of Rule 23 analysis—for failure to consider or include attributes that are important to buyers of the products at issue, as Dr. Dubé has failed to do here.  In *In re Fluidmaster*, 2017 U.S. Dist. LEXIS 48792, for example, the court excluded an expert's proposed conjoint survey for failure to justify why she excluded certain attributes which the evidence indicated were important to purchasers.  *Id.* at *92-93.  The expert's failure to include relevant product attributes and inability to justify their exclusion elevated the importance of the challenged attribute in the survey, thus skewing the results.  *Id.* at *92.  Similarly, in *Townsend*, survey respondents were initially asked to identify the attributes that were most important to them from a list of sixteen attributes.  303 F. Supp. 3d at 1050.  (As noted above, Dr. Dubé skipped this step entirely.)  Although the expert in *Townsend* did this necessary preliminary work, he only included in his conjoint survey attributes that ranked in the bottom half.  *Id.*  The court held that this was "not an adequate measure of damages" because the "survey design suffers from focalism bias, rendering it useless for the purpose of determining price premiums attributable to the challenged statements."  *Id.* at 1049.  And in *MacDougall*, 2020 U.S. Dist. LEXIS 166786, the court excluded a conjoint analysis after the expert arbitrarily selected 4 of 33

identified product attributes, ignoring the results of his pre-test to determine which attributes were most important to consumers.  *Id.* at \*23.[5]  As these cases show, by arbitrarily omitting certain attributes, Dr. Dubé's conjoint survey improperly caused respondents to focus on the Challenged Terms in a way they otherwise might not have, and to overvalue those terms as a result.  This methodological defect requires exclusion of his opinions.

3.   Dr. Dubé Violated Basic Tenets of Survey Design by Failing to Present the Products as they Appear in the Market

Dr. Dubé's survey design was also defective because it presented the Challenged Terms to respondents in a manner divorced from the context in which consumers would actually view the product label in the real world.  The "failure of a survey to approximate actual marketplace conditions can provide grounds for inadmissibility."  *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 231 (S.D.N.Y. 2010); *see also Cumberland Packing Corp. v. Monsanto Co.*, 32 F. Supp. 2d 561, 578 (E.D.N.Y. 1999) (finding survey "untrustworthy because it made no attempt to resemble an actual market situation.").

Rather than have respondents consider the Challenged Terms within the context of the product label itself—as they would in a salon or other retail setting—Dr. Dubé presented the terms in a separate text box removed from the actual product label.  *See supra*, at 4; *see also* Dubé Rep. Ex. 5.44-55.  In doing so, Dr. Dubé essentially forced respondents to focus on the Challenged Terms when they otherwise might not have, thus signaling to respondents that these

---

[5] *See also Visteon Global Techs., LLC v. Garmin Int'l, Inc*., 2016 U.S. Dist. LEXIS 142395, at \*21 (E.D. Mich. Oct. 14, 2016) (excluding conjoint survey that used only "unimportant" attributes and thus "express[ed] nothing about the value of the [tested] features relative to other important features of the accused devices."); *Oracle America, Inc. v. Google Inc.*, 2012 U.S. Dist. LEXIS 33619, at \*30-31 (N.D. Cal. Mar. 13, 2012) (excluding expert's conjoint analysis that "omitted important features that would have played an important role in real-world consumers' preferences" and as a result "inappropriately focused consumers on artificially selected features that did not reliably determine real-world behavior."); *Apple, Inc. v. Samsung Elecs. Co.*, 2014 U.S. Dist. LEXIS 29721, at \*82 (N.D. Cal. Mar. 6, 2014) (giving no weight to conjoint survey and holding that "any price premium that consumers are willing to pay for the [challenged] features in the survey is devoid of sufficient context" due to the "omission of numerous other important feature sets").

particular terms have some "special importance," and therefore add value.  As a result,

respondents placed more value on the Challenged Terms than they otherwise would have.  Scott

Rep. ¶¶ 10(d), 10(f), 31-32.

Moreover, at the moment respondents were instructed to choose their preferred product,

they only had access to a blurry, illegible thumbnail image of the front labels, and could not view

the back of the product labels at all.  *See supra*, at 4; Dubé Rep. Ex. 5.44-55; Dubé Tr. at 127:14-

19; Scott Rep. ¶¶ 10(d), 23, 34.  Indeed, when asked to look at his own survey on a laptop

computer during his deposition, Dr. Dubé could not read the label text and conceded that much

of the text on these label images was illegible.  Dubé Tr. at 131:21-133:21; 143:7-20.  Thus, the

wide range of information available on the label—and which may have influenced respondents'

valuation of the Challenged Terms—was excluded from respondents' consideration, creating a

scenario divorced from the real-world purchasing environment.  Scott Rep. ¶¶ 10(d), 10(f), 31-

32.

Courts routinely exclude surveys, like Dr. Dubé's, that present the challenged language to

respondents divorced from the context in which consumers would interact with that language in

the real world.  In *Townsend*, for example, the court found that a conjoint survey suffered from

focalism bias (and accordingly gave it no weight) because the challenged statements were shown

to respondents in a different manner from how they appeared on the label, which "essentially

forced" respondents "to consider these attributes isolated from their context."  303 F. Supp. 3d at

1050.  In *Apple v. Samsung*, the court likewise excluded a survey that placed "undue emphasis"

on the features at issue, which "likely inflated their price premiums" given that "[r]esearch has

shown that attention can elevate the importance of particular attributes to a level that is greater

than would occur in the marketplace."  2014 U.S. Dist. LEXIS 29721, at *93-95 (citation

omitted).[6]  Because Dr. Dubé's survey suffers from this same flaw—resulting in an artificial overvaluing of the Challenged Terms—the Court should exclude his opinions here.

### B.      Dr. Dubé's Economic Analysis is Fundamentally Flawed

Dr. Dubé's economic analysis represented his attempt to convert the results of his conjoint survey into a damages figure that adequately and correctly accounted for supply-side market factors such as costs, pricing, and competition.  This analysis consisted of a computer simulation of the market for in-salon shampoos for over-processed hair, by which Dr. Dubé attempted to assess whether the demand for and price of the Challenged Shampoo Product would change upon removal of the Challenged Terms.

In two critical respects, however, this analysis was inconsistent with the real-world market that Dr. Dubé attempted to recreate, and was instead based on unsupported, and incorrect, assumptions.  This requires exclusion of Dr. Dubé's analysis and conclusions.  *See Major League Baseball*, 542 F.3d at 311 (the "admission of expert testimony based on speculative assumptions is an abuse of discretion."); *Point Prods. A.G. v. Sony Music Entm't, Inc.*, 2004 U.S. Dist. LEXIS 2676, at *23-24 (S.D.N.Y. 2004) (excluding expert who adopted "speculative assumptions" instead of "factoring into his analysis the[] real world facts."); *Chart v. Town of Parma*, 2014 U.S. Dist. LEXIS 140463, at *43 (W.D.N.Y. Sep. 30, 2014) (an "expert's assumptions must … be accompanied by a sufficient factual foundation and cannot ignore the 'real world.'") (internal quotation marks and citation omitted).

---

[6] *See also WE Media, Inc. v. Gen. Elec. Co.*, 218 F. Supp. 2d 463, 474 (S.D.N.Y. 2002) (excluding survey that "did not use pictures or advertisements that approximate what a potential consumer would encounter" and thereby "essentially measured respondents' word associations devoid of context"); *ComponentOne, L.L.C. v. ComponentArt, Inc.*, 2008 U.S. Dist. LEXIS 87066, at *79-81 (W.D. Pa. Oct. 27, 2008) (excluding survey that "presented the parties' marks on a plain background in large block letters" because it was "completely divergent from the conditions that potential purchasers encounter in the parties' marketplace" and was "devoid of context.").

1.    Dr. Dubé Wrongly Assumed That L'Oréal Would Sell the Products
Without a Product Name

Dr. Dubé's analysis erroneously assumes that if the Challenged Terms were removed

from the label, L'Oréal would not replace these terms—***which include the name of the***

***product***—with alternative language.  Dubé Tr. at 393:17-394:9.  That is, in Dr. Dubé's "but for"

world, the labels of the Challenged Products would have no name (because "Keratindose" was

removed), and no differentiating claims (because "Pro-Keratin + Silk" was removed).  But Dr.

Dubé himself admitted that he had never seen a L'Oréal shampoo product that lacked a product

name and accompanying language (such as the Challenged Terms), and that if L'Oréal had

actually removed the Challenged Terms it would have replaced them with alternative language.

Dubé Tr. at 346:16-22.  This is common sense, and consistent with beauty and hair product

industry practice.  Cline Rep. ¶¶ 45-46.  There is therefore no basis for Dr. Dubé's decision to

design his analysis around the assumption that L'Oréal would not replace the Challenged Terms

with an alternative name and alternative descriptive language in the event that L'Oréal were to

remove the Challenged Terms from the label.  *See Davis*, 937 F. Supp. 2d at 419-20 (excluding

expert opinion based on "assumptions unsupported or contradicted by the record."); *Macaluso v.

Herman Miller, Inc.*, 2005 U.S. Dist. LEXIS 3717, at *23 (S.D.N.Y. Mar. 9, 2005) (excluding

expert's opinion "because it is based on incorrect factual assumptions that render all of his

subsequent conclusions purely speculative.").

Dr. Dubé's damages calculation was materially affected by his assumption that, in the

real world, L'Oréal would market a product without a name and without accompanying

descriptive language.  Dr. Dubé's own data shows that if he had replaced the Challenged Terms

with the other labeling "Text" options presented in his survey ("RCT Protein Complex" and/or

"With Asta-Repair"), instead of assuming the labels would be left blank when the Challenged

Terms were removed, his price premium would have been reduced by **26 percent** if just one of

these claims were used as a replacement, and by **61 percent** if both statements were used.  Ugone

Rep. ¶¶ 40-41.  Although L'Oréal would not use those particular text options on the Challenged

Products, these reduced price premiums illustrate the degree to which Dr. Dubé's unwarranted

omission of a product name and descriptive language from his hypothetical "but for" Challenged

Products unreliably inflated his damages calculations.

        2.     <u>Dr. Dubé's Attempt to "Infer" L'Oréal's Marginal Costs is Demonstrably
Unreliable</u>

Dr. Dubé's market simulation also utilized a "supply-side" input—L'Oréal's marginal

cost—that was demonstrably incorrect.  Reliance on this untenable data point at a key step of his

damages calculation renders his entire damages opinion inadmissible.  *Amorgianos*, 303 F.3d at

267 ("[A]ny step that renders the analysis unreliable under the *Daubert* factors renders the

expert's testimony inadmissible.") (citation omitted).

Specifically, Dr. Dubé told the Court (and confirmed during his deposition) that

L'Oréal's marginal cost for each unit sold of the Challenged Shampoo Product was a "data

requirement" for calculating a price premium.  *See* Dkt. No. 114, Dubé Supplemental Marginal

Costs Declaration ¶ 19; Dubé Tr. at 396:13-397:7; 400:9-20.  But after acknowledging that he

could not use L'Oréal's marginal costs in his analysis (because L'Oréal does not calculate or

maintain such information), Dr. Dubé instead tried to "infer" this data requirement using a

complex economic formula.  Dubé Rep. ¶ 82; Ugone Rep. ¶ 92.  Dr. Dubé agreed that a failure to

correctly infer the marginal costs could impact his damages calculations, including the price

premium figure.  Dubé Tr. at 401:16-402:10.

Yet Dr. Dubé's attempt to "infer" the marginal costs associated with the Shampoo

yielded an illogical, "inferred" marginal cost of $11.07—a result that is easily disproved by real-

world data that was available to Dr. Dubé.  Given Dr. Dubé's assumed purchase price of $21, a marginal cost of $11.07 would mean that L'Oréal earned an incremental profit of $9.93 per unit under Dubé's model.  However, L'Oréal's wholesale revenue per unit is only $ ███ Ugone Rep. ¶¶ 95-96.  A marginal cost of $11.07 therefore cannot be correct because it is impossible to earn *profits* of $9.93 per unit when *revenue* per unit is only ███ *Id.*

Indeed, Dr. Dubé readily conceded that profits cannot exceed revenue, and testified that an inferred marginal costs figure indicating that profits exceed revenue would likely be an "incorrect inference of marginal cost."  Dubé Tr. at 402:24-403-11.  Yet that is exactly what Dr. Dubé's analysis reflects here.  Thus, even accepting that Dr. Dubé's methodology for inferring marginal costs *theoretically* could have yielded a reliable result, his *particular* execution of this methodology, on the facts of this case, clearly did not.  *See Oleg Cassini, Inc. v. Electrolux Home Prod., Inc.*, 2014 U.S. Dist. LEXIS 52085, at *1 (S.D.N.Y. Apr. 15, 2014) (expert testimony is "inadmissible if the expert fails to explain how her opinion follows logically from the application of the methodology to the specific facts of the case").  Dr. Dubé's failure to assess whether his results made any economic sense is grounds for exclusion.  *See Amorgianos*, 303 F.3d at 269 (affirming exclusion of expert "due to his failure to apply his stated methodology 'reliably to the facts of the case." (quoting Fed. R. Evid. 702));  *R.F.M.A.S.*, 748 F. Supp. 2d at 274 (excluding damages expert who used "methodologies [that] might conceivably be justified in some circumstances," but "utterly failed to justify the[] chosen methodologies in light of the facts of this case.");  *Robinson v. Sanctuary Record Grps., Ltd.*, 542 F. Supp. 2d 284, 292-293 (S.D.N.Y. 2008) (excluding experts who "never tested their calculations as commended by *Daubert*, instead relying exclusively on their many faulty assumptions").

VII.   **THE CLASSES MUST BE DECERTIFIED BECAUSE THEY INCLUDE A MATERIAL PERCENTAGE OF UNINJURED YET UNIDENTIFIABLE CLASS MEMBERS**

The classes must also be decertified because Plaintiffs' own evidence shows that a material percentage of class members placed a ***negative value*** on the Challenged Terms— meaning they showed no preference for them at all during the survey—and therefore suffered no injury.  *See* Ugone Rep. ¶¶ 52-55.  Dr. Dubé's underlying survey data revealed that 7.6% of respondents who previously purchased one of the Products placed a negative value on the Challenged Terms; when only those respondents who may qualify as class members are considered—past purchasers who are residents of either California or New York—the percentage of uninjured class members rises to 11.1%.  *Id.* ¶ 54.  Dr. Dubé has conceded that his model offers no method for identifying such class members to prevent them from receiving a windfall. Dubé Tr. at 327:25-330:24; 335:18-336:21.

This data from Dr. Dubé's own analysis warrants decertification.  Whether viewed through the lens of Article III standing or Rule 23's predominance requirement, a class cannot be maintained if it includes uninjured class members.  The Second Circuit has made clear that "no class may be certified that contains members lacking Article III standing," which means that the class "must … be defined in such a way that ***anyone within it*** would have standing."  *Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006) (emphasis added); *see also Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1053 (2016) ("Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not.") (Roberts, J., *concurring*).  Here, Plaintiffs' own evidence demonstrates that between 7.6% and 11.1% of class members lack standing because they have suffered no injury as a result of L'Oréal's conduct.

The presence of this many uninjured class members also requires decertification under Rule 23(b)(3)'s predominance requirement.  *See Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d

70, 82 (2d Cir. 2015) ("[P]laintiffs must … show that they can prove, through common evidence, that all class members were … injured.") (quoting *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C. Cir. 2013)); *id.* ("[W]e do expect the common evidence to show all class members suffered *some* injury.").  Under the "majority view" of federal courts of appeals, where there are more than a "de minimis" number of uninjured class members that cannot easily be "picked off in a manageable, individualized process at or before trial," the "need to identify those individuals will predominate" over any common questions, thus precluding certification.  *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53-54 (1st Cir. 2018) (certification improper because there were "thousands who in fact suffered no injury" but no "mechanism [to] manageably remove uninjured persons from the class.").  Courts have recognized that "5% to 6% constitutes the outer limits of a *de minimis* number" of "uninjured class members."  *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 624-25 (D.C. Cir. 2019).

In this case, the record shows that more than a *de minimis* number of class members—at minimum, between 7.6% and 11.1%— did not value the Challenged Terms at all, and therefore suffered no injury.  There is no "manageable" way of "picking off" these individuals, as identifying them would necessitate individualized inquiries of each class member.  For this reason, the classes should be decertified.

## CONCLUSION

For all these reasons, Dr. Dubé's testimony should be excluded and the classes should be decertified.

October 30, 2020                              Patterson Belknap Webb & Tyler LLP

                                  By:    */s/ Frederick B. Warder III*
                                         Frederick B. Warder III
                                         Joshua Kipnees
                                         Maren J. Messing

1133 Avenue of the Americas, New York,
NY 10036-6710

*Attorneys for Defendants*